1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In Re:
Microsoft Corporation

DEERE & COMPANY,

Plaintiff,

v.

XAPT CORPORATION,

Defendant.

No.  2:21-mc-00123-TL

**DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER**

(Subpoena issued in Case No. 4:19-cv-04210-SLD-JEH in the U.S. District Court for the Central District of Illinois)

NOTE ON MOTION CALENDAR:
FRIDAY, JANUARY 7, 2022

Pursuant to Fed. R. Civ. P. 45, Deere & Company, Inc. ("Deere") respectfully moves for an order quashing the subpoena served by XAPT Corporation ("XAPT") on non-party Microsoft Corporation ("Microsoft") (the "Subpoena," attached as **Ex. A**) or for entry of a protective order.

## I.      BACKGROUND

On or about November 30, 2021, XAPT provided notice of the Subpoena seeking documents from non-party Microsoft for use in the Illinois Action, Case No. 4:19-cv-04210-SLD-JEH, styled *Deere & Company v. XAPT Corporation, et al.* (**Ex. A**; Illinois Action Dkt.

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 1*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

1    ("Dkt") 182.)  This Subpoena[1] was issued from the United States District Court for the

2    Central District of Illinois and directed to Microsoft at its headquarters in Redmond, WA.

3    The "place" for compliance identified in the Subpoena is the office of the law firm Lewis

4    Brisbois Bisgaard & Smith LLP in Seattle, WA.  Both Redmond and Seattle, Washington are

5    located in the District of Washington and within this Court's jurisdiction.

6    Under Rule 45(d)(3), a motion to quash a subpoena is to be filed in "the court for the

7    district where compliance is required."  Fed. R. Civ. P. 45(d)(3).  As compliance is required in

8    this District, Deere properly moves to quash the subpoena in this Court.  Nevertheless, the

9    substance of this Motion concerns discovery affecting Deere pertinent to the Illinois Action,

10   in which the Illinois District Court has multiple discovery-related motions pending before it

11   and is familiar with the complex facts and issues relating to this litigation.  Deere therefore

12   respectfully requests in its contemporaneously filed Motion to Transfer, pursuant to Fed. R.

13   Civ. P. 45(f), that this Court transfer the Motion to the issuing court, the Central District of

14   Illinois, for resolution.

15   Boiled to its essence, the Illinois Action (filed in 2019 and pending) concerns a

16   software development project gone bad. (*See generally* Dkt. 60, **Ex. B**.)  Specifically, as

17   Deere has alleged in the 2019 Illinois Action, Deere determined in 2013 that it could better

18   serve its dealers by developing a single, fully integrated "Dealer Business System" ("DBS")

19   for purchase by all of its dealers in key markets. (*Id.* ¶ 23.)  Thus, Deere determined it needed

20   a platform on which the system would be built, and a developer to create and implement the

21   system, and provide ongoing support.  (*Id.* ¶ 27.)  Based on XAPT's representations that it

22   was a "'global leading provider of Microsoft Dynamics ERP business solutions' that

23

24   ---
         [1] This is XAPT's third subpoena attempt directed to Microsoft, to each of which Deere filed a Motion to
25   Quash. The first Microsoft subpoena was issued out of the Delaware Chancery Court and was stayed along with
     Deere's Motion to Quash the first Subpoena by the Delaware Chancery Court when it stayed XAPT's second filed
26   litigation in favor of the first filed Illinois litigation. (Dkt. 178.) The second Microsoft Subpoena was issued by
     XAPT out of the Illinois Federal Court and XAPT demanded compliance by Microsoft in Delaware. Deere again
27   filed a Motion to transfer or quash the second Microsoft subpoena, and on the date XAPT's response was due,
     XAPT withdrew its second Subpoena to Microsoft. (Dkt. 180-181.)

28   *DEERE & COMPANY'S MOTION TO QUASH SUBPOENA*      **HILLIS CLARK MARTIN & PETERSON P.S.**
     *DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*   999 Third Avenue, Suite 4600
     *FOR A PROTECTIVE ORDER - 2*                       Seattle, WA 98104
                                                        Tel: (206) 623-1745
                                                        Fax: (206) 623-7789

1   'provides a full complement of business consulting services, including implementation and

2   integration, for mid-size and enterprise organizations globally,'" Deere contracted with XAPT

3   to develop the DBS.  (*Id.* ¶ 15.)

4        After contract execution, gaps to produce the DBS multiplied exponentially and

5   XAPT failed to deliver project deliverables, produced code riddled with errors, and racked up

6   costs.  (*Id.* at 19-20.)  Deere invested in training XAPT to support XAPT but, post-training,

7   gaps increased, quality did not improve, and XAPT sought a $10 million increase in the

8   contract price to deliver the same product.  (*Id.* at 20-21.)  Thus, after years of development,

9   despite collecting more than $15 million in payments from Deere, XAPT breached the

10  parties' contracts by failing to deliver a workable product and non-defective code.  As a

11  result, Deere filed the 2019 Illinois Action.

12       Microsoft was the provider of the platform on which the DBS was built.  (*Id.* ¶ 29.)  In

13  its ERP Project Proposal dated March 17, 2016, XAPT represented to Deere that "XAPT

14  Corporation is a global leading provider of Microsoft Dynamics ERP business solutions.

15  XAPT specializes in the development of industry specific solutions built on the Microsoft

16  Dynamics AX ERP platform for the Heavy Equipment Distribution, Automotive and

17  Wholesale/Distribution industries and provides a full complement of business consulting

18  services, including implementation and integration, for mid-size and enterprise organizations

19  globally."  (*Id.* ¶ 38(c).)  In collateral litigation XAPT filed against Deere in Delaware

20  Chancery Court (now stayed), XAPT again touted its relationship with Microsoft, alleging

21  that "XAPT has a long-running partnership with Microsoft and stands as one of the few

22  Microsoft partners that are focused on heavy equipment dealers. . .. Due to this relationship

23  with Microsoft and its familiarity with Microsoft's technology, XAPT's position in the

24  industry is unmatched."  (**Ex. C**, ¶ 18.)[2]

25  ───────────────

26       [2] XAPT's collateral action in Delaware Chancery Court is stayed pending the Illinois Court's decisions on a
    host of motions, including Deere's motion seeking a two-tiered protective order.  On December 10, 2021 Judge

27  Sara Darrow denied all XAPT Defendants' respective Motions to Dismiss and/or to abstain from exercising
    Federal Jurisdiction.  Order attached as Ex. F.  On December 13, 2021 Magistrate Judge Hawley issued a text

28  *DEERE & COMPANY'S MOTION TO QUASH SUBPOENA*          **HILLIS CLARK MARTIN & PETERSON P.S.**
    *DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*      999 Third Avenue, Suite 4600
    *FOR A PROTECTIVE ORDER - 3*                           Seattle, WA 98104
                                                          Tel: (206) 623-1745
                                                          Fax: (206) 623-7789

XAPT's Third Subpoena to Microsoft contains 29 separate requests seeking broad categories of documents including, oddly, requests for documents concerning the intellectual property rights owned by Microsoft in the NAXT Core software, information which XAPT should have known since well before the litigation – particularly in light of XAPT's professed long-running partnership with Microsoft and familiarity with Microsoft's technology (*Id.* ¶ 18).

Moreover, the Third Subpoena seeks all documents and communications between Deere and Microsoft—unlimited in time and scope—on a broad range of subjects that extend far beyond the subject matter at issue in this lawsuit and sweeps within its reach trade secrets and other proprietary information of Deere.  For example, the Third Subpoena demands:

> Request 6:  All Documents and Communications reflecting any communications regarding intellectual property licenses by and between Deere and any person or entity other than a Microsoft related entity or XAPT.

(**Ex. A**, p. 8.)  Indeed, the Third Subpoena includes requests for any efforts of Deere to work with Microsoft to develop a dealer management system in lieu of the project XAPT could not deliver:

> Request 24:  All Documents and Communications between any Microsoft related entity and any consultant, developer or vendor, other than XAPT Corporation, regarding modifying, improving, further developing, or implementing Deere's global DBS or any plans or efforts to do so.

(*Id.* p. 11.)

Any documents or communications between Deere and Microsoft that might be relevant to the parties' dispute are already the subject of document requests served on Deere in the Illinois Action.[3]  Those requests are limited to the dates relevant to the lawsuit—and

order scheduling a hearing on several discovery-related motions pending before him, including Deere's motion seeking a two-tiered protective order.  (**Ex. E**.)  XAPT is seeking to continue that hearing to a later date.

[3] For example, in its Second Set of Requests for Production to Deere, XAPT requested Deere to produce "all Documents and Communications related to the Project, which Deere directed to Microsoft or Microsoft directed to Deere, from June 26, 2017 to January 24, 2020."  Deere has indicated that, subject to its General Objections and Statements and subject to the terms of an appropriate protective order and ESI Protocol, it will produce relevant non-privileged documents and communications responsive to XAPT's request. (**Ex. D**, Deere's 10-16-2020

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 4*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

Deere has committed to produce additional relevant, non-privileged documents when the Illinois Court enters a protective order and ESI Protocol, which motions are currently briefed and pending in Illinois.

The Third Subpoena thus appears to be an end run around the meet and confer process required by the Illinois rules of court and a burdensome fishing expedition to determine whether Deere may have worked with Microsoft to develop an alternative dealer system and, if so, to attempt to learn for competitive purposes Deere's and/or Deere/Microsoft's joint proprietary and trade secret information relating to any such new project.  The discovery XAPT seeks in that regard is not relevant to any currently pending issues raised in the Illinois Action.

Lastly, as XAPT should already possess the information it seeks from Microsoft and, even if there are some narrow categories of information XAPT does not possess, it has already requested that Deere produce such information in discovery requests served in the Illinois Action, the only conceivable reasons for XAPT to subpoena documents from Microsoft are to attempt to obtain Deere's confidential, proprietary information and an end-run around the anticipated decision of the court in the Illinois Action on Deere's pending motion for a two-tiered protective order—which XAPT vehemently opposes.[4]

Rather than wait for the Illinois Court's impending decision, XAPT again seeks to have a distant court – less familiar with the facts of the litigation – issue a ruling that presupposes or might undermine that of the Illinois Court.  As did the Delaware Chancery Court, this Court should allow the Illinois Court to decide this important issue, and should not countenance XAPT's gamesmanship or attempt to use procedural roadblocks to access such information after objections have been raised to those requests.

---

Response to XAPT's Second Set of Requests for Production, No. 12.)  Moreover, Deere already has produced to XAPT more than 8,048 pages of screenshots of the data residing in the Microsoft environments pertinent to the Deere/XAPT software development project at issue in the Illinois Action.

[4] Specifically, Deere seeks an attorneys' eyes only designation, while XAPT insists that it be able to view Deere's and its potential other vendors' and partners' trade secrets, confidential, and proprietary information.

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 5*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

For the reasons set forth herein and in Deere's separate motion to transfer, this Court should transfer this Motion to the Illinois Court, which is in a superior position to resolve this dispute.  If the Court declines to transfer this motion, the Court should quash the Third Subpoena or grant a protective order to prevent XAPT from trying to evade the jurisdiction of the Illinois Court by seeking non-party Microsoft's confidential documents through the Third Subpoena before the Illinois Court has ruled on an appropriate protective order and ESI Protocol to govern that case.

## II.    ARGUMENT

### A.    THE COURT SHOULD GRANT DEERE'S MOTION TO QUASH THE SUBPOENA.

#### 1.    Deere has standing to move to quash the subpoena.

As a threshold matter, Deere has standing to move to quash XAPT's improper Subpoena to non-party Microsoft.  Fed. R. Civ. P. 26(c)(1); Fed. R. Civ. P. 45(d)(3); *Johnson v. U.S. Bancorp*, No. C11-02010 RAJ, 2012 WL 6726523, at *2 (W.D. Wash. Dec. 27, 2012) ("A party has standing to challenge a subpoena issued to third parties where its own interests may be implicated."); *Abu v. Piramco Sea-Tac Inc.*, No. C08-1167RSL, 2009 WL 279036, at *1 (W.D. Wash. Feb. 5, 2009).

While a party ordinarily "lacks standing under Federal Civil Rule 45(c)(3) to challenge a subpoena issued to a non-party," the party may have standing if "the party claims a personal right or privilege with respect to the documents requested in the subpoena." *Eric v. Van Cleave*, No. C16-1278RSM, 2017 WL 553276, at *6 (W.D. Wash. Feb. 10, 2017); *see also Abu*, 2009 WL 279036, at *1 ("As a threshold matter, a plaintiff has standing to seek to quash a subpoena issued to a third party where the plaintiff asserts a legitimate privacy interest in the material sought.").  "Examples of such legitimate interests have included the assertion of privilege, interference with business relationships, and the production of private information." *Prince v. Kato*, No. 18-CV-2952, 2019 WL 10947351, at *2 (N.D. Ill. Sept. 19, 2019).  Indeed, "[e]ven a minimal privacy interest is sufficient to confer standing on the party

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 6*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

1   seeking to quash a subpoena." *PrimeSource Buildings Prod., Inc. v. Felten*, No. 16 CV

2   11468, 2018 WL 10425599, at *2 (N.D. Ill. Apr. 27, 2018); *see also Abu*, 2009 WL 279036,

3   at *1 (finding party had standing to move to quash non-party subpoena "shown that she has a

4   legitimate privacy interest in the contents of her employment-related files"); *Johnson*, 2012

5   WL 6726523, at *2 (finding defendant bank had standing to bring motion to quash subpoena

6   directed to non-party officer of bank).

7          Deere has standing to move to quash the Subpoena for several independent reasons.

8   First, XAPT's Third Subpoena, seeking documents not relevant to any claim or defense in the

9   Illinois Action, undoubtedly is an effort to harass and burden Microsoft and interfere with

10  Deere's existing business relationship with its vendor.  Despite that (1) XAPT already should

11  possess much of the information it requests from Microsoft, and (2) XAPT already served

12  discovery on Deere encompassing any potentially relevant documents between Deere and

13  Microsoft, XAPT has served three separate subpoenas seeking the same information from

14  Microsoft.  It thus appears that one of XAPT's motives behind the Third Subpoena is simply

15  to interfere with Deere's existing business relationship with Microsoft and, as discussed

16  below, to presuppose or circumvent the Illinois Court's decision with respect to Deere's

17  pending motion for a two-tiered protective order.  Deere thus has standing to move to quash

18  the Third Subpoena on this basis alone.  *See Cabell v. Zorro Prods., Inc.*, 294 F.R.D. 604, 608

19  (W.D. Wash. 2013) ("The Court finds that because the subpoenas seek confidential

20  information implicating ZPI's privacy interests and bear on ZPI's business relationships with

21  its licensees, ZPI has standing to bring this motion.").[5]

22         Second, XAPT's Third Subpoena seeks access to broad categories of documents,

23  including documents concerning any efforts of Deere to develop a dealer management system

24

25          [5] *Cabell* concerned a motion for a protective order, but the court analyzed standing as if it were a motion to

26  quash. 294 F.R.D. at 608 ("Although typically only the recipient of a subpoena has standing to assert objections,
     '[a] party has standing to challenge a subpoena issued to third parties where its own interests may be implicated.'"

27  (quoting *Johnson*, 2012 WL 6726523, at *2)).

28  *DEERE & COMPANY'S MOTION TO QUASH SUBPOENA        HILLIS CLARK MARTIN & PETERSON P.S.*
     *DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*      999 Third Avenue, Suite 4600
     *FOR A PROTECTIVE ORDER - 7*                            Seattle, WA 98104
                                                             Tel: (206) 623-1745
                                                             Fax: (206) 623-7789

1   in lieu of the failed project XAPT could not deliver.  Such materials are not "relevant" to any

2   "claim or defense" in the Illinois Action under Rule 26(b)(1), and they include *Deere's*

3   privileged trade secrets and other confidential, proprietary information.  *See Stein v. I 5*

4   *Exteriors Inc.*, No. 3:21-CV-5093-DWC, 2021 WL 4902518, at *1 (W.D. Wash. Sept. 15,

5   2021) ("The Court may also quash or modify a subpoena if it requires 'disclosing a trade

6   secret or other confidential research, development, or commercial information[.]'") (quoting

7   Fed. R. Civ. P. 45(d)(3)(B)).  Deere has a legitimate interest in the potential production by a

8   third party of *Deere's own* private, confidential, trade secret information. Deere thus has

9   standing to move to quash XAPT's Subpoena.

10   **2.   This Court should quash the subpoena directed to Microsoft.**

11   "The Court has broad discretion to manage discovery and to control the course of

12   litigation under [Rule] 16." *Bodyguard Prods., Inc. v. Doe 1*, No. C17-1648 RSM, 2018 WL

13   2387841, at *1 (W.D. Wash. May 25, 2018). While the scope of discovery is generally broad

14   and far reaching, "[j]udicial supervision of discovery should always seek to minimize its costs

15   and inconvenience and to prevent improper uses of discovery requests." *Societe Nationale*

16   *Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546, 107 (1987).

17   Consistent with Rule 26, as well as with federal law in Illinois where the underlying

18   action is pending, "[d]iscovery sought must not only be relevant, but it must be 'proportional'

19   to the needs of the case, 'considering the importance of the issues at stake in the action, the

20   amount in controversy, the parties' relative access to relevant information, the parties'

21   resources, the importance of the discovery in resolving the issues, and whether the burden or

22   expense of the proposed discovery outweighs its likely benefit.'" *Saleh v. Pfister*, No. 18 C

23   1812, 2021 WL 326361, at *2 (N.D. Ill. Feb. 1, 2021) (quoting Fed. R. Civ. P. 26(b)(1)); *see*

24   *also Rollins v. Traylor Bros.*, No. C14-1414-JCC, 2017 WL 1756576, at *2 (W.D. Wash.

25   May 5, 2017) (quashing subpoena and noting that "[c]ourts may limit the use of discovery to

26   prevent . . . so-called 'fishing expeditions'").  Moreover, a Court must limit discovery when

27

28   *DEERE & COMPANY'S MOTION TO QUASH SUBPOENA*
   *DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*
   *FOR A PROTECTIVE ORDER - 8*

1    "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from

2    some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ.

3    P. 26(b)(2)(C).

4      The impropriety of the duplicative discovery sought by XAPT here is compounded by

5    the fact that Microsoft is not a party to the Illinois Action.  "[D]iscovery from nonparties is,

6    like all discovery, subject to the cost-benefit limitations set forth in Rule 26(b)(2)."  *Conrad v.*

7    *Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2020 WL 5293805, at *3 (S.D. Ill.

8    Sept. 4, 2020) (citing Fed R. Civ. P. 45 Advisory Committee's note)); *Mannington Mills*, 206

9    F.R.D. at 529.  "A party or attorney responsible for issuing and serving a subpoena must take

10   reasonable steps to avoid imposing undue burden or expense on a person subject to the

11   subpoena.  The court for the district where compliance is required must enforce this duty . . .."

12   Fed. R. Civ. P. 45(d)(1).

13     Accordingly, "a witness's nonparty status is an important factor to be considered in

14   determining whether to allocate discovery cost on the demanding or the producing party."

15   *E.W., ex rel. Schauerman v. Moody*, No. C06-5253-BHS, 2007 WL 2409850, at *2 (W.D.

16   Wash. Aug. 20, 2007) (quoting *U.S. v. Columbia Broadcasting Sys., Inc.*, 666 F.2d 364, 371–

17   72 (9th Cir. 1981)). "Non-parties are afforded this special consideration, because they have a

18   different set of expectations than parties." *Rossman v. EN Eng'g, LLC*, 467 F.Supp.3d 586,

19   590 (N.D. Ill. 2020).

20     Courts have held that, "[w]here a party establishes that information is equally

21   available from a party and a non-party, the non-party should not be inconvenienced." *Malden*

22   *Transportation, Inc. v. Uber Techs., Inc.*, No. C18-1592RSM, 2018 WL 5808422, at *2

23   (W.D. Wash. Nov. 6, 2018); *Arista Recs. LLC v. Lime Grp. LLC*, No. 2:10-CV-02074-MJP,

24   2011 WL 679490, at *2 (W.D. Wash. Feb. 9, 2011) ("There is simply no reason to burden

25   nonparties when the documents sought are in possession of the party defendant."); *Ameritox,*

26   *Ltd. v. Millennium Laboratories, Inc.*, No. 12-CV-7493, 2012 WL 6568226, at *2-3 (N.D. Ill.

27

28   *DEERE & COMPANY'S MOTION TO QUASH SUBPOENA*
     *DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*
     *FOR A PROTECTIVE ORDER - 9*

Dec. 14, 2012) (granting a motion to quash non-party subpoenas "because the requests [we]re cumulative and duplicative of discovery requests made to [a] party to the litigation").

For example, in *Rossman*, an action brought under the Fair Labor Standards Act concerning the plaintiff's entitlement to overtime pay, the plaintiff, who worked for the defendant as an oil and gas project consultant/inspector, issued a subpoena to a non-party, Ameren, which was one of the companies the defendant provided with project consultant/inspectors.  467 F.Supp. 3d at 590.  In reviewing the propriety of the subpoena, the *Rossman* court noted that the subpoena was "rather broad," demanding production of nearly a dozen categories of documents, many of which the court noted should be—and were— directed to the defendant in earlier-served discovery requests.  *Id.* at 591.  Rather than pursuing discovery responses from the defendant, the plaintiff chose instead to move to compel Ameren's compliance with the subpoena.  *Id.*  On that backdrop, the *Rossman* court noted that "[w]hile the public is entitled to every man's evidence, use of subpoenas to obtain that evidence is not unlimited, especially when the target is a nonparty."  *Id.*  Recognizing Rule 45's instruction that courts "must protect" non-parties "from significant expense resulting from compliance" with a subpoena, and in light of the fact that about half of the categories of documents demanded by the subpoena were duplicative of the discovery requests served on the defendant, the court denied the plaintiff's motion to compel Ameren's compliance with the subpoena, stating:

> The upshot of all this is that plaintiff ought to have pursued discovery from the company he sued before targeting a non-party.  The legitimacy of the subpoena to a non-party is determined by far more than an examination of the relevancy of the materials sought or the fact that it may be simpler for the subpoenaing party to insist on production from a non-party.

*Id.* at 591-92.  *Rossman* is instructive, as the issue presented therein is remarkably similar to that presented here.  XAPT's pursuit of the Third Subpoena to Microsoft is an effort to manipulate Rule 45 to gain unauthorized access to Deere's proprietary information while evading resolution of Deere's objections in the Illinois Action to the same information.  *See*

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 10*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

Fed. R. Civ. P. 45(d)(3)(A)(iii) (stating that a court must quash or modify a subpoena if it "requires disclosure of privileged or other protected matter, if no exception or waiver applies"); *see also* Fed. R. Civ. P. 45(c)(3)(B) (providing additional permissive bases to quash or modify a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information").  XAPT has no need for such information from Microsoft because it has sought discovery concerning Deere and Microsoft's documents relating to the project in the Illinois Action.  Deere already has committed to producing responsive, non-privileged documents relevant to a pled claim or defense once the Illinois Court rules on pending motions regarding a protective order and ESI protocol.  This approach is consistent with Rule 26, will afford Deere the opportunity to assert appropriate privileges, and will avoid an unnecessary and burdensome fishing expedition on Microsoft.  To the extent Deere objected to such discovery in the Illinois Action, XAPT cannot skirt that court's resolution of the objection through a subpoena to a non-party.

Accordingly, if the Court decides not to transfer this Motion to the Illinois Court, Deere respectfully requests that this Court quash the Subpoena directed to Microsoft.

### B.   ALTERNATIVELY, THE COURT HAS DISCRETION TO ENTER A PROTECTIVE ORDER.

Regardless of whether a party has standing to bring "a motion to quash, a party clearly has standing to seek a protective order to limit discovery from a third party." *Robertson v. Cath. Cmty. Servs. of W. Washington*, No. C19-1618 RSM, 2020 WL 1819842, at *5 (W.D. Wash. Apr. 10, 2020); *Nichols v. GEICO Gen. Ins. Co.*, No. C18-1253-RAJ, 2020 WL 2084921, at *1 (W.D. Wash. Apr. 30, 2020) ("An opposing party has standing to seek a protective order to limit the third-party discovery."); *Eric v. Van Cleave*, No. C16-1278RSM, 2017 WL 553276, at *6 (W.D. Wash. Feb. 10, 2017 ("A party may move for a protective order in regard to a subpoena issued to a non-party if he or she believes his or her own interest is jeopardized by the discovery sought by a third party, and has standing under Rule 26(c) to

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 11*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

seek a protective order regarding subpoenas issued to non-parties which seek irrelevant information."). Such is the case here.

Rule 26(b) limits discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "If a party believes that the discovery sought by an opposing party is . . . not relevant to a claim or defense, . . . the Court may grant[] a protective order upon good cause shown, either limiting the scope of, or forbidding, disclosure or discovery." *Fonovisa, Inc. v. Does 1-9*, No. 07-1515, 2008 WL 919701, at *7 n.12 (W.D. Pa. Apr. 3, 2008).

As set forth above, XAPT's sweeping requests for all documents and communications between Deere and Microsoft concerning the project, and any other efforts by Deere and Microsoft to develop a dealer management system unrelated to XAPT's failed project, or to consult with Deere or suggest other vendors to work on an alternative project, casts far too wide and burdensome a net, grossly disproportionate to legitimate need, if any exists. XAPT's foray into Deere's competitively sensitive, proprietary and trade secret information, and information and documents unrelated to the issues raised in the litigation, is unwarranted.

Thus, this Court alternatively should grant a protective order to prevent XAPT's fishing expedition into matters well beyond the operative Complaint in the Illinois Action.

### III.   CONCLUSION

For these reasons, Deere respectfully requests that the Court quash XAPT's Third Subpoena directed to non-party Microsoft, or, in the alternative, grant a protective order, and for such other and further relief as this Court deems just and proper.

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 12*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated this 14th day of December 2021.

HILLIS CLARK MARTIN & PETERSON P.S.                    GREENSFELDER, HEMKER & GALE, P.C.

By *s/ Alexander M. Wu*                                             By *s/ Mary Ann L. Wymore*
    Alexander M. Wu, WSBA #40649                       Mary Ann L. Wymore (*pro hac vice*
    999 Third Avenue, Suite 4600                              *admission forthcoming)*
    Seattle, WA 98104                                             10 S. Broadway | Suite 2000
    (206) 623-1745                                                 St. Louis, MO 63102
    alex.wu@hcmp.com                                           (314) 516-2662
                                                   mlw@greensfelder.com

*Counsel for Plaintiff*

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA*
*DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR*
*FOR A PROTECTIVE ORDER - 13*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

CERTIFICATE OF SERVICE

I certify that on this 14th day of December, 2021, I caused to be served a true and correct copy of the foregoing *Deere & Company's Motion to Quash Subpoena Directed to Non-Party Microsoft Corporation or for a Protective Order* by method indicated below and addressed to the following:

| | |
|---|---|
| William S. Helfand | *Delivery Via:* |
| Bill_Helfand@lewisbrisbois.com | [ X ] U.S. Mail |
| LEWIS BRISBOIS BISGAARD & SMITH LLP | [ X ] Overnight Mail |
| 24 Greenway Plaza, Suite 1400 | [   ] Facsimile |
| Houston, Texas 77046 | [   ] Hand Delivery |
| | [   ] E-Service |
| Josh M. Kantrow | [ X ] E-Mail |
| Josh.Kantrow@leisbrisbois.com | |
| LEWIS BRISBOIS BISGAARD & SMITH LLP | |
| 550 West Adams Street, Suite 300 | |
| Chicago, Illinois 60661 | |
| **Attorneys for Defendant XAPT Corporation** | |
| | |
| Joseph R. Marconi | *Delivery Via:* |
| Victor J. Pioli | [ X ] U.S. Mail |
| Samuel D. Branum | [ X ] Overnight Mail |
| Johnson & Bell, Ltd. | [   ] Facsimile |
| 33 West Monroe Street | [   ] Hand Delivery |
| Suite 2700 | [   ] E-Service |
| Chicago, Illinois 60603 | [ X ] E-Mail |
| marconij@jbltd.com | |
| pioliv@jbltd.com | |
| branums@jbltd.com | |
| **Attorneys for XAPT Solutions PTY, Ltd.,** | |
| **XAPT KFT, and Cosmo Consult** | |
| **Business Solution S.R.L.** | |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and accurate.

DATED this 14th day of December, 2021, at Mountlake Terrace, Washington.

_____
Carol A. Cannon, Legal Assistant

ND: 23677.002 4894-9689-1142v1

*DEERE & COMPANY'S MOTION TO QUASH SUBPOENA DIRECTED TO NON-PARTY MICROSOFT CORPORATION OR FOR A PROTECTIVE ORDER - 14*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | )  |
|---|---|
| _____ | ) |
| Plaintiff | ) |
| v. | )  Civil Action No. |
| | ) |
| _____ | ) |
| Defendant | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: | Date and Time: |
|---|---|
| | |
| | |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFENDANT XAPT CORPORATION'S SUBPOENA DUCES TECUM TO MICROSOFT CORPORATION

Produce the documents identified below, subject to the following instructions and definitions.

## DEFINITIONS

1.      This "Action" means Deere & Company v. XAPT Corporation, 4:19-cv-04210-SLD-JEH, in the United States District Court for the Central District of Illinois, Rock Island Division.

2.      "Agreements" (or "Contracts") refer to: (a) the Master Services Agreement dated June 26, 2017, as amended on June 27, 2018 and June 26, 2019 (the "MSA"); (b) the Work Order Template – Global Template dated June 26, 2017 (the "Global Template Statement of Work" or "Global Template SOW"), as amended on February 11, 2019 ("Amendment 1"); (c) the Work Order – Governance, dated June 26, 2017 (the "Governance Statement of Work" or "Governance SOW"); and (d) the XAPT Subscription Delivery Agreement ("SDA").

3.      "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

4.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all responses that might otherwise be construed to be outside the scope of that request.

5.      "Communication" or "Communications" refers to any exchange of information, words, numbers, pictures, charts, studies, or graphs by any means of transmission, sending or receipt of information of any kind by or through any means including personal delivery, speech,

writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or Electronically-Stored Information (as defined herein), sound, radio or video signals, telecommunication, telephone, facsimile, mail, film, photographic film of all types, or other media of any kind. The term "Communication" also includes all inquiries, discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity, or trade releases.

6.      "Complaint" refers to Plaintiff's Second Amended and First Supplemental Complaint (Docket No. 60) filed in this Action and attached as Exhibit 1 of this Subpoena Duces Tecum.

7.      "Document" is intended to have the broadest possible meaning under Federal Rules of Civil Procedure and Federal Rules of Evidence, and includes electronic or computerized data compilations; electronic file backup tapes; hard drives and images of hard drives; all drafts; Communications; Memoranda; records; presentations; books; reports; transcripts or summaries of conversations or interviews; diaries; graphs; charts; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; transcripts or summaries of meetings or conferences; records and reports of consultants; press releases; stenographic, handwritten or any other notes; workpapers; and any paper or writing of whatever description, including any electronic database or server or information contained on any Electronic Media (as defined herein) although not yet printed out. A draft or non-identical copy of any document is a separate document within the meaning of this term.

8.      "Electronically Stored Information" or "ESI" includes the following:

1.      information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (e.g., author, recipient, file creation date, file modification date, etc.);

2.      files, information, or data saved on backup tapes or hard drives;

3.      internal or external web sites;

4.      output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messenger (or similar programs), bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

5.      all items stored on Electronic Media (as defined herein).

9.      "Electronic Media" means any magnetic or other storage media device used to record ESI. Electronic Media devices may include computer memories, hard disks, floppy disks, hard drives, memory sticks, CDs, CD-ROMs, DVDs, magnetic tapes of all types, microfiche, or any other vehicle for digital data storage and/or transmittal, including, but not limited to, any containers or labels appended to, or relating to, any physical storage device associated with each original or copy of such device.

10.     "Employee" means any person who at any time acted or purported to act on behalf of an entity, You, or another person or persons including all present and former officers, directors, executives, partners, principals, managers, staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors, advisors, and consultants of such entity, person, or persons.

11.     "NAXT" is a software/product as explained in detail in the Complaint (again attached as Exhibit 1).

12.     "Person" or "Persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations, and all other entities.

13.     The "Project" refers to the subject matter of the parties' Agreements, including development of a global Dealer Management System (also referred to herein as "Dealer Business System" or "DBS") template for Deere.

14.     "Relate," "related to," "relating to," or "regarding" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with, reflecting upon, constituting, evidencing, or having any logical or factual connection with the stated subject matter.

15.     Unless otherwise indicated, "Relevant Time Period" is from December 1, 2015 continuing through the present day. The Relevant Time Period includes all documents and information that relate to such period, even though responsive documents may have been prepared or published outside of the Relevant Time Period.

16.     "XAPT" means XAPT Corporation and all other persons acting or purporting to act on its behalf, including its subsidiaries, affiliates, Employees, in-house and outside attorneys, accountants, representatives, agents, consultants, investigators, or other persons purporting to act on its behalf.

17.     "You" or "Your" means Microsoft Corporation and all other affiliated entities and persons acting or purporting to act on its behalf, including its subsidiaries, affiliates, related companies, parent companies, employees, contractors, in-house and outside attorneys, accountants, representatives, agents, consultants, investigators, or other persons purporting to act on its behalf.

## **INSTRUCTIONS**

1.     Unless otherwise stated, the Relevant Time Period shall govern each request, as well as other discovery served in this Action, including any depositions under the Federal Rules of Civil Procedure.

2.      In responding to these requests, You shall produce all responsive Documents which are in Your possession, custody, or control, or in the possession, custody, or control of Your agents, Employees, attorneys, investigators, or other representatives. A Document shall be deemed to be within Your control if You have the right or practical ability to secure the Document or a copy of the Document from another person or entity having possession or custody of the Document.

3.      You are to produce for inspection and copying by Defendant original Documents as they are kept in the usual course of business in their original folders, binders, covers, and containers or facsimile thereof. You shall produce the Documents as they are kept in the usual course of business or organize and label the Documents to correspond with the categories in these Requests.  If the original is not in Your custody, then You are to produce a copy thereof, and all non-identical copies which differ from the original or from the other copies produced for any reason including making of notes thereon.

4.      These Requests are specifically intended to encompass any data or information maintained in any form of computer memory or on computer hard drives or diskettes, including any word processing or spreadsheet programs or electronic mail systems, or in any form of electronic or computer-related storage, whether or not You currently have "hard copy" printouts of the same.

5.      All Documents responsive to these Requests shall be produced with all metadata contained within such Documents in the usual course of business.

6.      If You claim any form of privilege or any other objection, whether based on statute, common law or otherwise as a ground for not producing any requested Document, please furnish a list identifying each Document for which the privilege or other objection is claimed together with the following information:

A.      brief description sufficient to identify its nature, i.e., agreement, letter, memorandum, tape, etc.;

B.      the subject matter and purpose of the document;

C.      its date;

D.      the author;

E.      the recipient(s);

F.      the privilege being asserted;

G.      all persons to whom its contents have been disclosed;

H.      a precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such a file; and

I.      a statement as to whom each identified lawyer represented or purported to represent at all relevant times.

7.      If a portion of any Document responsive to these Requests is withheld under claim of privilege, any non-privileged portion of such Document must be produced with the portion You claim to be privileged redacted. Whenever a Document is not produced in full or is produced in redacted form, so indicate on the Document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of Your knowledge, information, and belief, and with as much particularity as possible, those portions of the Document which are not being produced, as set forth above in paragraph 6, above.

8.      You are to produce each Document requested herein in its entirety, with attachments and enclosures without deletion or excision regardless of whether You consider the entire Document to be relevant or responsive to the Requests. Each Document that You cannot legibly copy should be produced in its original form. Documents not otherwise responsive to any of the Requests herein must be produced if such Documents are attached to a Document called for by these Requests. Whenever a Document or group of Documents is removed from a file folder,

binder, file drawer, file box, notebook, or other cover or container, the Document or group of Documents must be produced with information identifying the cover or container.

9.     If a Document responsive to these Requests was at any time in Your possession, custody, or control, but is no longer available for production, as to each such Document, state the following information:

A.     whether the Document is missing or lost;

B.     whether it has been destroyed;

C.     whether the Document has been transferred or delivered to another person and, if so, at whose request;

D.     whether the Document has been otherwise disposed of; and

E.     a precise statement of the circumstances surrounding the disposition of the Document and the date of its disposition.

10.    The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

11.    If in responding to these Requests, You claim any ambiguity in interpreting a Request or a Definition or Instruction applicable thereto, such claim shall not be utilized by You as a basis for refusing to produce responsive Documents, but there shall be set forth as part of Your response the language deemed to be ambiguous, and the interpretation chosen or used in responding to the Request.

12.    With respect to any category of Documents whose production You contend is in some way "burdensome" or "oppressive," please state the specific reason for that objection.

These Requests are continuing requests, and You are required to supplement Your answers with any new or newly discovered materials responsive to these Requests in accordance with the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS FOR MICROSOFT CORPORATION

1.      All Documents and Communications reflecting Deere's communications with any Microsoft related entity referring or relating to the Project, whether directly with Microsoft or any Microsoft related entity.

2.      All Documents and Communications reflecting Deere's communications with any Microsoft related entity referring or relating to the Deere's efforts to evaluate the status of the Project during the relevant time period.

3.      All Documents and Communications reflecting Deere's communications with any Microsoft related entity referring or relating to the Deere's efforts to complete the Project.

4.      All Documents and Communications reflecting any communications regarding intellectual property licenses by and between Deere and any Microsoft related entity.

5.      All Documents and Communications reflecting any communications regarding intellectual property licenses by and between Deere and XAPT.

6.      All Documents and Communications reflecting any communications regarding intellectual property licenses by and between Deere and any person or entity other than a Microsoft related entity or XAPT.

7.      All Documents and Communications reflecting all communications between any Microsoft related entity and Deere about XAPT Corporation or any XAPT affiliated entity, employee or contractor at any time.

8.      Documents identifying any and all intellectual property rights owned by any Microsoft related entity in the NAXT software.

9.      Documents sufficient to identify and distinguish between the intellectual property rights in the NAXT software owned by XAPT, intellectual property rights in the NAXT software owned by any Microsoft related entity, and intellectual property rights in the NAXT software owned by any other party.

10.      All Documents and Communications related to any Deere inquiries to any Microsoft related entity regarding any Microsoft related entity's willingness to serve as a vendor/developer for the Project.

11.      All Documents and Communications related to any Deere inquiries to any Microsoft related entity regarding any Microsoft related entity's willingness to identify, suggest, or recommend any vendor or developer for the Project, other thanXAPT Corporation.

12.      All Documents and Communications related to any request by Deere or any other person or entity requesting that any Microsoft related entity evaluate XAPT's development or coding work on the Project at any time.

13.      All Documents and Communications reflecting or relating to Deere's communications with any Microsoft related entity regarding the possibility of developing a Dealer Business System with capabilities like or similar to the NAXTsoftware by any Microsoft related entity or any other person or entity, other than XAPT Corporation.

14.      All Documents and Communications reflecting or relating to Deere's communications with any Microsoft related entity regarding payment of royalties or licensing costs for the Project.

15.     All Documents and Communications reflecting or relating to any Microsoft related entity's communications with any parties, other than Deere and XAPT Corporation, regarding any aspect of the Project.

16.     All Documents and Communications related to the Project, which (a) Deere directed to any Microsoft related entity, or (b) any Microsoft related entity directed to Deere at any time.

17.     All Documents and Communications reflecting or relating to any Microsoft related entity's communications with any Hitachi related entity, including but not limited to Hitachi Solutions America, Ltd., about the Project.

18.     All Documents and Communications relating to or reflecting all written contracts or agreements between any Microsoft related entity and any developer or vendor Deere may have identified, contracted, or hired to modify, improve, further develop, or otherwise provided any consulting or performed work on the Project.

19.     All Documents and Communications reflecting Deere's communications with any Microsoft  related entity referring or relating to any aspect of NAXT software, including NAXT software qualities or capabilities.

20.     All Documents and Communications with any Microsoft related entity related to actions Deere has considered or taken to modify the Combined Solution.

21.     All Documents and Communications related to any inquiry from or communication with Deere and any Microsoft related entity regarding XAPT's intellectual property rights in the NAXT software.

22.     All Documents and Communications reflecting or relating to any Microsoft related entity's communications with any person or entity on Deere's behalf regarding Deere's modification, implementation of, or use of the Project.

23.     All Documents and Communications reflecting or relating to any Microsoft related entity's communications with Deere or any person or entity on Deere's  behalf regarding  Deere's modification, implementation, development, or use of the NAXT software.

24.     All Documents and Communications between any Microsoft related entity and any consultant, developer or vendor, other than XAPT Corporation, regarding modifying, improving, further developing, or implementing Deere's global DBS or any plans or efforts to do so.

25.     All Documents and Communications relating to Deere's communications with You during the relevant time period regarding any other actual, proposed, or contemplated project, undertaking, or service other than for the Project as defined herein.

26.     All Documents and Communications relating to Deere's communications with You regarding payment of royalties or licensing costs for the Project.

27.     All Documents and Communications relating to any internal communications among You about the Project.

28.     All Documents and Communications relating to Deere's communications with You regarding any aspect or NAXT software, including NAXT software qualities or capabilities.

29.     All Documents and Communications relating to all written contracts or agreements between You and any developer or vendor Deere may have identified, contracted, or hired to modify, improve, further develop, or otherwise provided any consulting or work on any application that would interface with the DBS, Project, and/or NAXT.

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:19-cv-04210-SLD-JEH |
| | ) | |
| v. | ) | |
| | ) | |
| XAPT CORPORATION; XAPT | ) | |
| SOLUTIONS PTY LTD; | ) | |
| XAPT KFT; COSMO CONSULT | ) | |
| BUSINESS SOLUTIONS S.R.L, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED AND FIRST SUPPLEMENTAL COMPLAINT

Plaintiff Deere & Company ("Deere"), by and through its undersigned attorneys, for its Second Amended and First Supplemental Complaint against Defendant XAPT Corporation ("XAPT"), XAPT Kft ("XAPT Kft"), XAPT Solutions Pty Ltd ("XAPT Solutions"), and Cosmo Consult Business Solutions S.R.L. ("Cosmo Consult") (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.      Deere brings this action for breach of contract, fraudulent inducement arising out of XAPT's bait and switch tactics, reformation of Amendment 1 to the contract, breach of post termination contractual obligations, declaratory judgment, injunctive relief, specific performance, conversion, replevin and alter ego.

2.      To win a lucrative, decades-long development and licensing project with Deere, XAPT grossly misrepresented its system's capabilities and the cost to complete the project.  Only after the project began and Deere paid XAPT millions of dollars did it become clear that XAPT is

1

either incapable of or has chosen not to perform at the requisite level, leaving Deere with nothing to show for it.

3.     In 2013, Deere decided to develop a state of the art global, integrated software system that its dealers in seven geographical locations around the globe could use to manage all aspects of their businesses, from sales and inventory, to tax and regulatory, to service and parts.

4.     Seeking to win the bid, XAPT promoted its depth of industry knowledge and experience, the robust and flexible nature of its software, its ability to easily modify its out-of-the-box template "to suit John Deere," and its expertise in global implementation and scaling up. XAPT represented its software solution, "NAXT," as a kind of software utopia: highly configurable and perfectly tailored to the heavy equipment market.  XAPT told Deere that it could meet Deere's requirements with minimal development in eighteen months.

5.     These promises, and others, induced Deere to choose XAPT for a multi-phase, lucrative, decade-long contract.

6.     Despite XAPT's representations that it is an expert and global leader in software solutions, XAPT continually failed to deliver as required by the contract, and the current code contains exceptionally high numbers of defects.  XAPT's poor performance has caused the project to take years longer, and millions of dollars more, than Deere had committed.

7.     In addition, XAPT's underhanded negotiation tactics resulted in a contractual amendment that the parties did not intend.

8.     The software XAPT promised and for which Deere contracted was never completed and is not available to a single Deere dealer.

9.     Following XAPT's mounting breaches, Deere terminated its contracts with XAPT and asked XAPT to comply with its post termination obligations—which it has yet to do.

10. Deere also asked XAPT to comply with its contractual obligations and return Deere's confidential information, which to date, XAPT has also failed to do.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12. Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred in the Central District of Illinois and the damages arise here.

13. Pursuant to Local Rule 40.1(F), the basis for filing in the Rock Island Division is that the plaintiff resides in Rock Island County, Illinois, and a substantial portion of the events or omissions giving rise to the claims occurred in Rock Island County, Illinois.

## THE PARTIES

14. Plaintiff Deere & Company is a Delaware Corporation with its principal place of business in Moline, Illinois. Deere is engaged, among other things, in the business of delivering products and services to support those linked to the land, in line with its core values of integrity, quality, commitment, and innovation.

15. Defendant XAPT Corporation (XAPT) is a Florida Corporation with its principal place of business in Miami, Florida. XAPT is a division of the New Frontier Group, a "fast-growing regional IT solutions player" headquartered in Vienna, Austria. XAPT styles itself a "global leading provider of Microsoft Dynamics ERP business solutions" that "provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

16.     Defendant XAPT Kft ("XAPT Kft") is a foreign company with its principal place of business in Budapest, Hungary, and none of its owners are citizens of Illinois.

17.     Defendant XAPT Solutions Pty Ltd (XAPT Solutions) is a foreign company with its principal place of business in Brisbane, Australia, and none of its owners are citizens of Illinois.

18.     Defendant Cosmo Consult Business Solutions S.R.L. (Cosmo Consult) is a foreign company with its principal place of business in Bucharest, Romania, and none of its owners are citizens of Illinois.

## FACTUAL BACKGROUND

### A. Deere Develops Strategy to Offer Dealers Single, Integrated, Global Dealer Business System

19.     Deere dealers run businesses involved in selling, renting, and servicing agriculture, turf, construction, and/or forestry equipment.  Deere dealers operate on six continents.

20.     Behind the scenes of a Deere dealer's business sit dozens of other functions, including marketing, accounting, tax, administrative, regulatory, human resources, information technology, inventory, data management, contract management, and subscription management, among many others.  Many of these functions are enabled by separate web applications.

21.     To bring multiple applications together such that information can flow among them (for example, linking inventory to parts purchases, or sales information to financial statements), dealers purchase a computer software system known as a "Dealer Business System," or "DBS."

22.     Deere has developed and offered its own DBS, which has been available in the United States, Canada, Mexico and Brazil.

23.     After extensive analysis and discussions with stakeholders and consultants, Deere determined in 2013 that it could better serve its dealers by developing a single, fully integrated DBS for purchase by all of its dealers in key markets.

24.     Deere's vision, informed by its own DBS experience, was to offer its dealers a fully integrated DBS that could be configured by market.  For example, an agriculture equipment Deere dealer in Mexico could select options applicable to that dealer, such as the Spanish language, agriculture equipment settings, and a Mexico regulatory function.  A Brazilian construction and forestry dealer could, by contrast, select Portuguese, construction and forestry, and Brazilian regulatory settings.  Technological advances had rendered Deere's own DBS difficult to expand, so Deere decided to start anew using updated technology.

25.     First, Deere developed a list of more than three hundred capabilities that the new DBS must have.  These capabilities fell into five functional areas: accounting, parts, rental, sales, and service.  The capabilities are currently offered by Deere's own DBS and span the operations of Deere dealers.  They include, for example, "Associate a file with an accounting ledger, account, PO [Purchase Order] or other," "Quickly and easily view available payment options for the customer prior to finalizing the invoice. Credit limits and restrictions should be easy to determine whether it is in house (accounts receivable) or outside financing (JDF)," and "Quickly and easily request, schedule and execute transportation events with two work orders to two different customers on two different machines on same transportation route."

26.     Next, Deere targeted seven markets: first Mexico followed by Australia and New Zealand, and then Canada, the United States and its territories and possessions, Brazil, and Argentina.

27.     Finally, Deere determined that it needed a platform on which the system would be built, and a developer to create and implement the system, as well as provide ongoing support.

B. **Selecting a Platform and a System Developer**

28.  Because of the importance of the project and the longevity of the planned relationship, Deere took great care in selecting its platform provider and system developer for the global DBS.

29.  Deere began by sending a Request for Information ("RFI") to several potential platform providers on September 27, 2013.  Finalists in the RFI process were invited to demonstrate their platform capabilities.  After months of analysis and rigorous testing, including deep dive meetings to gauge capabilities, proof of concept projects to understand user experience, and discussions with stakeholders, Deere selected Microsoft as the provider of the platform on which the DBS would be built.

30.  To find its system developer—its "Independent Software Vendor"—Deere sent a Request for Proposal ("RFP") to potential providers on December 4, 2015.  As it did with selecting its platform provider, Deere rigorously analyzed and vetted its Independent Software Vendor prospects.  This process, which began in 2014 and ended with the execution of contracts with XAPT on June 26, 2017, had many facets, including multiple deep dive meetings, proof of concept projects, financial modeling, contract negotiations, and discussions with dealers and stakeholders.

C. **XAPT and Deere's Extensive Pre-Contract Meetings and Discussions**

31.  Deere and XAPT's relationship began with a telephone call in December 2015. From the inception of the relationship, and consistently over the next almost two years prior to contract execution, Deere consistently described its development needs: a global DBS template, customizable by region, including more than three hundred enumerated capabilities, data migration from Deere's prior systems, full integration among its applications, and initial roll-out to dealers in seven countries.

32.     During the selection process, including at least nine meetings at Deere's office in East Moline, Illinois involving more than twenty XAPT representatives, XAPT grossly and consistently misrepresented the development required to adapt its allegedly "proprietary and confidential" NAXT system to meet Deere's capability requirements, the time it would require to complete the project, and its cost.

### 1.   March 1 – March 3, 2016 Deep Dive Meetings

33.     During deep dive meetings during the week of February 29, 2016 at XAPT's offices in Miami, Florida, Deere and XAPT and its representatives used demonstration scripts to analyze the 300+ capabilities that the new DBS must have in comparison with the preconfigured, out-of-the-box capabilities of XAPT's NAXT software.

34.     A primary goal of the deep dive meetings was to determine the number of gaps in each subject matter area that would require coding to meet Deere's needs.  The heart of the meetings involved presentations by XAPT subject-matter experts, including Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, and Juliet Cheng.  Also present from XAPT were team leaders and salesmen, including COO Hunt, who oversaw the NAXT team, VP Skiver, Chris Wittusen, and Daniel Enekes.

35.     Each XAPT subject matter expert spent hours presenting to Deere on NAXT's functionalities.  Through each of these presentations, as well as the entire deep dive process, XAPT's message was the same: NAXT could already perform the vast majority of capabilities on Deere's list, either out-of-the-box or with minimal configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

36.     "Gaps" are desired services and/or functions that XAPT's system could not perform that would require development/coding.  Such development/coding is done utilizing "stories."  The

7

number of stories needed to close a single gap varies, but closing 50 gaps generally requires more than 50 stories.

### 2. March 17, 2016 RFP Response

37.     On March 17, 2016, XAPT submitted its response to Deere's RFP.  XAPT's response contained several related documents, including an ERP Project Proposal, a draft Statement of Work, Draft Project Plans, and responses to dozens of questions Deere used to vet proposals.  In a "Certification and Authority Statement" signed by COO Hunt and Frank Squeri, XAPT's Chief Finance Officer on the same date, XAPT agreed to be bound by the representations, terms and conditions contained in its Proposal.

38.     In XAPT's ERP Project Proposal dated March 17, 2016, it represented:

    a.     "We understand the size of this undertaking, we have developed implementation schedules for the template buildout and for each dealer size that are conservative in nature and allow for extensive time to undertake testing, training, and data migration."

    b.     "Create the Template – XAPT can undertake this activity with existing staff."

    c.     "XAPT Corporation is a global leading provider of Microsoft Dynamics ERP business solutions.  XAPT specializes in the development of industry specific solutions built on the Microsoft Dynamics AX ERP platform for the Heavy Equipment Distribution, Automotive and Wholesale/Distribution industries and provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

39.     In response to a Deere RFP questionnaire, XAPT stated that it "does not intend to subcontract any services - other than for the provision of data center services through Microsoft

Azure, or as a method of engaging staff in locations where XAPT does not, or is not able to set up a local company and thus decides to use a service provider.  In such circumstances XAPT will consult with John Deere."

### 3.   March 31, 2016 Proposal Presentation

40.     Ralph Hunt, COO of XAPT, and VP Sean Skiver of Business Development, reiterated these representations during a March 31, 2016 proposal presentation to Deere in Moline. During this presentation, XAPT touted its industry knowledge, development qualifications, product, and commitment to Deere.  In short, XAPT presented itself as the ideal developer for Deere.

41.     XAPT emphasized its "extensive industry knowledge and experience," its "[h]istory of working with Equipment Manufacturers," and its "[e]xperience in implementing [its] solution globally."   XAPT represented that it focuses both "on the development and implementation of integrated software solutions tailored to the Heavy Equipment Industry," and that it understood the "added complexity of implementing systems in multiple countries, cultures and languages."

42.     For its product, XAPT touted the "functionally rich, highly flexible" nature of its software, the process of "[u]sing an existing template and methodology as a base to build on," and its ability to modify its existing template "to suit John Deere."  XAPT characterized its product and development capabilities in a manner that demonstrated its understanding of and commitment to meeting Deere's needs:

- "One database. One environment. Fully integrated. No redundancy.  From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

- "The fully integrated solution for John Deere dealers."

> - "XAPT offers a fully integrated solution that provides functionality across the entire dealership. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."
>
> - "The complex structures of equipment dealerships, their suppliers and customers, demand both global and local knowledge. We bring the reassurance of a fully integrated solution, tailored to equipment dealers, with an understanding of regional requirements, delivered by Award winning specialists. XAPT provides clients full visibility and control across every branch and subsidiary, wherever their location."

43.     Consistent with Deere's core value of commitment, XAPT promised to "be involved forever – not just the term of the project."

### 4. Proof of Concept Presentations July 11-12, 2016

44.     At its Proof of Concept presentations to Deere on July 11-12, 2016, in Budapest, Hungary, XAPT reiterated these themes: competence, responsiveness to Deere's needs, and ability to tailor its solution quickly and efficiently, with minimal development/coding.

45.     For example, XAPT demonstrated how it would tailor its system to handle an everyday dealer task: a customer orders an item in-store and pays for it at the cash register. While the XAPT system originally took eleven minutes and dozens of "clicks" of the computer mouse to complete this task, XAPT quickly streamlined the process to take a fraction of the "clicks" and less than six minutes. XAPT represented that its system was flexible enough to handle many such tasks in the same manner.

46.     Following all the meetings and a thorough review of XAPT's RFP response, Deere engaged XAPT as its Independent Software Vendor. XAPT's first task as Independent Software Vendor was to develop the Global DBS template.

### D. Contractual Framework for Creating the Global DBS

47.     Four principal contracts govern the creation and development of the Global DBS: (a) the Master Services Agreement dated June 26, 2017, as amended on June 27, 2018 and June

26, 2019 (the "MSA"); (b) the Work Order Template – Global Template dated June 26, 2017 (the "Global Statement of Work" or "Global Template SOW"), as amended on February 11, 2019 ("Amendment 1"); (c) the Work Order – Governance, dated June 26, 2017 (the "Governance Statement of Work" or "Governance SOW"); and (d) the XAPT Subscription Delivery Agreement ("SDA"). The MSA, Global Template SOW, Governance SOW, and SDA are collectively referred to as the "Contracts".

48.     The MSA establishes the framework for the parties' relationship, and the Global Template SOW and the Governance SOW operate within this framework. The Global Template SOW governs the technical aspects of developing the Global DBS. The Governance SOW establishes structures for communication, project management, and quality control. The SDA structures subscription-related services, and also contains warranties related to the product itself.

1. **Master Services Agreement**

49.     Section 3.6 governs XAPT's use of subcontractors. Under Section 3.6, XAPT:

> [M]ay subcontract any of the Services to those subcontractors and Affiliates listed on the applicable SOW, or, thereafter, with Deere's prior written consent to use the subcontractor in the capacity described in [XAPT]'s consent request (such consent not to be unreasonably withheld). . . . [XAPT] will not disclose Deere Data or Confidential Information to a subcontractor unless and until the subcontractor needs to have access to the information to perform the Services relating to the Master Agreement and has agreed in writing to confidentiality terms substantially equivalent to that required of [XAPT] under this Agreement. . . . Prior to disclosing any Confidential Information of Deere to such approved subcontractors, [XAPT] will require each approved subcontractor to execute a non-disclosure agreement in the form provided by Deere.

> MSA § 3.6.

50.     Section 6.5.1 lays out some of Deere's ownership and intellectual property rights:

> Deere shall own all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. Supplier hereby irrevocably assigns in perpetuity to Deere, and will require its

11

Representatives to assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications. As to any Deliverables (other than Supplier Modifications) and Deere Modifications created after execution of this Agreement, the assignment shall become effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

MSA § 6.5.1.

51.    The MSA broadly defines "Deliverable" or "Deliverables:"

[T]hose Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

MSA § 1.12.

52.    In addition, under Section 6.3.4, Deere owns all "interfaces" between Deere's Pre-Existing Works and XAPT's Pre-Existing Works, Combined Solution, or Modifications created by XAPT:

Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications.

MSA § 6.3.4.

53.    In addition to Deere's ownership rights, the MSA defines several categories of Deere Confidential Information which include the MSA itself, as well as "any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data,

and all Deliverables, with the exception of Deliverables deemed "Supplier Modifications." MSA § 6.13.2.

54.     Under Sections 10.2 and 10.3, XAPT represents and warrants "that all Services will comply with the requirements in each applicable SOW in conformance with good professional practices and accepted industry standards," and "that it will provide sufficient Representatives to perform the Services within the time frames agreed and that its Representatives have sufficient skill, knowledge and training to perform the Services." MSA §§ 10.2, 10.3.

55.     Section 12 of the MSA governs termination. Upon termination of the MSA, under Section 12.4.2, XAPT "must deliver to Deere all Deliverables, whether finished or unfinished, developed prior to termination, in a form and format useable by Deere (and Deere agrees to pay for such material according to the relevant SOW)." MSA § 12.4.2.

56.     Under Section 12.4.1, each Party must "[p]romptly return (or at Discloser's option, destroy) all applicable Discloser Confidential Information and other property and materials of Discloser, except that Deere shall not have the obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted" under the MSA. MSA § 12.4.1.

   2.  **Global Template SOW**

57.     The Global Template SOW "sets forth the Services to be performed by [the Parties] related to the NAXT 365 Solution." It "represents the complete baseline for scope, Services, Deliverables, and acceptance applicable to this project." Global Template SOW § 2.2.

58.     Based on XAPT's estimates, the Project "indicates a roughly 18 month duration." Global Template SOW § 3.3.

59.     The Global Template SOW sets forth XAPT's understanding of the project, including that it "has been retained to develop a Global Template for the implementation of a Dealer Management System for Authorized Dealers globally."   Global Template SOW § 2.3.

60.     Section 3.2.2 requires XAPT to provide dedicated personnel in the following areas: Project & Executive Sponsor, Project Management, Solution Architecture, Functional Consultants, Technical Consultants, Data Migration Consultants, and Technical Writers, each with enumerated responsibilities.  Global Template SOW § 3.2.2.

61.     Under Section 4.1, XAPT "will provide all Deliverables and complete milestones by the respective target dates identified below."  Global Template SOW § 4.1.  These targets included a "go-live (acceptance of template)" date in all seven countries of April 12, 2019.  Global Template SOW App'x I.

62.     The Global Template SOW provides for XAPT to invoice based on time and materials, and XAPT estimated that the cost of the Global Template SOW would be $7,744,679. Global Template SOW § 6.1.

63.     As described in Section 2.1 of the Global Template SOW, the Appendices crystallize the scope of the project as well as its planned methodology and cost.

64.     Appendix A, Section A contained 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.  These capabilities include "functionality for each of the following areas (including but not limited to): Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."   Global Template SOW § 3.1.

65.     Appendix B listed the 50 gaps XAPT identified would require additional development in order to meet the core capabilities enumerated in Appendix A.  According to

Appendix B, "Most of these forms, data and functionalities are available as standard in Dynamics 365[.]"

66.     Appendix C detailed 137 required integrations to Deere applications.

67.     Appendix E contains Service Level Agreements ("SLAs") and was created "to allow Deere to ensure that user experience and expectations are met as they pertain to speed and response times of the solution."  The SLAs "will be used to measure the quality, delivery, and overall performance of [XAPT] for customizations" and are "designed to achieve the following goals:

1.  On-time delivery of quality code that meets or exceeds requirements

2.  Appropriate amount of testing

3.  Timely response to identified problems

4.  Severity 1 [critical] and 2 [major] defects associated with supported Authorized Dealer processes will be fixed by [XAPT] prior to production release of the Authorized Dealer as defined by the acceptance criteria below."

68.     Under Appendix E, unless otherwise specified in an individual Work Order:

- The "Plan/Deliver Score target is 90%."  The Plan/Deliver Score is "the number of system changes delivered divided by the total number of mutually agreed upon system changes in original FDD on or before the defined milestone."

- The "Acceptance Testing Coverage target is 90%."  Acceptance Testing Coverage is "the number of acceptance tests executed divided by the total number of acceptance tests associated with the system changes in the original FDD delivered on or before the defined milestone."

- The "Quality Bar target," or "number of identified open defects associated with the customization as defined in the approved FDD delivered on, or before the defined milestone," is:

    i.  "No known Severity 1 [critical] defects

    ii.  No Severity 2 [major] defects without mutually agreed workaround and resolution plan for each related defect.

15

                    iii.   Mutually agreed resolution plans for all Severity 3 [standard] and Severity 4 [minor] defects."

69.     Appendix E also provides an "established set of metrics designed for measuring the performance and User Experience for mutually agreed [dealer] business processes"—in other words, maximum processing time thresholds for everyday dealer tasks, such as "Retrieve a previously created parts order file." The established set of metrics is based on the processing times in Deere's current DBS.

70.     Appendix J "Supplier's Development Methodologies," states, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices." In particular, XAPT's "development methodology is based on sprints of two weeks, continuous integration, daily builds, with unit and functional testing as part of the daily operation." XAPT submits "every development . . . to a best practice validation using a Microsoft provided tool."

71.     The Agile method of software development is a highly collaborative, iterative approach to product development. It involves setting a list of prioritized requirements and completing the top priorities first. Work is completed in two-week sprints. After each sprint, the list of priorities is re-evaluated, and priorities often shift as the project progresses. Deere, as the customer for whom XAPT is developing a product, drives priority setting.

72.     Appendix M provides a total cost estimate for the project, as follows:

     a.   $13,604,800 under the Governance SOW

     b.   The following under the Build Global Template SOW

         i.   $3,780,770 for Template Build Configuration

        ii.   $727,584 for Template Build – Gaps

      iii.   $1,100,000 for Template Build – SD [Service Delivery]

16

       iv.   $1,986,325 for Template Build – JD Apps Integration (rest); and

       v.   $150,000 for Mexico Localization Development

  3.  **Governance SOW**

73.    The Governance SOW, effective for ten years, "defines the roles and responsibilities of both Parties, and establishes reporting mechanisms that are required to maintain an effective working relationship[.]" Governance SOW §§ 2, 7.1.

74.    Sections 2.4 and 6.2, and Appendix B address the composition of XAPT's team, which included the following positions: Project Director, Project Manager, Project Scheduler, Quality Assurance (QA) Manager, Technical writers, Consultants, and Developers, etc. Governance SOW § 2.4. The Project Director and Project Scheduler, as well as a Solutions Architect and Hungary Development Project Manager, are "Key Employees" under the Governance SOW. Governance SOW App'x B. The team also includes infrastructure and cloud support. Governance SOW § 6.2.

75.    Appendix I "Supplier's Development Methodologies" reaffirms, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices."

  4.  **SDA**

76.    XAPT makes the following representations and warranties under the SDA:

-  "the Product, Global Template and Subscription Services shall perform in accordance with the Specifications" SDA § 20.1;

-  "all Services shall be performed in conformance with good professional practices and accepted industry standards" SDA § 20.2; and

-  XAPT "will provide sufficient Representatives to perform the Services and its obligation hereunder within the time frames agreed and that its Representatives have sufficient skill, knowledge, experience, competence, skill and training to perform the services and obligations as set forth in this Agreement." SDA § 20.3.

### E.    After Contract Execution, Gaps Multiply Exponentially and XAPT Fails to Deliver Project Deliverables, Produces Code Riddled with Errors, and Racks up Costs

77.    Once the project kicked off, it became apparent that XAPT grossly misrepresented the number of gaps required to bring its system in line with Deere's list of capabilities. XAPT originally identified just *50 gaps* to produce the global DBS for all seven countries, but that number became well *over 600 gaps* just to produce the Global DBS for Mexico, Australia, and New Zealand.

78.    Because XAPT purports to be an industry leader, with experience making similar integrated systems for dealers in the same industry as Deere, this cannot be a harmless miscalculation.

79.    During the months following contract execution, including over 100 meetings in which XAPT representatives traveled to Deere's office in East Moline, XAPT's gross misrepresentation of the gaps became apparent, and, at the same time, XAPT failed to meet its code delivery requirements. Among the XAPT representatives who traveled to Deere's office located in East Moline, Illinois were individuals who worked for XAPT Kft.

80.    XAPT's code development tasks are divided into component parts and placed into a deliverable timeline. Each task component is a "story." A typical story is assigned a point value between three and 21, depending on the complexity of the development required to complete it. The entire development project was estimated at 4,500 story points, to be delivered in increments of approximately 450 per month.

81.    Although development tasks were not classified as stories with point values until later in the project, a conversion of early deliverables into this classification nomenclature is as follows: by February 2018, XAPT was supposed to have delivered 450 points; instead it only

18

delivered 61. By March 2018, XAPT was supposed to have delivered 900 points, but it had only delivered 159. By April 2018, XAPT was 962 points behind schedule.

82.     Even more problematic than failing to deliver on time, the code is riddled with defects (also known as "bugs") – errors in the code that prevent it from working properly.

83.     By April 2018, XAPT had delivered 388 points, 50 of which met the Defect Service Level Requirements of Appendix E to the Global Template SOW and Appendix D to the Governance SOW.

84.     The cost associated with these deliveries was also significantly higher than expected. On average, each point as of April 2018 had cost $1,235, as compared to XAPT's estimate of $880 (as represented in Appendix M of the Global Template SOW), indicating that XAPT's development took considerably longer than represented. Given that Deere paid based on time and materials, this level of performance cost Deere significantly more than originally agreed.

## F.     Deere Invests in Training XAPT

85.     By April 2018, it became clear that XAPT was not adhering to the Agile project methodology required by the Global Template SOW and the Governance SOW.

86.     Two key features of Agile project management methodology are its priority list and its flexibility. Priorities are re-adjusted at the close of every two-week sprint. Deere, as the customer buying the product, drives priority-setting.

87.     Contrary to the Agile model, XAPT was resisting priority-shifting, and was providing Deere with stories that were not the highest priority.

88.     Deere sent its Manager of Development, Delivery, and Quality for the system to Hungary from April 16-25, 2018 to train XAPT's developers on Agile project methodology in an effort to support XAPT's commitment to use the Agile project methodology.

**G.      Post-Training, Gaps Increase, Quality Does Not Improve, and XAPT Seeks a $10 Million Increase in Contract Price to Deliver the Same Product**

89.      By June 2018, the identified number of gaps requiring development had risen eight-fold, XAPT continued to deliver behind schedule, and its defect rate remained high.

90.      At this time, gaps had increased to a conservative estimate of more than 400, XAPT was 1,095 points behind schedule, and, of the gaps it did deliver, 56 of 77 contained defects.

91.      At the same time, XAPT requested an additional $10 million to account for the increase in identified gaps due to its own gross misrepresentations, despite the same project scope—the capabilities in Appendix A to the Global Template SOW.

92.      After XAPT sought to exponentially increase the costs of the development project, the parties commenced six months of contentious negotiations to fix the price of the remaining work.

**H.      Amendment 1 Creates Fixed Price for Remainder of Development Project and Ties Payment to Quality**

93.      The key features of Amendment 1 to the Global Template SOW were: (i) a fixed price for the remainder of the development project, (ii) a fixed number of 545 gaps XAPT would have to close, and (iii) payment tied to meeting quality and delivery performance metrics. Amendment 1 also added 49 gaps of new scope (included as part of the 545), for which Deere agreed to pay $1.179 million.

94.      Despite XAPT's purported expertise, the parties had identified hundreds of additional gaps that XAPT had failed to initially identify, all of which were needed to achieve the original product capabilities.  However, in the interest of moving the project forward, Deere agreed in Amendment 1 to limit the number of gaps to 545, plus the service module gaps for the defined service capabilities for which the stories were being created during the negotiations of Amendment

1. In fact, Deere was paying XAPT for functional consulting to define service module gap requirements at that time.

95. To incentivize better performance by XAPT, the parties tied payment to quality: delivering 90% of the code for that month triggered a payment; eliminating Severity 1 and Severity 2 bugs triggered an additional payment; eliminating Severity 3 bugs triggered an additional payment; and completion of certain milestones triggered payment of a risk premium.

### I.    The Executed Version of Amendment 1 Does Not Reflect the Parties' True Agreement

96. In Amendment 1, Deere and XAPT re-negotiated only part of their relationship: the number of gaps, quality incentives, fixed prices for gap closing, and $1.179 million in additional project scope. These negotiations were necessitated by XAPT's gross misrepresentation of the number of gaps that it would need to close in order to provide a system with the capabilities required in Appendix A. Deere, relying on XAPT's original estimate of 50 gaps, had not budgeted for the time and materials necessary to close the number of actual gaps, nor had Deere budgeted for the increased per-point cost of development work that was grossly above the estimates provided by XAPT. Deere and XAPT did not renegotiate other key aspects of the relationship, such as the capabilities required to bring the final DBS to market, or the $1.1 million allocated to integrating the Deere service module.

97. The text of Amendment 1 states, under "Amendment to Appendices," that the appendices in the Global Template SOW are "replaced" with the Amendment 1 appendices.

98. Appendix A to the Global Template SOW comprised a list of "capabilities" needed for a complete DBS. Appendix B to the Global Template SOW had the list of "gaps" in order to meet the capabilities list of Appendix A.

99.     By contrast, Appendix A of Amendment 1 included only a list of "gaps," and omitted the list of capabilities, and Appendix B of Amendment 1 included another list of "gaps."

100.    Without a complete list of capabilities in Appendix A, which is filled by "gaps," Amendment 1 fails to capture the fundamental scope and purpose of the DBS project.

101.     Because the parties did not negotiate to exclude the original scope of the project, the use of "replace" in Amendment 1 was a mistake.

102.    A large part of the original scope included integrating the Deere service module. These capabilities were not included in the amended appendices as they were part of the original appendices.  Deere had no reason to believe that these capabilities were not included in the project because: (1) integration of the Deere service module is included on the original list of capabilities contained in Appendix A to the Global Template SOW; (2) during Amendment 1 negotiations, the parties were conducting a service module integration proof of concept, showing that this part of the project was alive and well; (3) the DBS would not function in a single country without the Deere service module; and (4) Deere paid for service module integration in a specific line-item under the Global Template SOW, and Amendment 1 did not remove that line-item from the Global Template SOW.

103.    Deere signed Amendment 1 believing that its Appendices modified rather than replaced those in the Global Template SOW.

104.    Following execution of Amendment 1, and without explanation, XAPT refused to develop service module integration stories.  Despite Deere continuing to submit service module integration stories to XAPT for development, XAPT continued to reject them, and, inexplicably, sought more fees to develop them.

105.    Ultimately, Deere discovered the basis of XAPT's refusal to develop service module integration stories.  Although the project included $1.1 million for service module integration stories, XAPT had taken the position that the "replacement" of Appendix A had removed service module integration from the project scope.  Since the parties did not negotiate such a removal, Deere would still have to pay the $1.1 million line-item but would get nothing in return.

106.    Deere brought the contract mistake to XAPT's attention at a meeting in Budapest on April 23, 2019 between Deere representatives and Popovic.

107.    At this meeting, Deere informed Popovic that it seemed like he had known all along about the mistake in the Amendment 1 Appendices—that the unintended effect of the contractual language would be to exclude service module integration from the project scope yet still require that Deere pay it.  Deere told Popovic that it seemed that XAPT had stayed quiet knowing the Amendment 1 did not accurately reflect the parties' understanding.

108.    In response, Popovic exclaimed that "of course" he knew Amendment 1 would eliminate service module integration from the contract and that he knew that was not Deere's expectation.

109.    XAPT refused to provide the service module integration work for which Deere paid nearly all of the $1.1 million.

## J.    XAPT's Fraudulent Misrepresentation to Induce Deere to Choose XAPT

110.    From the inception of the relationship, and consistently over the next almost two years prior to contract execution, including at least nine in-person meetings at Deere's office in East Moline, Deere consistently described to XAPT the DBS that it intended to purchase from an

Independent Software Vendor: at its most basic, a global DBS template with more than three hundred enumerated capabilities.

111.    Though Deere's messaging regarding its needs for the project remained consistent, XAPT grossly and consistently misrepresented the configurability of its product and the development required to adapt its system to meet Deere's capability requirements, both of which directly impact project costs.

112.    Prior to entering into the Contracts, XAPT and Deere had numerous meetings and conversations in order to understand the full extent of work needed to modify XAPT's current system to perform all of Deere's desired capabilities.  Deere and XAPT understood that this was critical information to Deere's selection of an Independent Software Vendor and that it was closely linked with the timing and cost of the project.

113.    During the March 1-3, 2016 deep dive meetings at XAPT's offices in Miami, Florida, prior to XAPT submitting a bid for the project, Deere and XAPT used demonstration scripts to analyze the 300+ capabilities that the new DBS must meet and XAPT, including subject-matter experts Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, Juliet Cheng, VP Skiver, COO Hunt, Chris Wittusen, and Daniel Enekes, represented that the majority of the capabilities required minimal or no configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

114.    Again, on March 31, 2016, at a Proposal Presentation, XAPT COO Hunt, and XAPT VP Skiver, reiterated these representations, that, to meet Deere's 300+ list of capabilities, only 50 gaps would require coding/development.

115. Once again, on July 11-12, 2016, in Budapest, XAPT reiterated its competence and efficiency, and emphasized that it could tailor its solution quickly and efficiently, with minimal development/coding (and only 50 gaps).

116. Appendix A, Section A to the Global Template SOW contains 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.

117. In Appendix B, XAPT identifies only 50 "gaps" that would require additional development in order to meet the core capabilities enumerated in Appendix A.

118. On information and belief, XAPT, a self-professed industry leader with extensive experience in the industry creating integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was well aware of what was required to modify its current software system, NAXT.

119. XAPT also knew that quoting fewer gaps meant the estimated contract price would be much lower.

120. Instead of the promised 50 gaps XAPT identified, it had become clear that the number of gaps required to develop the system is well over 600—and this is only to roll the system out in Mexico, Australia, and New Zealand. For the Global DBS to be available in all seven countries as originally planned, it became impossible to create a dependable estimate of gaps due to XAPT's misrepresentation regarding its product and development abilities.

### K.  Removal of Exclusivity

121. By June 2019, Deere understood that it needed to enlist additional development help to complete the project.

122. Deere asked XAPT to remove the MSA's exclusivity clause so that it could engage another developer to perform some of the work, and XAPT agreed to do so for additional consideration.

## L.     **XAPT Uses Unapproved Subcontractors and Hides It From Deere**

123.    In or about October or early November 2019, Deere learned that XAPT was utilizing an unapproved subcontractor on its project that operated under the email address @cosmoconsult.com.

124.    On November 1, 2019, Deere notified XAPT of this breach under Section 3.6 of the MSA and advised that depending on the relationship between XAPT and Cosmo Consult, there may also be breaches of the change in control provisions under Section 15.1 of the MSA.

125.    At that time, Deere asked XAPT to identify the relationship between Cosmo Consult and XAPT with supporting documentation.

126.     On November 1, 2019, XAPT responded by stating: "[Cosmo Consult] is the same consultants as it [*sic*] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [*sic*] the same that Deere approved in July of 2018."

127.    Noting XAPT's failure to provide adequate information to determine the relationship between Cosmo Consult, XAPT Solutions, and XAPT Kft, Deere reiterated is request on November 4, 2019 and asked XAPT to:

•      Please explain your use of resources from this company (Cosmo Consult).

•      Please also explain why you did not notify Deere of the use of this subcontractor (Cosmo Consult).

•      Please identify the relationship between Cosmo Consult and XAPT Corporation with supporting documentation.

128.    Changing its story, on November 5, 2019, XAPT responded that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS

26

SOLUTION S.R.L.".  This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

129.    XAPT continued to use Cosmo Consult on Deere's project without authorization.

130.    With no action taken by XAPT to cease Cosmo Consult's access to Deere's confidential information, on or about November 26, 2019, Deere again asked XAPT to comply with its obligations and Deere removed access to all @cosmoconsult.com email addresses.

131.    Nonetheless, despite Deere removing access to all @cosmoconsult.com email addresses, XAPT still continued to share Deere's confidential information with Cosmo Consult team members.

132.    On January 22, 2020, counsel for Deere informed XAPT that it was aware of the blatant disregard of Deere's instruction and that XAPT continued to provide Cosmo Consult access to Deere's confidential information.

**M.    Press Release Tells a Different Story about XAPT and Cosmo Consult's Relationship**

133.    Contrary to XAPT's representations that S.C. XAPT Solutions SRL merely changed its name, a press release dated September 17, 2019 and posted on Cosmo Consult's website at https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ has a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS."  A copy is attached hereto as Exhibit 1.

134.    The text of the press release states: "The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania."

### N.     Deere Terminates the Project for Cause

135.    By January 2020, the Global DBS, originally scheduled to be available in seven countries by April 12, 2019, was not available in a single country.

136.    As of October 2019, the schedule was that the system would not be available to dealers in its first country—Mexico—until June 2020, or the second country-Australia-until October 2020.

137.    Deere has complied with the Contracts and fully complied with the Mutual Dispute Resolution process.

138.    Faced with XAPT's breaches accumulating without cure, and a continually expanding timeline, on January 24, 2020, Deere properly terminated the Contracts for cause.

139.    The relevant provisions of the MSA regarding Deere Ownership, irrevocable license, and post termination obligations survive termination, including the provisions governing return of Confidential Deere Information.

### O.     XAPT Fails to Comply with Its Post-Termination Obligations

140.    After Deere terminated the Contracts, on January 24, 2020, it asked XAPT to comply with all of its post termination obligations.   XAPT has failed to do so.

141.    Again, on March 23, 2020, Deere asked XAPT to comply with its contractual obligations and return Deere's confidential information.  XAPT has not.

142.    To date, XAPT has not returned *any* documents or materials to Deere.

143.    Section 12 of the MSA outlines the parties' obligations upon termination.

144.    Contrary to the requirements delineated in Section 12 of the MSA, and in breach of those contractual obligations, XAPT has failed to comply with its post termination obligations.

28

145.     Instead, XAPT and its representatives engaged in a series of acts designed to deprive Deere of property that Deere owns, holds an irrevocable license to, and/or that XAPT and its representatives agreed were Deere Confidential information.

**P.     XAPT Asserts Ownership of Property Either Owned by Or Perpetually Licensed to Deere.**

### XAPT's Assertions

146.     XAPT's demands made on its behalf in a March 9, 2020 email ("March 9 Email"), establish that a controversy exists between Deere and XAPT regarding ownership, possession of and license to property either owned or perpetually licensed to Deere.

147.     The March 9 Email included the following demand: "Deere is required to either return or destroy all such XAPT Intellectual Property in its possession including any and all copies of code (electronic or paper), files, documents, designs, workflows and the like. Deere is also obligated to cease using or accessing the IP as contained in the environments provided under the XAPT Software Delivery Agreement."

148.     XAPT "intellectual property" is defined in MSA Section 6.3.1 as "Supplier Modifications" and "Supplier Pre-Existing Works" in MSA Section 6.2.

149.     In addition, MSA Section 12.4.1 expressly states: "Deere shall not have an obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted hereunder."

150.     Further, to the extent Deere is not identified as the owner of the items demanded by XAPT, MSA Section 6.6.4 provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

29

151.    XAPT's demands are contrary to the express terms of the MSA.  Deere already owns or has a fully pre-paid, perpetual, irrevocable, license in and to the items demanded in the March 9 Email.

**Deere's Ownership Rights**

152.    The MSA, including all exhibits, applies to all SOWs entered into between the parties.

153.    The Global Template SOW is governed by the MSA, and is incorporated into the MSA.

154.    The MSA applies to all Deliverables, Products and Services provided by XAPT to Deere as described in each SOW or other document executed by the parties during the term of the MSA.  MSA § 1.1

155.    The MSA provides for Deere's ownership of Deliverables, Products, Services and Intellectual Property provided to it by XAPT.  MSA §§ 6.5.1, 1.12, 1.25 and 1.23.

156.    The MSA also provides: "In addition, Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications."

157.    Further, pursuant to the MSA, Deere owns all Deere Pre-Existing Work, including "all Information, and any material owned or licensed by Deere as of the Effective Date or acquired by Deere after the Effective date. Any information relating to an Authorized Dealer and Deere's business and processes and information relating to gaps in requirements and features and

functionality relating to any Third-Party Component shall be considered Deere's Pre-Existing Works."

**Deere Holds an Irrevocable License to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Intellectual Property.**

158.    To the extent Deere is not identified as the owner of Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

159.    Section 6.6.4. of the MSA states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

160.    Section 18 of the SDA states:

> As contemplated by Section 6.6.4 of the MOSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

161.    Section 18 of the SDA also provides:

> XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers

and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

162.    Section 18 of the SDA also provides:

In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

163.    Section 6.6.3 of the MSA provides:

To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

164.    Under MSA Section 6.6.4, Deere "shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

165.    MSA Section 12.4.1. states that Deere has no obligation to return Supplier Modifications and Supplier Pre-Existing Works for which irrevocable licenses have been granted.

**Deere's Right to Modify the Combined Solution**

166.    Further, pursuant to MSA Section 6.7, Deere has the right to modify the Combined Solution.

**The MSA Provisions on Ownership and License Survive Termination**

167.    Section 15.16 of the MSA states in relevant part: "Survival. Upon termination of the Master Services Agreement for any reason, all provisions that by their nature should survive termination will survive and continue to be binding upon the Parties.

32

168.   Intellectual Property Rights (MSA § 6) and obligations upon Termination survive Termination. MSA § 12.4.  Section 28.12 of the SDA expressly provides that the licenses Deere holds in Section 18 to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring return of Deere Confidential Information survives termination.

169.   Section 28.12 of the SDA expressly provides that the licenses to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works XAPT granted to Deere in Section 18 survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring that XAPT return Deere Confidential Information also survives termination.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT
(Against XAPT)

170.   Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

171.   The parties, in exchange for valuable consideration, entered into the MSA, Global Template SOW, Governance SOW, and SDA (the Contracts), all of which are valid and enforceable.

172.   Deere fully complied with its obligations under the Contracts or has been excused from doing so.

173.   XAPT has repeatedly breached its obligations under the Contracts.

174.   More than 27 months after the parties entered into the Contracts, and after over one hundred meetings in East Moline alone, XAPT has not developed a system that includes Deere's 393 required capabilities or functionality in "Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."  Global Template SOW, § 3.1, App'x

A. By the time Deere terminated the Contracts in January 2020, the Global DBS was not available for purchase by Deere dealers in a single country.

175.    XAPT multiplied, rather than closed, the gaps required to meet Deere's capability list. To date, despite 20 monthly code deliveries, there are more than 315 gaps still to close before the DBS can be made available to dealers in Mexico, Australia, and New Zealand.

176.    XAPT has failed to meet the metrics established for system performance, including the maximum processing time thresholds for everyday dealer tasks, and has refused to work with Deere to update processing time targets, as required by Appendix E to the Global Template SOW.

177.    XAPT has neither provided the personnel necessary under the Contracts, nor used Agile product development methodology.

178.    XAPT has not followed the communication and decision lines detailed in the Governance SOW, including by seeking approval for important contract amendments from Deere employees not authorized to make such decisions.

179.    XAPT has consistently failed to meet its monthly obligation to deliver 90% of its committed deliverables. To date, XAPT has provided the required 90% on only two of 20 monthly code deliveries.

180.    XAPT has failed to meet quality targets for its development work and has failed to deliver code meeting industry standards for quality. XAPT's code is marred with more than 300 currently unresolved defects, and XAPT has failed to meet its published monthly defect resolution targets.

181.    XAPT has also failed to meet its representations and warranties under the Contracts.

182. Due to extremely high defect rates and XAPT's failure to complete its development obligations, the "Product" and the "Global Template" do not "perform in accordance with the Specifications" as required by SDA § 20.1.

183. By failing to fill important project roles, and failing to attract and retain developers who are sufficiently skilled to provide code without hundreds of significant and costly defects, XAPT has failed to "provide sufficient Representatives to perform the Services within the time frames agreed and [provide] Representatives [with] sufficient skill, knowledge and training to perform the Services" required by MSA § 10.3 and SDA § 20.3.

184. By providing highly defective code, circumventing established communication and decision making channels, and continually seeking to obtain higher payments from Deere for the same obligations for which it originally contracted, XAPT has failed to provided services "in conformance with good professional practices and accepted industry standards" as required by MSA § 10.2 and SDA § 20.2.

185. Despite Deere providing notice as required under the Contracts and following the parties' mutual dispute resolution process, including months of communications with the requisite Project Manager, "next level" management, and "designated leader" levels at XAPT, and a failed mediation "conducted by a mutually agreeable mediator in a mutually agreed location," XAPT has failed to cure the breaches as required pursuant to MSA §§ 10.12, 15.6.1, 15.6.2.

186. XAPT also breached MSA § 3.6 when it utilized an unapproved subcontractor on Deere's DBS project.

187. The Contracts contain provisions governing confidential information, procedures by which Deere must approve XAPT subcontractors, and change of control.

188.    Under the Global Template Build Statement of Work, Cosmo Consult is not an approved subcontractor to XAPT.

189.    XAPT failed to follow the applicable procedures before providing Cosmo Consult access to Deere's confidential information.

190.    Deere notified XAPT of this breach on November 1, 2019.

191.    XAPT continued to use Cosmo Consult on Deere's project without authorization.

192.    As a result of XAPT's continued failure to comply with the Contracts, Deere removed access to all @cosmoconsult.com email address on or about November 26, 2019 and again asked XAPT to comply with its obligations.

193.    Finally, on January 22, 2020, Deere put XAPT on notice that it had disregarded Deere's direct limitations on Cosmo Consult's access to its confidential information by continuing to share Deere's information with them and by allowing  Cosmo Consult to work on the JD-DBS project constitutes an ongoing breach of XAPT's obligations.

194.    Deere has paid millions of dollars to XAPT, and has otherwise performed its obligations under the Contracts.

195.    Deere has suffered damages as a result of XAPT's breaches in an amount greater than $15,000,000.

**COUNT II – BREACH OF CONTRACT –
BREACH OF POST TERMINATION OBLIGATIONS (SECTION 12 OF THE MSA)**
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

196.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

197.    The MSA is valid and enforceable.

198.    Deere has fully complied with its obligations under the MSA or has been excused from doing so.

199.    XAPT has repeatedly breached its post termination obligations under Section 12 of the MSA.

200.    For example, MSA § 12.4.1 requires Supplier to promptly return (or at Discloser's option destroy) all applicable Discloser Confidential information and other property and materials of Discloser.

201.    Among other things, XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult are required to return all Deliverables to Deere.

202.    Approved subcontractors were obligated to enter into the confidentiality agreement identified as Exhibit D to the MSA and have each sign it.  *See* Exhibit D to MSA, filed by XAPT under seal.  Deere requested that XAPT comply with its post termination obligation on January 24, 2020, and again on March 23, 2020.

203.    To date, XAPT has failed to comply with its obligation under MSA § 12.

**COUNT III – BREACH OF CONTRACT –
RETURN OF CONFIDENTIAL INFORMATION**
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

204.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

205.    The MSA is valid and enforceable.

206.    Deere fully complied with its obligations under the MSA or has been excused from doing so.

207.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult agreed to comply with the terms of the MSA, including agreeing to the terms of the confidentiality agreement in Exhibit D to the MSA.   *See* Exhibit D to MSA, filed by XAPT under seal.

208.    On January 24, 2020, Deere terminated the Contracts, including the MSA, for cause and requested that XAPT comply with its post termination obligations.

37

209.    Among other things, following termination of the Contracts, or at any time that Deere requests, Deere is entitled to the return of its Confidential Information.

210.    Again, on March 23, 2020, Deere requested that XAPT comply with its post termination obligations.

211.    Despite Deere providing notice as required under the Contracts, XAPT has not complied with its post termination obligations.

212.    Again, on March 24, 2020, Deere asked XAPT to comply with its and its approved subcontractors' post termination obligations.

213.    To date, that compliance has not occurred.

214.    XAPT is responsible for its approved subcontractors' compliance with the Contracts.

215.    Deere has suffered damages as a result of XAPT's breaches in an amount to be determinate at trial and that may not be quantifiable in monetary damages.

### COUNT IV – FRAUDULENT INDUCEMENT
(Against XAPT)

216.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

217.    As more fully set forth in Sections C and J of the Factual Background, XAPT made false statements and misrepresentations to induce Deere to choose XAPT as its Independent Software Vendor.

218.    Prior to entering into the Contracts, XAPT misrepresented that NAXT could already perform the vast majority of capabilities on Deere's list of required capabilities, either out-of-the-box or with minimal configuration.

219.    XAPT's estimate for the total cost to configure NAXT to Deere's capability list, integrated into the Contracts as Exhibit M, was $3,780,770.

220.   Deere paid over $5,392,503 in configuration costs.

221.   In addition, XAPT misrepresented that there would only be 50 development gaps to bring NAXT into line with all of Deere's required capabilities.  XAPT's list of gaps to meet Deere's required capability list has been integrated into the Contracts as Exhibit B to the Global Template SOW.

222.   XAPT's estimate for the total cost to close the gaps in Deere's capability list, integrated into the Contracts as Exhibit M, was $727,584.

223.   To bring NAXT to Deere dealers in only three of the originally anticipated and contracted-for countries—Mexico, Australia, and New Zealand—there are still more than three hundred gaps requiring development.

224.   It is impossible to create a dependable estimate of gaps to bring NAXT to Deere dealers in all seven jurisdictions due to XAPT's misrepresentation regarding their product and development abilities.

225.   So far, Deere has paid approximately $3,600,000 in gap closure development costs.

226.   XAPT represented that it could complete the entire development process in approximately 18 months.

227.   To date, after more than 27 months, the software system is not close to being fully developed and is not available to a single Deere dealer.

228.   Upon information and belief, at the time XAPT made these false statements and misrepresentations as to the configurability, gaps, cost, and project timeline, it knew they were false and/or made them with reckless indifference to the truth.

229.   On information and belief, XAPT, a self-proclaimed "global leading provider of Microsoft Dynamics ERP business solutions," with extensive experience in the industry creating

39

integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was fully aware of what was required to modify its current software system to meet the capabilities list, and the time and cost needed to do so.

230. Instead, XAPT grossly misrepresented the configurability of its product, gaps, and cost in order to induce Deere to enter into lucrative, decade-long development, licensing, and servicing contracts.

231. XAPT's false statements and misrepresentations induced Deere to choose XAPT to develop its global DBS.

232. Because XAPT had extensive experience in developing integrated DBS for global implementations and up-scaling, configuring and tailoring its DBS to the needs of its customers, and had extensive knowledge and experience in the heavy equipment industry, Deere's reliance on XAPT's false statements and misrepresentations was reasonable.

233. As a result of XAPT's misrepresentations, Deere has been injured in an amount exceeding $48,000,000.

## COUNT V – REFORMATION
### (Against XAPT)

234. Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

235. As more fully set forth in Section I of the Factual Background, the parties' true agreement in Amendment 1 was for its appendices to add additional information to the appendices in the Global Template SOW, for example, to reflect the fact that XAPT had failed to originally identify the correct gaps in order to meet the list of capabilities in Appendix A to the Global Template SOW.

236.    Contrary to the parties' agreement, the text of Amendment 1 provided that its appendices would "replace" those in the Global Template SOW.  Deere executed Amendment 1 believing that its appendices would not narrow the scope of the project.

237.    XAPT knew the language of Amendment 1 did not align with the parties' agreement and Deere's expectation because: (a) XAPT sought approval for Amendment 1 from Deere employees not authorized to make such decisions, in violation of the Governance SOW; and (b) when Deere asked Popovic whether he knew of the mistake, he stated that "of course" he knew.

238.    Deere therefore seeks reformation of Amendment 1 to reflect the parties' agreement that the appendices to Amendment 1 be added to, rather than replaced by, the appendices to the Global Template SOW.

## COUNT VI – DECLARATORY RELIEF
### (Against XAPT)

239.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

240.    An actual controversy exists between Deere and XAPT regarding XAPT's claims of an ownership interest in property rights in and to all Deere Pre-Existing IP, Deliverables and Deere Modifications acquired and owned and/or licensed by Deere under the Contracts.  Such claims by XAPT have thwarted Deere's legitimate use of its property rights under the Contracts.

241.    Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as provided for in MSA § 6.1.

242.    The term "Deliverables" is defined in MSA §1.12. "Deliverable" or "Deliverables" means "those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools,

and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software[1] and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf."

243.    Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

244.    The assignment was effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

245.    XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult do not have any ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

246.    XAPT and its Representatives' assertions of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including demands for return or demands for Deere not to use Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

247.    Deere has no obligation to return Deere's Pre-Existing Intellectual Property, Deliverables or Deere Modifications.

---

[1] Software is defined in the MSA to mean "Supplier's software products (including each module, component, and function described in the applicable SOW), including the Combined Solution and any Upgrades, new releases and documentation for the Combined Solution." Modification means a modification, customization or localization of the Combined Solution, including any associated update (as defined in the SDA)."  MSA §§ 1.26 and 1.18.

248. XAPT and its Representatives' demands that Deere not use, and XAPT and its Representatives threats of enforcement of ownership rights in and to, all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

249. Deere is not obligated to comply with those demands.

250. Non-compliance with those demands is not a breach of Deere's obligations under its agreements with XAPT or its representatives.

251. Deere also holds and irrevocable license to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing Intellectual Property under the Contracts.

252. To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

253. XAPT improperly demanded that Deere not use Supplier Modifications and Supplier Pre-Existing IP under the Contracts.  MSA § 12.4.1 expressly states that Deere is not required to return Supplier Modifications and Supplier Pre-Existing IP for which irrevocable perpetual licenses have been granted thereunder.

254. XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing IP not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage

Modifications, and Supplier Pre-existing IP in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

255.    Deere is not obligated to comply with XAPT's demands.

256.    Deere's non-compliance with XAPT's demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

257.    XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing Works be returned are improper because MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted.

258.    Deere is not obligated to comply with XAPT's demands.

259.    Deere's non-compliance with XAPT's demands is not a breach of Deere's obligations under its Contracts with XAPT or its Representatives.

260.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement in Exhibit D to the MSA.  *See* Exhibit D to MSA, filed by XAPT under seal.

261.    Deere has a right to immediate possession of Deere Confidential Information.

262.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

### COUNT VII – INJUNCTIVE RELIEF & SPECIFIC PERFORMANCE
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

263.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

264.  Deere seeks specific performance under Section 12 of the MSA.

265.  Deere has complied with all of terms of the MSA.  To the extent Deere has not yet complied with any terms of the MSA, it stands ready, willing, and able to perform any outstanding obligations.

266.  In additional to XAPT's contractual obligations, XAPT's approved subcontractors have obligations under Section 6.13.7.

267.  Approved subcontractors are required to have each of their representatives individually sign the Confidential Information Agreement attached to the MSA as Exhibit D.  *See* Exhibit D to MSA, filed by XAPT under seal.

268.  Pursuant to the post-termination provisions of MSA § 12.4, XAPT is required to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

269.  Pursuant to their respective contractual obligations, XAPT, XAPT Kft, and XAPT Solutions and Cosmo are required to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

270.  XAPT, XAPT Kft, and XAPT Solutions and Cosmo do not have ownership interests in all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as defined by the contracts between the parties.

271.  XAPT, XAPT Kft, and XAPT Solutions and Cosmo are not permitted to interfere with Deere's use of intellectual property right irrevocably licensed to Deere.  Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications,

Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

272.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo have failed or refused to perform their contractual obligation to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

## COUNT VIII – CONVERSION
### (Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

273.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

274.    Under the Contracts, Deere has a right to the Deliverables and Deere Confidential Information.

275.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

276.    Following termination of the Contracts, XAPT is required to provide Deere with the Deliverables along with Deere Confidential Information.

277.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have, without authorization, wrongfully assumed control, dominion, and/or ownership over the Deliverables and Deere Confidential Information.

278.    Despite Deere's multiple requests asking XAPT to comply with its contractual obligations, XAPT has willfully and without justification failed to provide Deere with this material.

## COUNT IX – REPLEVIN
### (Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

279.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

280.    The Contracts provide that Deere owns the Deliverables and Deere Confidential Information and has a right to this property.

281.    Deere also has the right to immediate possession of the Deliverables and Deere Confidential Information.

282.    Deere has the ownership and/or the right to immediate possession of the Deliverables and Deere Confidential Information.

283.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

284.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have no right to possess the Deliverables and Deere Confidential Information.

285.    On information and belief, to date, XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult still wrongfully possess this information.

286.    In addition to possession, Deere seeks an order instructing XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult not to intentionally destroy, sell, or secrete the information.

## COUNT X – ALTER EGO
### (Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

287.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

288.    XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult share a unity of interest and/or control.

289.    Recognition of individual corporate forms between XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult would promote injustice, inequity and/or fraud.

290.    Upon information and belief, corporate formalities have not been observed between XAPT, XAPT Kft, XAPT Solutions, and/or Cosmo Consult.

291.    Upon information and belief, XAPT is a mere instrumentality or façade for XAPT Kft, XAPT Solutions and Cosmo Consult.

292.    XAPT Solutions put out a press release dated September 17, 2019 on https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ with a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS."  Exhibit 1.

293.    XAPT and XAPT personnel were utilizing the email address @cosmoconsult.com.

294.    Upon information and belief, XAPT employees were interchangeable with those of Cosmo Consult.

295.    In that same timeframe, Deere learned of the press release.

296.    Initially, XAPT contended that "[Cosmo Consult] is the same consultants as it [*sic*] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [*sic*] the same that Deere approved in July of 2018."

297.    Shifting its position, XAPT later contended that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS SOLUTION S.R.L.". This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

298.    Upon information and belief, the alleged transactions conducted between the entities were not made in good faith and/or on commercially reasonable terms.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Deere & Company respectfully requests that this Court finds in its favor and against Defendant as follows:

A.     Enter judgment for Plaintiff and against XAPT on Count I;

B.     Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count I;

C.     Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count II;

D.     Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count II;

E.     Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count III;

F.     Award damages in an amount to be determined at trial under Count III;

G.     Enter judgment for Plaintiff and against XAPT on Count IV;

H.     Award damages in an amount to be determined at trial, in excess of $48,000,000 under Count IV;

I.     Enter judgment for Plaintiff and against XAPT on Count V;

J.     Award reformation of Amendment 1 to state that the appendices to Amendment 1 be added to, rather than "replace," the appendices to the Global Template SOW;

K.     Enter judgment for Deere and against XAPT on Count VI, granting the following declaratory relief:

1.  DEERE'S OWNERSHIP RIGHTS

49

a.  Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. MSA § 6.1.

b.  Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

c.  Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

d.  The assignment is effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

e.  XAPT, XAPT Kft, XAPT Solutions and Cosmo do not have an ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

50

f. XAPT and its Representatives' assertion of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return or Demands for Deere not to use Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, is improper.

2. DEERE HAS NO OBLIGATION TO RETURN DEERE PRE-EXISTING IP, DELIVERABLES, AND DEERE MODIFICATIONS.

a. XAPT and its Representatives demand that Deere not use, and XAPT and its Representatives' threats of enforcement of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

b. Deere is not obligated to comply with those demands.

c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

3. DEERE HOLDS AN IRREVOCABLE LICENSE TO SUPPLIER MODIFICATIONS, COMPETITIVE ADVANTAGE MODIFICATIONS AND SUPPLIER PRE-EXISTING IP.

a. To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license as set forth in MSA § 6.6.4.

i. Section 6.6.4. states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

51

ii.     Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

iii.     Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

iv.     Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

v.     In addition, MSA§ 6.6.3, it provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

4. XAPT'S DEMAND THAT DEERE NOT USE SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS IS IMPROPER

    a. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

    b. Deere is not obligated to comply with those demands.

    c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

5. DEERE HAS NO OBLIGATION TO RETURN SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS

    a. MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted. MSA § 12.4.1.

    b. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works be returned are improper.

    c. Deere is not obligated to comply with those demands.

    d. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

6.   XAPT AND ITS REPRESENTATIVES HAVE AN OBLIGATION TO RETURN DEERE CONFIDENTIAL INFORMATION

a.   XAPT, XAPT Kft, and XAPT Solutions and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

b.   The Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information.

c.   Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

d.   Deere has a right to immediate possession of Deere Confidential Information.

e.   XAPT, XAPT Kft, and XAPT Solutions and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1

and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

L.     For Count VII, for Injunctive Relief and Specific Performance, enter Judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult and order the following specific enforcement and injunctive relief relating to XAPT's Post Termination obligations and obligations to return its Deere Confidential Information:

1. An Order requiring XAPT to comply with its post Termination provisions MSA § 12.4 to Return Deere Confidential Information, Deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

2. An Order requiring XAPT, XAPT Kft, and XAPT Solutions, and Cosmo to return Deere Confidential Information pursuant to their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

3. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from asserting any ownership interest in including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

4. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from interfering with Deere's use of intellectual property right irrevocably licensed to Deere. Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

a.  Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work. "

b.  Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to

its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

c. Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

d. In addition, MSA § 6.6.3 provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

M. Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for conversion under Count VIII and order return of Deere Confidential Information;

N. Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for replevin under Count IX; order return of Deere Confidential Information; and order defendants not to intentionally destroy, sell, or secrete the information.

O.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count X;

P.      Award damages in an amount to be determined at trial under Count X; and

Q.      Granting such other and further relief on each Count I to X as this Court deems just and proper.

## JURY DEMAND

Plaintiff Deere & Company hereby demands a trial by jury on all issues so triable.

Dated:  March 27, 2020          /s/ *Mariangela M. Seale*

Matthew Fischer
Mariangela Seale
Lauren Jaffe
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
mfischer@rshc-law.com
mseale@rshc-law.com
ljaffe@rshc-law.com

Kara  E.  F.  Cenar  *(Admission  app.  filed contemporaneously herewith)*
S. Patrick McKey
GREENSFELDER, HEMKER & GALE, P.C
200 West Madison Street, Suite 3300
Chicago, Illinois 60606
(312) 419.9090 (tel)
(312) 419.1930 (fax)
kcenar@greensfelder.com
pmckey@greensfelder.com

Mary  Ann  L.  Wymore  *(Admission  app.  filed contemporaneously herewith)*
Ronnie  L.  White  II  *(Admission  app.  filed contemporaneously herewith)*
GREENSFELDER, HEMKER & GALE, P.C
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102

(314) 241.9090 (tel)
(314) 241.8624 (fax)
mlw@greensfelder.com
rwhite@greensfelder.com

*Attorneys for Plaintiff Deere & Company*

# Exhibit 1

Case 2:21-mc-00138-TUC Document 1 Filed 12/14/21 Page 92 of 266
4:19-cv-04210-SLD-JEH # 68-1 Page 335835



Acquisition XAPT Solutions

**CRM, ERP, PRESS RELATION**

# COSMO CONSULT ACQUIRES XAPT SOLUTIONS

**Gero Brinkbäumer**

**09/17/2019**



**The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania.**

## Integrating two market leaders

With 150 employees in <u>Hungary</u> and <u>Romania</u>, XAPT Solutions is the market leader for Microsoft business solutions there. Until now, the company was part of XAPT Software, an internationally active Microsoft solutions provider with which COSMO CONSULT has agreed on a comprehensive partnership in addition to the acquisition.

With XAPT Solutions, the COSMO CONSULT group is integrating a Dynamics pioneer that has expertise in the complete <u>Microsoft product portfolio</u> from Dynamics 365 to Office 365 and Power BI to Azure-based cloud infrastructures. XAPT Solutions also offers various industry solutions and special solutions that are used by well-known industrial companies around the world.

 **Digital Maturity Check**

**Compare benchmarks** now and get consulting. We offer you a **free online survey** that enables an initial analysis of your **digital business processes** - holistically or departmentally.

<u>Go to Digi-Check</u>

## Great potential in Eastern Europe

The integration of XAPT Solutions into the COSMO CONSULT group is a further milestone in the growth strategy of the largest Microsoft <u>digital transformation partner</u> in Europe, one that has been expanding its business most recently through acquisitions in Germany, Austria, France and Spain. With a total of 1,200 employees, COSMO CONSULT will now be represented with its own branches in the emerging Eastern European markets.

Local companies in Hungary and Romania will be able to benefit from the combined range of products and services offered by the two leading technology providers and from their precise knowledge of local market conditions, and so will international customers wishing to expand their business in Eastern Europe.

## Partner for digital transformation

"With its comprehensive, international Microsoft expertise, XAPT Solutions fits perfectly into our group," explains **Uwe Bergmann**, CEO of COSMO CONSULT. Eastern Europe has extremely interesting places to do business - with dynamic growth and great investment potential. It is important to us to be there with our own resources, to be there for our customers with all of COSMO's expertise."

But there's even more to it, says Uwe Bergmann: "Especially in times of great changes, such as the ongoing digital transformation, you need a strong IT partner who not only knows what to do, but is also going to be there for the long haul. By bringing together two market leaders under a common roof at COSMO CONSULT, our customers can be sure to have the strongest Microsoft partner for digital transformation in Europe at their side."

Tags

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:19-cv-04210-SLD-JEH |
| | ) | |
| v. | ) | |
| | ) | |
| XAPT CORPORATION; XAPT | ) | |
| SOLUTIONS PTY LTD; | ) | |
| XAPT KFT; COSMO CONSULT | ) | |
| BUSINESS SOLUTIONS S.R.L, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED AND FIRST SUPPLEMENTAL COMPLAINT

Plaintiff Deere & Company ("Deere"), by and through its undersigned attorneys, for its Second Amended and First Supplemental Complaint against Defendant XAPT Corporation ("XAPT"), XAPT Kft ("XAPT Kft"), XAPT Solutions Pty Ltd ("XAPT Solutions"), and Cosmo Consult Business Solutions S.R.L. ("Cosmo Consult") (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.      Deere brings this action for breach of contract, fraudulent inducement arising out of XAPT's bait and switch tactics, reformation of Amendment 1 to the contract, breach of post termination contractual obligations, declaratory judgment, injunctive relief, specific performance, conversion, replevin and alter ego.

2.      To win a lucrative, decades-long development and licensing project with Deere, XAPT grossly misrepresented its system's capabilities and the cost to complete the project.  Only after the project began and Deere paid XAPT millions of dollars did it become clear that XAPT is

1

either incapable of or has chosen not to perform at the requisite level, leaving Deere with nothing to show for it.

3.     In 2013, Deere decided to develop a state of the art global, integrated software system that its dealers in seven geographical locations around the globe could use to manage all aspects of their businesses, from sales and inventory, to tax and regulatory, to service and parts.

4.     Seeking to win the bid, XAPT promoted its depth of industry knowledge and experience, the robust and flexible nature of its software, its ability to easily modify its out-of-the-box template "to suit John Deere," and its expertise in global implementation and scaling up. XAPT represented its software solution, "NAXT," as a kind of software utopia: highly configurable and perfectly tailored to the heavy equipment market.  XAPT told Deere that it could meet Deere's requirements with minimal development in eighteen months.

5.     These promises, and others, induced Deere to choose XAPT for a multi-phase, lucrative, decade-long contract.

6.     Despite XAPT's representations that it is an expert and global leader in software solutions, XAPT continually failed to deliver as required by the contract, and the current code contains exceptionally high numbers of defects.  XAPT's poor performance has caused the project to take years longer, and millions of dollars more, than Deere had committed.

7.     In addition, XAPT's underhanded negotiation tactics resulted in a contractual amendment that the parties did not intend.

8.     The software XAPT promised and for which Deere contracted was never completed and is not available to a single Deere dealer.

9.     Following XAPT's mounting breaches, Deere terminated its contracts with XAPT and asked XAPT to comply with its post termination obligations—which it has yet to do.

10.    Deere also asked XAPT to comply with its contractual obligations and return Deere's confidential information, which to date, XAPT has also failed to do.

### JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.    Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred in the Central District of Illinois and the damages arise here.

13.    Pursuant to Local Rule 40.1(F), the basis for filing in the Rock Island Division is that the plaintiff resides in Rock Island County, Illinois, and a substantial portion of the events or omissions giving rise to the claims occurred in Rock Island County, Illinois.

### THE PARTIES

14.    Plaintiff Deere & Company is a Delaware Corporation with its principal place of business in Moline, Illinois.  Deere is engaged, among other things, in the business of delivering products and services to support those linked to the land, in line with its core values of integrity, quality, commitment, and innovation.

15.    Defendant XAPT Corporation (XAPT) is a Florida Corporation with its principal place of business in Miami, Florida.  XAPT is a division of the New Frontier Group, a "fast-growing regional IT solutions player" headquartered in Vienna, Austria.  XAPT styles itself a "global leading provider of Microsoft Dynamics ERP business solutions" that "provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

16.     Defendant XAPT Kft ("XAPT Kft") is a foreign company with its principal place of business in Budapest, Hungary, and none of its owners are citizens of Illinois.

17.     Defendant XAPT Solutions Pty Ltd (XAPT Solutions) is a foreign company with its principal place of business in Brisbane, Australia, and none of its owners are citizens of Illinois.

18.     Defendant Cosmo Consult Business Solutions S.R.L. (Cosmo Consult) is a foreign company with its principal place of business in Bucharest, Romania, and none of its owners are citizens of Illinois.

## FACTUAL BACKGROUND

### A. Deere Develops Strategy to Offer Dealers Single, Integrated, Global Dealer Business System

19.     Deere dealers run businesses involved in selling, renting, and servicing agriculture, turf, construction, and/or forestry equipment.  Deere dealers operate on six continents.

20.     Behind the scenes of a Deere dealer's business sit dozens of other functions, including marketing, accounting, tax, administrative, regulatory, human resources, information technology, inventory, data management, contract management, and subscription management, among many others.  Many of these functions are enabled by separate web applications.

21.     To bring multiple applications together such that information can flow among them (for example, linking inventory to parts purchases, or sales information to financial statements), dealers purchase a computer software system known as a "Dealer Business System," or "DBS."

22.     Deere has developed and offered its own DBS, which has been available in the United States, Canada, Mexico and Brazil.

23.     After extensive analysis and discussions with stakeholders and consultants, Deere determined in 2013 that it could better serve its dealers by developing a single, fully integrated DBS for purchase by all of its dealers in key markets.

24.     Deere's vision, informed by its own DBS experience, was to offer its dealers a fully integrated DBS that could be configured by market.  For example, an agriculture equipment Deere dealer in Mexico could select options applicable to that dealer, such as the Spanish language, agriculture equipment settings, and a Mexico regulatory function.  A Brazilian construction and forestry dealer could, by contrast, select Portuguese, construction and forestry, and Brazilian regulatory settings.  Technological advances had rendered Deere's own DBS difficult to expand, so Deere decided to start anew using updated technology.

25.     First, Deere developed a list of more than three hundred capabilities that the new DBS must have.  These capabilities fell into five functional areas: accounting, parts, rental, sales, and service.  The capabilities are currently offered by Deere's own DBS and span the operations of Deere dealers.  They include, for example, "Associate a file with an accounting ledger, account, PO [Purchase Order] or other," "Quickly and easily view available payment options for the customer prior to finalizing the invoice. Credit limits and restrictions should be easy to determine whether it is in house (accounts receivable) or outside financing (JDF)," and "Quickly and easily request, schedule and execute transportation events with two work orders to two different customers on two different machines on same transportation route."

26.     Next, Deere targeted seven markets: first Mexico followed by Australia and New Zealand, and then Canada, the United States and its territories and possessions, Brazil, and Argentina.

27.     Finally, Deere determined that it needed a platform on which the system would be built, and a developer to create and implement the system, as well as provide ongoing support.

B.  **Selecting a Platform and a System Developer**

28.     Because of the importance of the project and the longevity of the planned relationship, Deere took great care in selecting its platform provider and system developer for the global DBS.

29.     Deere began by sending a Request for Information ("RFI") to several potential platform providers on September 27, 2013.  Finalists in the RFI process were invited to demonstrate their platform capabilities.  After months of analysis and rigorous testing, including deep dive meetings to gauge capabilities, proof of concept projects to understand user experience, and discussions with stakeholders, Deere selected Microsoft as the provider of the platform on which the DBS would be built.

30.     To find its system developer—its "Independent Software Vendor"—Deere sent a Request for Proposal ("RFP") to potential providers on December 4, 2015.  As it did with selecting its platform provider, Deere rigorously analyzed and vetted its Independent Software Vendor prospects.  This process, which began in 2014 and ended with the execution of contracts with XAPT on June 26, 2017, had many facets, including multiple deep dive meetings, proof of concept projects, financial modeling, contract negotiations, and discussions with dealers and stakeholders.

C.  **XAPT and Deere's Extensive Pre-Contract Meetings and Discussions**

31.     Deere and XAPT's relationship began with a telephone call in December 2015. From the inception of the relationship, and consistently over the next almost two years prior to contract execution, Deere consistently described its development needs: a global DBS template, customizable by region, including more than three hundred enumerated capabilities, data migration from Deere's prior systems, full integration among its applications, and initial roll-out to dealers in seven countries.

32.     During the selection process, including at least nine meetings at Deere's office in East Moline, Illinois involving more than twenty XAPT representatives, XAPT grossly and consistently misrepresented the development required to adapt its allegedly "proprietary and confidential" NAXT system to meet Deere's capability requirements, the time it would require to complete the project, and its cost.

### 1.  March 1 – March 3, 2016 Deep Dive Meetings

33.     During deep dive meetings during the week of February 29, 2016 at XAPT's offices in Miami, Florida, Deere and XAPT and its representatives used demonstration scripts to analyze the 300+ capabilities that the new DBS must have in comparison with the preconfigured, out-of-the-box capabilities of XAPT's NAXT software.

34.     A primary goal of the deep dive meetings was to determine the number of gaps in each subject matter area that would require coding to meet Deere's needs.  The heart of the meetings involved presentations by XAPT subject-matter experts, including Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, and Juliet Cheng.  Also present from XAPT were team leaders and salesmen, including COO Hunt, who oversaw the NAXT team, VP Skiver, Chris Wittusen, and Daniel Enekes.

35.     Each XAPT subject matter expert spent hours presenting to Deere on NAXT's functionalities.  Through each of these presentations, as well as the entire deep dive process, XAPT's message was the same: NAXT could already perform the vast majority of capabilities on Deere's list, either out-of-the-box or with minimal configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

36.     "Gaps" are desired services and/or functions that XAPT's system could not perform that would require development/coding.  Such development/coding is done utilizing "stories."  The

number of stories needed to close a single gap varies, but closing 50 gaps generally requires more than 50 stories.

### 2. March 17, 2016 RFP Response

37.     On March 17, 2016, XAPT submitted its response to Deere's RFP.  XAPT's response contained several related documents, including an ERP Project Proposal, a draft Statement of Work, Draft Project Plans, and responses to dozens of questions Deere used to vet proposals.  In a "Certification and Authority Statement" signed by COO Hunt and Frank Squeri, XAPT's Chief Finance Officer on the same date, XAPT agreed to be bound by the representations, terms and conditions contained in its Proposal.

38.     In XAPT's ERP Project Proposal dated March 17, 2016, it represented:

a.   "We understand the size of this undertaking, we have developed implementation schedules for the template buildout and for each dealer size that are conservative in nature and allow for extensive time to undertake testing, training, and data migration."

b.   "Create the Template – XAPT can undertake this activity with existing staff."

c.   "XAPT Corporation is a global leading provider of Microsoft Dynamics ERP business solutions.  XAPT specializes in the development of industry specific solutions built on the Microsoft Dynamics AX ERP platform for the Heavy Equipment Distribution, Automotive and Wholesale/Distribution industries and provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

39.     In response to a Deere RFP questionnaire, XAPT stated that it "does not intend to subcontract any services - other than for the provision of data center services through Microsoft

Azure, or as a method of engaging staff in locations where XAPT does not, or is not able to set up a local company and thus decides to use a service provider. In such circumstances XAPT will consult with John Deere."

### 3. March 31, 2016 Proposal Presentation

40.     Ralph Hunt, COO of XAPT, and VP Sean Skiver of Business Development, reiterated these representations during a March 31, 2016 proposal presentation to Deere in Moline. During this presentation, XAPT touted its industry knowledge, development qualifications, product, and commitment to Deere. In short, XAPT presented itself as the ideal developer for Deere.

41.     XAPT emphasized its "extensive industry knowledge and experience," its "[h]istory of working with Equipment Manufacturers," and its "[e]xperience in implementing [its] solution globally." XAPT represented that it focuses both "on the development and implementation of integrated software solutions tailored to the Heavy Equipment Industry," and that it understood the "added complexity of implementing systems in multiple countries, cultures and languages."

42.     For its product, XAPT touted the "functionally rich, highly flexible" nature of its software, the process of "[u]sing an existing template and methodology as a base to build on," and its ability to modify its existing template "to suit John Deere." XAPT characterized its product and development capabilities in a manner that demonstrated its understanding of and commitment to meeting Deere's needs:

- "One database. One environment. Fully integrated. No redundancy. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

- "The fully integrated solution for John Deere dealers."

- "XAPT offers a fully integrated solution that provides functionality across the entire dealership. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

- "The complex structures of equipment dealerships, their suppliers and customers, demand both global and local knowledge. We bring the reassurance of a fully integrated solution, tailored to equipment dealers, with an understanding of regional requirements, delivered by Award winning specialists. XAPT provides clients full visibility and control across every branch and subsidiary, wherever their location."

43.    Consistent with Deere's core value of commitment, XAPT promised to "be involved forever – not just the term of the project."

### 4. Proof of Concept Presentations July 11-12, 2016

44.    At its Proof of Concept presentations to Deere on July 11-12, 2016, in Budapest, Hungary, XAPT reiterated these themes: competence, responsiveness to Deere's needs, and ability to tailor its solution quickly and efficiently, with minimal development/coding.

45.    For example, XAPT demonstrated how it would tailor its system to handle an everyday dealer task: a customer orders an item in-store and pays for it at the cash register.  While the XAPT system originally took eleven minutes and dozens of "clicks" of the computer mouse to complete this task, XAPT quickly streamlined the process to take a fraction of the "clicks" and less than six minutes.  XAPT represented that its system was flexible enough to handle many such tasks in the same manner.

46.    Following all the meetings and a thorough review of XAPT's RFP response, Deere engaged XAPT as its Independent Software Vendor.  XAPT's first task as Independent Software Vendor was to develop the Global DBS template.

### D. <u>Contractual Framework for Creating the Global DBS</u>

47.    Four principal contracts govern the creation and development of the Global DBS: (a) the Master Services Agreement dated June 26, 2017, as amended on June 27, 2018 and June

26, 2019 (the "MSA"); (b) the Work Order Template – Global Template dated June 26, 2017 (the "Global Statement of Work" or "Global Template SOW"), as amended on February 11, 2019 ("Amendment 1"); (c) the Work Order – Governance, dated June 26, 2017 (the "Governance Statement of Work" or "Governance SOW"); and (d) the XAPT Subscription Delivery Agreement ("SDA").  The MSA, Global Template SOW, Governance SOW, and SDA are collectively referred to as the "Contracts".

48.    The MSA establishes the framework for the parties' relationship, and the Global Template SOW and the Governance SOW operate within this framework.  The Global Template SOW governs the technical aspects of developing the Global DBS.  The Governance SOW establishes structures for communication, project management, and quality control.  The SDA structures subscription-related services, and also contains warranties related to the product itself.

1.  **Master Services Agreement**

49.    Section 3.6 governs XAPT's use of subcontractors.  Under Section 3.6, XAPT:

[M]ay subcontract any of the Services to those subcontractors and Affiliates listed on the applicable SOW, or, thereafter, with Deere's prior written consent to use the subcontractor in the capacity described in [XAPT]'s consent request (such consent not to be unreasonably withheld). . . . [XAPT] will not disclose Deere Data or Confidential Information to a subcontractor unless and until the subcontractor needs to have access to the information to perform the Services relating to the Master Agreement and has agreed in writing to confidentiality terms substantially equivalent to that required of [XAPT] under this Agreement. . . .  Prior to disclosing any Confidential Information of Deere to such approved subcontractors, [XAPT] will require each approved subcontractor to execute a non-disclosure agreement in the form provided by Deere.

MSA § 3.6.

50.    Section 6.5.1 lays out some of Deere's ownership and intellectual property rights:

Deere shall own all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. Supplier hereby irrevocably assigns in perpetuity to Deere, and will require its

Representatives to assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.  As to any Deliverables (other than Supplier Modifications) and Deere Modifications created after execution of this Agreement, the assignment shall become effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

MSA § 6.5.1.

51.     The MSA broadly defines "Deliverable" or "Deliverables:"

[T]hose Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

MSA § 1.12.

52.     In addition, under Section 6.3.4, Deere owns all "interfaces" between Deere's Pre-Existing Works and XAPT's Pre-Existing Works, Combined Solution, or Modifications created by XAPT:

Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications.

MSA § 6.3.4.

53.     In addition to Deere's ownership rights, the MSA defines several categories of Deere Confidential Information which include the MSA itself, as well as "any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data,

and all Deliverables, with the exception of Deliverables deemed "Supplier Modifications."  MSA § 6.13.2.

54.     Under Sections 10.2 and 10.3, XAPT represents and warrants "that all Services will comply with the requirements in each applicable SOW in conformance with good professional practices and accepted industry standards," and "that it will provide sufficient Representatives to perform the Services within the time frames agreed and that its Representatives have sufficient skill, knowledge and training to perform the Services."  MSA §§ 10.2, 10.3.

55.     Section 12 of the MSA governs termination.  Upon termination of the MSA, under Section 12.4.2, XAPT "must deliver to Deere all Deliverables, whether finished or unfinished, developed prior to termination, in a form and format useable by Deere (and Deere agrees to pay for such material according to the relevant SOW)."  MSA § 12.4.2.

56.     Under Section 12.4.1, each Party must "[p]romptly return (or at Discloser's option, destroy) all applicable Discloser Confidential Information and other property and materials of Discloser, except that Deere shall not have the obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted" under the MSA.  MSA § 12.4.1.

## 2.  Global Template SOW

57.     The Global Template SOW "sets forth the Services to be performed by [the Parties] related to the NAXT 365 Solution."  It "represents the complete baseline for scope, Services, Deliverables, and acceptance applicable to this project."  Global Template SOW § 2.2.

58.     Based on XAPT's estimates, the Project "indicates a roughly 18 month duration." Global Template SOW § 3.3.

13

59.     The Global Template SOW sets forth XAPT's understanding of the project, including that it "has been retained to develop a Global Template for the implementation of a Dealer Management System for Authorized Dealers globally."   Global Template SOW § 2.3.

60.     Section 3.2.2 requires XAPT to provide dedicated personnel in the following areas: Project & Executive Sponsor, Project Management, Solution Architecture, Functional Consultants, Technical Consultants, Data Migration Consultants, and Technical Writers, each with enumerated responsibilities.  Global Template SOW § 3.2.2.

61.     Under Section 4.1, XAPT "will provide all Deliverables and complete milestones by the respective target dates identified below."  Global Template SOW § 4.1.  These targets included a "go-live (acceptance of template)" date in all seven countries of April 12, 2019.  Global Template SOW App'x I.

62.     The Global Template SOW provides for XAPT to invoice based on time and materials, and XAPT estimated that the cost of the Global Template SOW would be $7,744,679.  Global Template SOW § 6.1.

63.     As described in Section 2.1 of the Global Template SOW, the Appendices crystallize the scope of the project as well as its planned methodology and cost.

64.     Appendix A, Section A contained 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.  These capabilities include "functionality for each of the following areas (including but not limited to): Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."   Global Template SOW § 3.1.

65.     Appendix B listed the 50 gaps XAPT identified would require additional development in order to meet the core capabilities enumerated in Appendix A.  According to

Appendix B, "Most of these forms, data and functionalities are available as standard in Dynamics 365[.]"

66.     Appendix C detailed 137 required integrations to Deere applications.

67.     Appendix E contains Service Level Agreements ("SLAs") and was created "to allow Deere to ensure that user experience and expectations are met as they pertain to speed and response times of the solution."  The SLAs "will be used to measure the quality, delivery, and overall performance of [XAPT] for customizations" and are "designed to achieve the following goals:

1.  On-time delivery of quality code that meets or exceeds requirements

2.  Appropriate amount of testing

3.  Timely response to identified problems

4.  Severity 1 [critical] and 2 [major] defects associated with supported Authorized Dealer processes will be fixed by [XAPT] prior to production release of the Authorized Dealer as defined by the acceptance criteria below."

68.     Under Appendix E, unless otherwise specified in an individual Work Order:

- The "Plan/Deliver Score target is 90%."  The Plan/Deliver Score is "the number of system changes delivered divided by the total number of mutually agreed upon system changes in original FDD on or before the defined milestone."

- The "Acceptance Testing Coverage target is 90%."  Acceptance Testing Coverage is "the number of acceptance tests executed divided by the total number of acceptance tests associated with the system changes in the original FDD delivered on or before the defined milestone."

- The "Quality Bar target," or "number of identified open defects associated with the customization as defined in the approved FDD delivered on, or before the defined milestone," is:

    i.   "No known Severity 1 [critical] defects

    ii.  No Severity 2 [major] defects without mutually agreed workaround and resolution plan for each related defect.

          iii.  Mutually agreed resolution plans for all Severity 3 [standard] and Severity 4 [minor] defects."

69.    Appendix E also provides an "established set of metrics designed for measuring the performance and User Experience for mutually agreed [dealer] business processes"—in other words, maximum processing time thresholds for everyday dealer tasks, such as "Retrieve a previously created parts order file." The established set of metrics is based on the processing times in Deere's current DBS.

70.    Appendix J "Supplier's Development Methodologies," states, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices." In particular, XAPT's "development methodology is based on sprints of two weeks, continuous integration, daily builds, with unit and functional testing as part of the daily operation." XAPT submits "every development . . . to a best practice validation using a Microsoft provided tool."

71.    The Agile method of software development is a highly collaborative, iterative approach to product development. It involves setting a list of prioritized requirements and completing the top priorities first. Work is completed in two-week sprints. After each sprint, the list of priorities is re-evaluated, and priorities often shift as the project progresses. Deere, as the customer for whom XAPT is developing a product, drives priority setting.

72.    Appendix M provides a total cost estimate for the project, as follows:

    a.  $13,604,800 under the Governance SOW

    b.  The following under the Build Global Template SOW

        i.  $3,780,770 for Template Build Configuration

        ii.  $727,584 for Template Build – Gaps

        iii.  $1,100,000 for Template Build – SD [Service Delivery]

16

        iv.   $1,986,325 for Template Build – JD Apps Integration (rest); and

        v.   $150,000 for Mexico Localization Development

3. **Governance SOW**

73.     The Governance SOW, effective for ten years, "defines the roles and responsibilities of both Parties, and establishes reporting mechanisms that are required to maintain an effective working relationship[.]" Governance SOW §§ 2, 7.1.

74.     Sections 2.4 and 6.2, and Appendix B address the composition of XAPT's team, which included the following positions: Project Director, Project Manager, Project Scheduler, Quality Assurance (QA) Manager, Technical writers, Consultants, and Developers, etc. Governance SOW § 2.4.  The Project Director and Project Scheduler, as well as a Solutions Architect and Hungary Development Project Manager, are "Key Employees" under the Governance SOW.  Governance SOW App'x B.  The team also includes infrastructure and cloud support.  Governance SOW § 6.2.

75.     Appendix I "Supplier's Development Methodologies" reaffirms, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices."

4. **SDA**

76.     XAPT makes the following representations and warranties under the SDA:

-   "the Product, Global Template and Subscription Services shall perform in accordance with the Specifications" SDA § 20.1;

-   "all Services shall be performed in conformance with good professional practices and accepted industry standards"  SDA § 20.2; and

-   XAPT "will provide sufficient Representatives to perform the Services and its obligation hereunder within the time frames agreed and that its Representatives have sufficient skill, knowledge, experience, competence, skill and training to perform the services and obligations as set forth in this Agreement."  SDA § 20.3.

17

### E.   After Contract Execution, Gaps Multiply Exponentially and XAPT Fails to Deliver Project Deliverables, Produces Code Riddled with Errors, and Racks up Costs

77.   Once the project kicked off, it became apparent that XAPT grossly misrepresented the number of gaps required to bring its system in line with Deere's list of capabilities.  XAPT originally identified just **50 gaps** to produce the global DBS for all seven countries, but that number became well **over 600 gaps** just to produce the Global DBS for Mexico, Australia, and New Zealand.

78.   Because XAPT purports to be an industry leader, with experience making similar integrated systems for dealers in the same industry as Deere, this cannot be a harmless miscalculation.

79.   During the months following contract execution, including over 100 meetings in which XAPT representatives traveled to Deere's office in East Moline, XAPT's gross misrepresentation of the gaps became apparent, and, at the same time, XAPT failed to meet its code delivery requirements.  Among the XAPT representatives who traveled to Deere's office located in East Moline, Illinois were individuals who worked for XAPT Kft.

80.   XAPT's code development tasks are divided into component parts and placed into a deliverable timeline.  Each task component is a "story."  A typical story is assigned a point value between three and 21, depending on the complexity of the development required to complete it. The entire development project was estimated at 4,500 story points, to be delivered in increments of approximately 450 per month.

81.   Although development tasks were not classified as stories with point values until later in the project, a conversion of early deliverables into this classification nomenclature is as follows: by February 2018, XAPT was supposed to have delivered 450 points; instead it only

18

delivered 61. By March 2018, XAPT was supposed to have delivered 900 points, but it had only delivered 159. By April 2018, XAPT was 962 points behind schedule.

82. Even more problematic than failing to deliver on time, the code is riddled with defects (also known as "bugs") – errors in the code that prevent it from working properly.

83. By April 2018, XAPT had delivered 388 points, 50 of which met the Defect Service Level Requirements of Appendix E to the Global Template SOW and Appendix D to the Governance SOW.

84. The cost associated with these deliveries was also significantly higher than expected. On average, each point as of April 2018 had cost $1,235, as compared to XAPT's estimate of $880 (as represented in Appendix M of the Global Template SOW), indicating that XAPT's development took considerably longer than represented. Given that Deere paid based on time and materials, this level of performance cost Deere significantly more than originally agreed.

### F. Deere Invests in Training XAPT

85. By April 2018, it became clear that XAPT was not adhering to the Agile project methodology required by the Global Template SOW and the Governance SOW.

86. Two key features of Agile project management methodology are its priority list and its flexibility. Priorities are re-adjusted at the close of every two-week sprint. Deere, as the customer buying the product, drives priority-setting.

87. Contrary to the Agile model, XAPT was resisting priority-shifting, and was providing Deere with stories that were not the highest priority.

88. Deere sent its Manager of Development, Delivery, and Quality for the system to Hungary from April 16-25, 2018 to train XAPT's developers on Agile project methodology in an effort to support XAPT's commitment to use the Agile project methodology.

### G.    Post-Training, Gaps Increase, Quality Does Not Improve, and XAPT Seeks a $10 Million Increase in Contract Price to Deliver the Same Product

89.    By June 2018, the identified number of gaps requiring development had risen eight-fold, XAPT continued to deliver behind schedule, and its defect rate remained high.

90.    At this time, gaps had increased to a conservative estimate of more than 400, XAPT was 1,095 points behind schedule, and, of the gaps it did deliver, 56 of 77 contained defects.

91.    At the same time, XAPT requested an additional $10 million to account for the increase in identified gaps due to its own gross misrepresentations, despite the same project scope—the capabilities in Appendix A to the Global Template SOW.

92.    After XAPT sought to exponentially increase the costs of the development project, the parties commenced six months of contentious negotiations to fix the price of the remaining work.

### H.    Amendment 1 Creates Fixed Price for Remainder of Development Project and Ties Payment to Quality

93.    The key features of Amendment 1 to the Global Template SOW were: (i) a fixed price for the remainder of the development project, (ii) a fixed number of 545 gaps XAPT would have to close, and (iii) payment tied to meeting quality and delivery performance metrics. Amendment 1 also added 49 gaps of new scope (included as part of the 545), for which Deere agreed to pay $1.179 million.

94.    Despite XAPT's purported expertise, the parties had identified hundreds of additional gaps that XAPT had failed to initially identify, all of which were needed to achieve the original product capabilities.  However, in the interest of moving the project forward, Deere agreed in Amendment 1 to limit the number of gaps to 545, plus the service module gaps for the defined service capabilities for which the stories were being created during the negotiations of Amendment

1.  In fact, Deere was paying XAPT for functional consulting to define service module gap requirements at that time.

95.     To incentivize better performance by XAPT, the parties tied payment to quality: delivering 90% of the code for that month triggered a payment; eliminating Severity 1 and Severity 2 bugs triggered an additional payment; eliminating Severity 3 bugs triggered an additional payment; and completion of certain milestones triggered payment of a risk premium.

### I.      The Executed Version of Amendment 1 Does Not Reflect the Parties' True Agreement

96.     In Amendment 1, Deere and XAPT re-negotiated only part of their relationship: the number of gaps, quality incentives, fixed prices for gap closing, and $1.179 million in additional project scope.  These negotiations were necessitated by XAPT's gross misrepresentation of the number of gaps that it would need to close in order to provide a system with the capabilities required in Appendix A.  Deere, relying on XAPT's original estimate of 50 gaps, had not budgeted for the time and materials necessary to close the number of actual gaps, nor had Deere budgeted for the increased per-point cost of development work that was grossly above the estimates provided by XAPT.  Deere and XAPT did not renegotiate other key aspects of the relationship, such as the capabilities required to bring the final DBS to market, or the $1.1 million allocated to integrating the Deere service module.

97.     The text of Amendment 1 states, under "Amendment to Appendices," that the appendices in the Global Template SOW are "replaced" with the Amendment 1 appendices.

98.     Appendix A to the Global Template SOW comprised a list of "capabilities" needed for a complete DBS.  Appendix B to the Global Template SOW had the list of "gaps" in order to meet the capabilities list of Appendix A.

99.     By contrast, Appendix A of Amendment 1 included only a list of "gaps," and omitted the list of capabilities, and Appendix B of Amendment 1 included another list of "gaps."

100.    Without a complete list of capabilities in Appendix A, which is filled by "gaps," Amendment 1 fails to capture the fundamental scope and purpose of the DBS project.

101.     Because the parties did not negotiate to exclude the original scope of the project, the use of "replace" in Amendment 1 was a mistake.

102.    A large part of the original scope included integrating the Deere service module. These capabilities were not included in the amended appendices as they were part of the original appendices.  Deere had no reason to believe that these capabilities were not included in the project because: (1) integration of the Deere service module is included on the original list of capabilities contained in Appendix A to the Global Template SOW; (2) during Amendment 1 negotiations, the parties were conducting a service module integration proof of concept, showing that this part of the project was alive and well; (3) the DBS would not function in a single country without the Deere service module; and (4) Deere paid for service module integration in a specific line-item under the Global Template SOW, and Amendment 1 did not remove that line-item from the Global Template SOW.

103.    Deere signed Amendment 1 believing that its Appendices modified rather than replaced those in the Global Template SOW.

104.    Following execution of Amendment 1, and without explanation, XAPT refused to develop service module integration stories.  Despite Deere continuing to submit service module integration stories to XAPT for development, XAPT continued to reject them, and, inexplicably, sought more fees to develop them.

105.     Ultimately, Deere discovered the basis of XAPT's refusal to develop service module integration stories.  Although the project included $1.1 million for service module integration stories, XAPT had taken the position that the "replacement" of Appendix A had removed service module integration from the project scope.  Since the parties did not negotiate such a removal, Deere would still have to pay the $1.1 million line-item but would get nothing in return.

106.     Deere brought the contract mistake to XAPT's attention at a meeting in Budapest on April 23, 2019 between Deere representatives and Popovic.

107.     At this meeting, Deere informed Popovic that it seemed like he had known all along about the mistake in the Amendment 1 Appendices—that the unintended effect of the contractual language would be to exclude service module integration from the project scope yet still require that Deere pay it.  Deere told Popovic that it seemed that XAPT had stayed quiet knowing the Amendment 1 did not accurately reflect the parties' understanding.

108.     In response, Popovic exclaimed that "of course" he knew Amendment 1 would eliminate service module integration from the contract and that he knew that was not Deere's expectation.

109.     XAPT refused to provide the service module integration work for which Deere paid nearly all of the $1.1 million.

### J.     XAPT's Fraudulent Misrepresentation to Induce Deere to Choose XAPT

110.     From the inception of the relationship, and consistently over the next almost two years prior to contract execution, including at least nine in-person meetings at Deere's office in East Moline, Deere consistently described to XAPT the DBS that it intended to purchase from an

Independent Software Vendor: at its most basic, a global DBS template with more than three hundred enumerated capabilities.

111.    Though Deere's messaging regarding its needs for the project remained consistent, XAPT grossly and consistently misrepresented the configurability of its product and the development required to adapt its system to meet Deere's capability requirements, both of which directly impact project costs.

112.    Prior to entering into the Contracts, XAPT and Deere had numerous meetings and conversations in order to understand the full extent of work needed to modify XAPT's current system to perform all of Deere's desired capabilities.  Deere and XAPT understood that this was critical information to Deere's selection of an Independent Software Vendor and that it was closely linked with the timing and cost of the project.

113.    During the March 1-3, 2016 deep dive meetings at XAPT's offices in Miami, Florida, prior to XAPT submitting a bid for the project, Deere and XAPT used demonstration scripts to analyze the 300+ capabilities that the new DBS must meet and XAPT, including subject-matter experts Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, Juliet Cheng, VP Skiver, COO Hunt, Chris Wittusen, and Daniel Enekes, represented that the majority of the capabilities required minimal or no configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

114.    Again, on March 31, 2016, at a Proposal Presentation, XAPT COO Hunt, and XAPT VP Skiver, reiterated these representations, that, to meet Deere's 300+ list of capabilities, only 50 gaps would require coding/development.

115.     Once again, on July 11-12, 2016, in Budapest, XAPT reiterated its competence and efficiency, and emphasized that it could tailor its solution quickly and efficiently, with minimal development/coding (and only 50 gaps).

116.     Appendix A, Section A to the Global Template SOW contains 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.

117.     In Appendix B, XAPT identifies only 50 "gaps" that would require additional development in order to meet the core capabilities enumerated in Appendix A.

118.     On information and belief, XAPT, a self-professed industry leader with extensive experience in the industry creating integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was well aware of what was required to modify its current software system, NAXT.

119.     XAPT also knew that quoting fewer gaps meant the estimated contract price would be much lower.

120.     Instead of the promised 50 gaps XAPT identified, it had become clear that the number of gaps required to develop the system is well over 600—and this is only to roll the system out in Mexico, Australia, and New Zealand.  For the Global DBS to be available in all seven countries as originally planned, it became impossible to create a dependable estimate of gaps due to XAPT's misrepresentation regarding its product and development abilities.

**K.     Removal of Exclusivity**

121.     By June 2019, Deere understood that it needed to enlist additional development help to complete the project.

122.     Deere asked XAPT to remove the MSA's exclusivity clause so that it could engage another developer to perform some of the work, and XAPT agreed to do so for additional consideration.

25

## L. **XAPT Uses Unapproved Subcontractors and Hides It From Deere**

123.    In or about October or early November 2019, Deere learned that XAPT was utilizing an unapproved subcontractor on its project that operated under the email address @cosmoconsult.com.

124.    On November 1, 2019, Deere notified XAPT of this breach under Section 3.6 of the MSA and advised that depending on the relationship between XAPT and Cosmo Consult, there may also be breaches of the change in control provisions under Section 15.1 of the MSA.

125.    At that time, Deere asked XAPT to identify the relationship between Cosmo Consult and XAPT with supporting documentation.

126.     On November 1, 2019, XAPT responded by stating: "[Cosmo Consult] is the same consultants as it [sic] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [sic] the same that Deere approved in July of 2018."

127.    Noting XAPT's failure to provide adequate information to determine the relationship between Cosmo Consult, XAPT Solutions, and XAPT Kft, Deere reiterated is request on November 4, 2019 and asked XAPT to:

•    Please explain your use of resources from this company (Cosmo Consult).

•    Please also explain why you did not notify Deere of the use of this subcontractor (Cosmo Consult).

•    Please identify the relationship between Cosmo Consult and XAPT Corporation with supporting documentation.

128.    Changing its story, on November 5, 2019, XAPT responded that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS

SOLUTION S.R.L.". This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

129.    XAPT continued to use Cosmo Consult on Deere's project without authorization.

130.    With no action taken by XAPT to cease Cosmo Consult's access to Deere's confidential information, on or about November 26, 2019, Deere again asked XAPT to comply with its obligations and Deere removed access to all @cosmoconsult.com email addresses.

131.    Nonetheless, despite Deere removing access to all @cosmoconsult.com email addresses, XAPT still continued to share Deere's confidential information with Cosmo Consult team members.

132.    On January 22, 2020, counsel for Deere informed XAPT that it was aware of the blatant disregard of Deere's instruction and that XAPT continued to provide Cosmo Consult access to Deere's confidential information.

**M.    Press Release Tells a Different Story about XAPT and Cosmo Consult's Relationship**

133.    Contrary to XAPT's representations that S.C. XAPT Solutions SRL merely changed its name, a press release dated September 17, 2019 and posted on Cosmo Consult's website at https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ has a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS." A copy is attached hereto as Exhibit 1.

134.    The text of the press release states: "The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania."

## N.    Deere Terminates the Project for Cause

135.    By January 2020, the Global DBS, originally scheduled to be available in seven countries by April 12, 2019, was not available in a single country.

136.    As of October 2019, the schedule was that the system would not be available to dealers in its first country—Mexico—until June 2020, or the second country-Australia-until October 2020.

137.    Deere has complied with the Contracts and fully complied with the Mutual Dispute Resolution process.

138.    Faced with XAPT's breaches accumulating without cure, and a continually expanding timeline, on January 24, 2020, Deere properly terminated the Contracts for cause.

139.    The relevant provisions of the MSA regarding Deere Ownership, irrevocable license, and post termination obligations survive termination, including the provisions governing return of Confidential Deere Information.

## O.    XAPT Fails to Comply with Its Post-Termination Obligations

140.    After Deere terminated the Contracts, on January 24, 2020, it asked XAPT to comply with all of its post termination obligations.   XAPT has failed to do so.

141.    Again, on March 23, 2020, Deere asked XAPT to comply with its contractual obligations and return Deere's confidential information.  XAPT has not.

142.    To date, XAPT has not returned **any** documents or materials to Deere.

143.    Section 12 of the MSA outlines the parties' obligations upon termination.

144.    Contrary to the requirements delineated in Section 12 of the MSA, and in breach of those contractual obligations, XAPT has failed to comply with its post termination obligations.

145.     Instead, XAPT and its representatives engaged in a series of acts designed to deprive Deere of property that Deere owns, holds an irrevocable license to, and/or that XAPT and its representatives agreed were Deere Confidential information.

### P.  XAPT Asserts Ownership of Property Either Owned by Or Perpetually Licensed to Deere.

**XAPT's Assertions**

146.     XAPT's demands made on its behalf in a March 9, 2020 email ("March 9 Email"), establish that a controversy exists between Deere and XAPT regarding ownership, possession of and license to property either owned or perpetually licensed to Deere.

147.     The March 9 Email included the following demand: "Deere is required to either return or destroy all such XAPT Intellectual Property in its possession including any and all copies of code (electronic or paper), files, documents, designs, workflows and the like. Deere is also obligated to cease using or accessing the IP as contained in the environments provided under the XAPT Software Delivery Agreement."

148.     XAPT "intellectual property" is defined in MSA Section 6.3.1 as "Supplier Modifications" and "Supplier Pre-Existing Works" in MSA Section 6.2.

149.     In addition, MSA Section 12.4.1 expressly states: "Deere shall not have an obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted hereunder."

150.     Further, to the extent Deere is not identified as the owner of the items demanded by XAPT, MSA Section 6.6.4 provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

151.     XAPT's demands are contrary to the express terms of the MSA.  Deere already owns or has a fully pre-paid, perpetual, irrevocable, license in and to the items demanded in the March 9 Email.

**Deere's Ownership Rights**

152.     The MSA, including all exhibits, applies to all SOWs entered into between the parties.

153.     The Global Template SOW is governed by the MSA, and is incorporated into the MSA.

154.     The MSA applies to all Deliverables, Products and Services provided by XAPT to Deere as described in each SOW or other document executed by the parties during the term of the MSA.  MSA § 1.1

155.     The MSA provides for Deere's ownership of Deliverables, Products, Services and Intellectual Property provided to it by XAPT.  MSA §§ 6.5.1, 1.12, 1.25 and 1.23.

156.     The MSA also provides: "In addition, Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications."

157.     Further, pursuant to the MSA, Deere owns all Deere Pre-Existing Work, including "all Information, and any material owned or licensed by Deere as of the Effective Date or acquired by Deere after the Effective date. Any information relating to an Authorized Dealer and Deere's business and processes and information relating to gaps in requirements and features and

functionality relating to any Third-Party Component shall be considered Deere's Pre-Existing Works."

## Deere Holds an Irrevocable License to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Intellectual Property.

158.    To the extent Deere is not identified as the owner of Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

159.    Section 6.6.4. of the MSA states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

160.    Section 18 of the SDA states:

> As contemplated by Section 6.6.4 of the MOSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

161.    Section 18 of the SDA also provides:

> XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers

and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

162.    Section 18 of the SDA also provides:

In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

163.    Section 6.6.3 of the MSA provides:

To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

164.    Under MSA Section 6.6.4, Deere "shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

165.    MSA Section 12.4.1. states that Deere has no obligation to return Supplier Modifications and Supplier Pre-Existing Works for which irrevocable licenses have been granted.

### Deere's Right to Modify the Combined Solution

166.    Further, pursuant to MSA Section 6.7, Deere has the right to modify the Combined Solution.

### The MSA Provisions on Ownership and License Survive Termination

167.    Section 15.16 of the MSA states in relevant part: "Survival.  Upon termination of the Master Services Agreement for any reason, all provisions that by their nature should survive termination will survive and continue to be binding upon the Parties.

32

168.    Intellectual Property Rights (MSA § 6) and obligations upon Termination survive Termination. MSA § 12.4.  Section 28.12 of the SDA expressly provides that the licenses Deere holds in Section 18 to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring return of Deere Confidential Information survives termination.

169.    Section 28.12 of the SDA expressly provides that the licenses to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works XAPT granted to Deere in Section 18 survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring that XAPT return Deere Confidential Information also survives termination.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT
(Against XAPT)

170.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

171.    The parties, in exchange for valuable consideration, entered into the MSA, Global Template SOW, Governance SOW, and SDA (the Contracts), all of which are valid and enforceable.

172.    Deere fully complied with its obligations under the Contracts or has been excused from doing so.

173.    XAPT has repeatedly breached its obligations under the Contracts.

174.    More than 27 months after the parties entered into the Contracts, and after over one hundred meetings in East Moline alone, XAPT has not developed a system that includes Deere's 393 required capabilities or functionality in "Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."  Global Template SOW, § 3.1, App'x

33

A. By the time Deere terminated the Contracts in January 2020, the Global DBS was not available for purchase by Deere dealers in a single country.

175.    XAPT multiplied, rather than closed, the gaps required to meet Deere's capability list. To date, despite 20 monthly code deliveries, there are more than 315 gaps still to close before the DBS can be made available to dealers in Mexico, Australia, and New Zealand.

176.    XAPT has failed to meet the metrics established for system performance, including the maximum processing time thresholds for everyday dealer tasks, and has refused to work with Deere to update processing time targets, as required by Appendix E to the Global Template SOW.

177.    XAPT has neither provided the personnel necessary under the Contracts, nor used Agile product development methodology.

178.    XAPT has not followed the communication and decision lines detailed in the Governance SOW, including by seeking approval for important contract amendments from Deere employees not authorized to make such decisions.

179.    XAPT has consistently failed to meet its monthly obligation to deliver 90% of its committed deliverables. To date, XAPT has provided the required 90% on only two of 20 monthly code deliveries.

180.    XAPT has failed to meet quality targets for its development work and has failed to deliver code meeting industry standards for quality. XAPT's code is marred with more than 300 currently unresolved defects, and XAPT has failed to meet its published monthly defect resolution targets.

181.    XAPT has also failed to meet its representations and warranties under the Contracts.

182. Due to extremely high defect rates and XAPT's failure to complete its development obligations, the "Product" and the "Global Template" do not "perform in accordance with the Specifications" as required by SDA § 20.1.

183. By failing to fill important project roles, and failing to attract and retain developers who are sufficiently skilled to provide code without hundreds of significant and costly defects, XAPT has failed to "provide sufficient Representatives to perform the Services within the time frames agreed and [provide] Representatives [with] sufficient skill, knowledge and training to perform the Services" required by MSA § 10.3 and SDA § 20.3.

184. By providing highly defective code, circumventing established communication and decision making channels, and continually seeking to obtain higher payments from Deere for the same obligations for which it originally contracted, XAPT has failed to provided services "in conformance with good professional practices and accepted industry standards" as required by MSA § 10.2 and SDA § 20.2.

185. Despite Deere providing notice as required under the Contracts and following the parties' mutual dispute resolution process, including months of communications with the requisite Project Manager, "next level" management, and "designated leader" levels at XAPT, and a failed mediation "conducted by a mutually agreeable mediator in a mutually agreed location," XAPT has failed to cure the breaches as required pursuant to MSA §§ 10.12, 15.6.1, 15.6.2.

186. XAPT also breached MSA § 3.6 when it utilized an unapproved subcontractor on Deere's DBS project.

187. The Contracts contain provisions governing confidential information, procedures by which Deere must approve XAPT subcontractors, and change of control.

188.     Under the Global Template Build Statement of Work, Cosmo Consult is not an approved subcontractor to XAPT.

189.     XAPT failed to follow the applicable procedures before providing Cosmo Consult access to Deere's confidential information.

190.     Deere notified XAPT of this breach on November 1, 2019.

191.     XAPT continued to use Cosmo Consult on Deere's project without authorization.

192.     As a result of XAPT's continued failure to comply with the Contracts, Deere removed access to all @cosmoconsult.com email address on or about November 26, 2019 and again asked XAPT to comply with its obligations.

193.     Finally, on January 22, 2020, Deere put XAPT on notice that it had disregarded Deere's direct limitations on Cosmo Consult's access to its confidential information by continuing to share Deere's information with them and by allowing  Cosmo Consult to work on the JD-DBS project constitutes an ongoing breach of XAPT's obligations.

194.     Deere has paid millions of dollars to XAPT, and has otherwise performed its obligations under the Contracts.

195.     Deere has suffered damages as a result of XAPT's breaches in an amount greater than $15,000,000.

### COUNT II – BREACH OF CONTRACT –
### BREACH OF POST TERMINATION OBLIGATIONS (SECTION 12 OF THE MSA)
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

196.     Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

197.     The MSA is valid and enforceable.

198.     Deere has fully complied with its obligations under the MSA or has been excused from doing so.

199.     XAPT has repeatedly breached its post termination obligations under Section 12 of the MSA.

200.     For example, MSA § 12.4.1 requires Supplier to promptly return (or at Discloser's option destroy) all applicable Discloser Confidential information and other property and materials of Discloser.

201.     Among other things, XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult are required to return all Deliverables to Deere.

202.     Approved subcontractors were obligated to enter into the confidentiality agreement identified as Exhibit D to the MSA and have each sign it.  *See* Exhibit D to MSA, filed by XAPT under seal.  Deere requested that XAPT comply with its post termination obligation on January 24, 2020, and again on March 23, 2020.

203.     To date, XAPT has failed to comply with its obligation under MSA § 12.

### COUNT III – BREACH OF CONTRACT –
### RETURN OF CONFIDENTIAL INFORMATION
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

204.     Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

205.     The MSA is valid and enforceable.

206.     Deere fully complied with its obligations under the MSA or has been excused from doing so.

207.     XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult agreed to comply with the terms of the MSA, including agreeing to the terms of the confidentiality agreement in Exhibit D to the MSA.  *See* Exhibit D to MSA, filed by XAPT under seal.

208.     On January 24, 2020, Deere terminated the Contracts, including the MSA, for cause and requested that XAPT comply with its post termination obligations.

209. Among other things, following termination of the Contracts, or at any time that Deere requests, Deere is entitled to the return of its Confidential Information.

210. Again, on March 23, 2020, Deere requested that XAPT comply with its post termination obligations.

211. Despite Deere providing notice as required under the Contracts, XAPT has not complied with its post termination obligations.

212. Again, on March 24, 2020, Deere asked XAPT to comply with its and its approved subcontractors' post termination obligations.

213. To date, that compliance has not occurred.

214. XAPT is responsible for its approved subcontractors' compliance with the Contracts.

215. Deere has suffered damages as a result of XAPT's breaches in an amount to be determinate at trial and that may not be quantifiable in monetary damages.

### COUNT IV – FRAUDULENT INDUCEMENT
(Against XAPT)

216. Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

217. As more fully set forth in Sections C and J of the Factual Background, XAPT made false statements and misrepresentations to induce Deere to choose XAPT as its Independent Software Vendor.

218. Prior to entering into the Contracts, XAPT misrepresented that NAXT could already perform the vast majority of capabilities on Deere's list of required capabilities, either out-of-the-box or with minimal configuration.

219. XAPT's estimate for the total cost to configure NAXT to Deere's capability list, integrated into the Contracts as Exhibit M, was $3,780,770.

220. Deere paid over $5,392,503 in configuration costs.

221. In addition, XAPT misrepresented that there would only be 50 development gaps to bring NAXT into line with all of Deere's required capabilities. XAPT's list of gaps to meet Deere's required capability list has been integrated into the Contracts as Exhibit B to the Global Template SOW.

222. XAPT's estimate for the total cost to close the gaps in Deere's capability list, integrated into the Contracts as Exhibit M, was $727,584.

223. To bring NAXT to Deere dealers in only three of the originally anticipated and contracted-for countries—Mexico, Australia, and New Zealand—there are still more than three hundred gaps requiring development.

224. It is impossible to create a dependable estimate of gaps to bring NAXT to Deere dealers in all seven jurisdictions due to XAPT's misrepresentation regarding their product and development abilities.

225. So far, Deere has paid approximately $3,600,000 in gap closure development costs.

226. XAPT represented that it could complete the entire development process in approximately 18 months.

227. To date, after more than 27 months, the software system is not close to being fully developed and is not available to a single Deere dealer.

228. Upon information and belief, at the time XAPT made these false statements and misrepresentations as to the configurability, gaps, cost, and project timeline, it knew they were false and/or made them with reckless indifference to the truth.

229. On information and belief, XAPT, a self-proclaimed "global leading provider of Microsoft Dynamics ERP business solutions," with extensive experience in the industry creating

integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was fully aware of what was required to modify its current software system to meet the capabilities list, and the time and cost needed to do so.

230.    Instead, XAPT grossly misrepresented the configurability of its product, gaps, and cost in order to induce Deere to enter into lucrative, decade-long development, licensing, and servicing contracts.

231.    XAPT's false statements and misrepresentations induced Deere to choose XAPT to develop its global DBS.

232.    Because XAPT had extensive experience in developing integrated DBS for global implementations and up-scaling, configuring and tailoring its DBS to the needs of its customers, and had extensive knowledge and experience in the heavy equipment industry, Deere's reliance on XAPT's false statements and misrepresentations was reasonable.

233.    As a result of XAPT's misrepresentations, Deere has been injured in an amount exceeding $48,000,000.

## COUNT V – REFORMATION
### (Against XAPT)

234.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

235.    As more fully set forth in Section I of the Factual Background, the parties' true agreement in Amendment 1 was for its appendices to add additional information to the appendices in the Global Template SOW, for example, to reflect the fact that XAPT had failed to originally identify the correct gaps in order to meet the list of capabilities in Appendix A to the Global Template SOW.

236.    Contrary to the parties' agreement, the text of Amendment 1 provided that its appendices would "replace" those in the Global Template SOW.  Deere executed Amendment 1 believing that its appendices would not narrow the scope of the project.

237.    XAPT knew the language of Amendment 1 did not align with the parties' agreement and Deere's expectation because: (a) XAPT sought approval for Amendment 1 from Deere employees not authorized to make such decisions, in violation of the Governance SOW; and (b) when Deere asked Popovic whether he knew of the mistake, he stated that "of course" he knew.

238.    Deere therefore seeks reformation of Amendment 1 to reflect the parties' agreement that the appendices to Amendment 1 be added to, rather than replaced by, the appendices to the Global Template SOW.

## COUNT VI – DECLARATORY RELIEF
(Against XAPT)

239.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

240.    An actual controversy exists between Deere and XAPT regarding XAPT's claims of an ownership interest in property rights in and to all Deere Pre-Existing IP, Deliverables and Deere Modifications acquired and owned and/or licensed by Deere under the Contracts.  Such claims by XAPT have thwarted Deere's legitimate use of its property rights under the Contracts.

241.    Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as provided for in MSA § 6.1.

242.    The term "Deliverables" is defined in MSA §1.12. "Deliverable" or "Deliverables" means "those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools,

41

and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software[1] and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf."

243.     Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

244.     The assignment was effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

245.     XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult do not have any ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

246.     XAPT and its Representatives' assertions of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including demands for return or demands for Deere not to use Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

247.     Deere has no obligation to return Deere's Pre-Existing Intellectual Property, Deliverables or Deere Modifications.

---

[1] Software is defined in the MSA to mean "Supplier's software products (including each module, component, and function described in the applicable SOW), including the Combined Solution and any Upgrades, new releases and documentation for the Combined Solution." Modification means a modification, customization or localization of the Combined Solution, including any associated update (as defined in the SDA)."  MSA §§ 1.26 and 1.18.

248.    XAPT and its Representatives' demands that Deere not use, and XAPT and its Representatives threats of enforcement of ownership rights in and to, all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

249.    Deere is not obligated to comply with those demands.

250.    Non-compliance with those demands is not a breach of Deere's obligations under its agreements with XAPT or its representatives.

251.    Deere also holds and irrevocable license to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing Intellectual Property under the Contracts.

252.    To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

253.    XAPT improperly demanded that Deere not use Supplier Modifications and Supplier Pre-Existing IP under the Contracts.  MSA § 12.4.1 expressly states that Deere is not required to return Supplier Modifications and Supplier Pre-Existing IP for which irrevocable perpetual licenses have been granted thereunder.

254.    XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing IP not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage

43

Modifications, and Supplier Pre-existing IP in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

255.    Deere is not obligated to comply with XAPT's demands.

256.    Deere's non-compliance with XAPT's demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

257.    XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing Works be returned are improper because MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted.

258.    Deere is not obligated to comply with XAPT's demands.

259.    Deere's non-compliance with XAPT's demands is not a breach of Deere's obligations under its Contracts with XAPT or its Representatives.

260.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement in Exhibit D to the MSA.  *See* Exhibit D to MSA, filed by XAPT under seal.

261.    Deere has a right to immediate possession of Deere Confidential Information.

262.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

### COUNT VII – INJUNCTIVE RELIEF & SPECIFIC PERFORMANCE
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

263.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

264.     Deere seeks specific performance under Section 12 of the MSA.

265.     Deere has complied with all of terms of the MSA.  To the extent Deere has not yet complied with any terms of the MSA, it stands ready, willing, and able to perform any outstanding obligations.

266.     In additional to XAPT's contractual obligations, XAPT's approved subcontractors have obligations under Section 6.13.7.

267.     Approved subcontractors are required to have each of their representatives individually sign the Confidential Information Agreement attached to the MSA as Exhibit D.  *See* Exhibit D to MSA, filed by XAPT under seal.

268.     Pursuant to the post-termination provisions of MSA § 12.4, XAPT is required to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

269.     Pursuant to their respective contractual obligations, XAPT, XAPT Kft, and XAPT Solutions and Cosmo are required to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

270.     XAPT, XAPT Kft, and XAPT Solutions and Cosmo do not have ownership interests in all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as defined by the contracts between the parties.

271.     XAPT, XAPT Kft, and XAPT Solutions and Cosmo are not permitted to interfere with Deere's use of intellectual property right irrevocably licensed to Deere.  Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications,

45

Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

272.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo have failed or refused to perform their contractual obligation to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

### COUNT VIII – CONVERSION
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

273.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

274.    Under the Contracts, Deere has a right to the Deliverables and Deere Confidential Information.

275.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

276.    Following termination of the Contracts, XAPT is required to provide Deere with the Deliverables along with Deere Confidential Information.

277.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have, without authorization, wrongfully assumed control, dominion, and/or ownership over the Deliverables and Deere Confidential Information.

278.    Despite Deere's multiple requests asking XAPT to comply with its contractual obligations, XAPT has willfully and without justification failed to provide Deere with this material.

## COUNT IX – REPLEVIN
### (Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

279.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

280.    The Contracts provide that Deere owns the Deliverables and Deere Confidential Information and has a right to this property.

281.    Deere also has the right to immediate possession of the Deliverables and Deere Confidential Information.

282.    Deere has the ownership and/or the right to immediate possession of the Deliverables and Deere Confidential Information.

283.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

284.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have no right to possess the Deliverables and Deere Confidential Information.

285.    On information and belief, to date, XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult still wrongfully possess this information.

286.    In addition to possession, Deere seeks an order instructing XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult not to intentionally destroy, sell, or secrete the information.

## COUNT X – ALTER EGO
### (Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

287.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

288.    XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult share a unity of interest and/or control.

47

289.     Recognition of individual corporate forms between XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult would promote injustice, inequity and/or fraud.

290.     Upon information and belief, corporate formalities have not been observed between XAPT, XAPT Kft, XAPT Solutions, and/or Cosmo Consult.

291.     Upon information and belief, XAPT is a mere instrumentality or façade for XAPT Kft, XAPT Solutions and Cosmo Consult.

292.     XAPT Solutions put out a press release dated September 17, 2019 on https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ with a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS."  Exhibit 1.

293.     XAPT and XAPT personnel were utilizing the email address @cosmoconsult.com.

294.     Upon information and belief, XAPT employees were interchangeable with those of Cosmo Consult.

295.     In that same timeframe, Deere learned of the press release.

296.     Initially, XAPT contended that "[Cosmo Consult] is the same consultants as it [*sic*] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [*sic*] the same that Deere approved in July of 2018."

297.     Shifting its position, XAPT later contended that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS SOLUTION S.R.L.". This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

298.     Upon information and belief, the alleged transactions conducted between the entities were not made in good faith and/or on commercially reasonable terms.

48

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff Deere & Company respectfully requests that this Court finds in its favor and against Defendant as follows:

A.      Enter judgment for Plaintiff and against XAPT on Count I;

B.      Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count I;

C.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count II;

D.      Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count II;

E.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count III;

F.      Award damages in an amount to be determined at trial under Count III;

G.      Enter judgment for Plaintiff and against XAPT on Count IV;

H.      Award damages in an amount to be determined at trial, in excess of $48,000,000 under Count IV;

I.      Enter judgment for Plaintiff and against XAPT on Count V;

J.      Award reformation of Amendment 1 to state that the appendices to Amendment 1 be added to, rather than "replace," the appendices to the Global Template SOW;

K.      Enter judgment for Deere and against XAPT on Count VI, granting the following declaratory relief:

    1.   DEERE'S OWNERSHIP RIGHTS

a. Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. MSA § 6.1.

b. Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

c. Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

d. The assignment is effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

e. XAPT, XAPT Kft, XAPT Solutions and Cosmo do not have an ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

50

  f. XAPT and its Representatives' assertion of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return or Demands for Deere not to use Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, is improper.

2. DEERE HAS NO OBLIGATION TO RETURN DEERE PRE-EXISTING IP, DELIVERABLES, AND DEERE MODIFICATIONS.

  a. XAPT and its Representatives demand that Deere not use, and XAPT and its Representatives' threats of enforcement of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

  b. Deere is not obligated to comply with those demands.

  c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

3. DEERE HOLDS AN IRREVOCABLE LICENSE TO SUPPLIER MODIFICATIONS, COMPETITIVE ADVANTAGE MODIFICATIONS AND SUPPLIER PRE-EXISTING IP.

  a. To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license as set forth in MSA § 6.6.4.

    i. Section 6.6.4. states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

51

ii.    Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

52

iii.    Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

iv.    Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

v.    In addition, MSA§ 6.6.3, it provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

4. XAPT'S DEMAND THAT DEERE NOT USE SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS IS IMPROPER

   a. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

   b. Deere is not obligated to comply with those demands.

   c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

5. DEERE HAS NO OBLIGATION TO RETURN SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS

   a. MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted. MSA § 12.4.1.

   b. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works be returned are improper.

   c. Deere is not obligated to comply with those demands.

   d. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

54

6.  XAPT AND ITS REPRESENTATIVES HAVE AN OBLIGATION TO RETURN DEERE CONFIDENTIAL INFORMATION

   a.  XAPT, XAPT Kft, and XAPT Solutions and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

   b.  The Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information.

   c.  Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

   d.  Deere has a right to immediate possession of Deere Confidential Information.

   e.  XAPT, XAPT Kft, and XAPT Solutions and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1

55

and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

L.     For Count VII, for Injunctive Relief and Specific Performance, enter Judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult and order the following specific enforcement and injunctive relief relating to XAPT's Post Termination obligations and obligations to return its Deere Confidential Information:

1. An Order requiring XAPT to comply with its post Termination provisions MSA § 12.4 to Return Deere Confidential Information, Deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

2. An Order requiring XAPT, XAPT Kft, and XAPT Solutions, and Cosmo to return Deere Confidential Information pursuant to their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

3. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from asserting any ownership interest in including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

4. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from interfering with Deere's use of intellectual property right irrevocably licensed to Deere.  Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

a. Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work. "

b. Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to

its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

c.  Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

d.  In addition,  MSA § 6.6.3 provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

M.  Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for conversion under Count VIII and order return of Deere Confidential Information;

N.  Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for replevin under Count IX; order return of Deere Confidential Information; and order defendants not to intentionally destroy, sell, or secrete the information.

58

O.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count X;

P.      Award damages in an amount to be determined at trial under Count X; and

Q.      Granting such other and further relief on each Count I to X as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff Deere & Company hereby demands a trial by jury on all issues so triable.

Dated:  March 27, 2020                     /s/ *Mariangela M. Seale*

Matthew Fischer
Mariangela Seale
Lauren Jaffe
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
mfischer@rshc-law.com
mseale@rshc-law.com
ljaffe@rshc-law.com

Kara   E.   F.   Cenar   *(Admission   app.   filed contemporaneously herewith)*
S. Patrick McKey
GREENSFELDER, HEMKER & GALE, P.C
200 West Madison Street, Suite 3300
Chicago, Illinois 60606
(312) 419.9090 (tel)
(312) 419.1930 (fax)
kcenar@greensfelder.com
pmckey@greensfelder.com

Mary   Ann   L.   Wymore   *(Admission   app.   filed contemporaneously herewith)*
Ronnie   L.   White   II   *(Admission   app.   filed contemporaneously herewith)*
GREENSFELDER, HEMKER & GALE, P.C
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102

(314) 241.9090 (tel)
(314) 241.8624 (fax)
mlw@greensfelder.com
rwhite@greensfelder.com

*Attorneys for Plaintiff Deere & Company*

# Exhibit 1



Acquisition XAPT Solutions

**CRM, ERP, PRESS RELATION**

# COSMO CONSULT ACQUIRES XAPT SOLUTIONS

**Gero Brinkbäumer**

**09/17/2019**



**The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania.**

## Integrating two market leaders

With 150 employees in <u>Hungary</u> and <u>Romania</u>, XAPT Solutions is the market leader for Microsoft business solutions there. Until now, the company was part of XAPT Software, an internationally active Microsoft solutions provider with which COSMO CONSULT has agreed on a comprehensive partnership in addition to the acquisition.

With XAPT Solutions, the COSMO CONSULT group is integrating a Dynamics pioneer that has expertise in the complete <u>Microsoft product portfolio</u> from Dynamics 365 to Office 365 and Power BI to Azure-based cloud infrastructures. XAPT Solutions also offers various industry solutions and special solutions that are used by well-known industrial companies around the world.

 **Digital Maturity Check**

**Compare benchmarks** now and get consulting. We offer you a **free online survey** that enables an initial analysis of your **digital business processes** - holistically or departmentally.

<u>Go to Digi-Check</u>

## Great potential in Eastern Europe

The integration of XAPT Solutions into the COSMO CONSULT group is a further milestone in the growth strategy of the largest Microsoft <u>digital transformation partner</u> in Europe, one that has been expanding its business most recently through acquisitions in Germany, Austria, France and Spain. With a total of 1,200 employees, COSMO CONSULT will now be represented with its own branches in the emerging Eastern European markets.

Local companies in Hungary and Romania will be able to benefit from the combined range of products and services offered by the two leading technology providers and from their precise knowledge of local market conditions, and so will international customers wishing to expand their business in Eastern Europe.

## Partner for digital transformation

"With its comprehensive, international Microsoft expertise, XAPT Solutions fits perfectly into our group," explains **Uwe Bergmann**, CEO of COSMO CONSULT. Eastern Europe has extremely interesting places to do business - with dynamic growth and great investment potential. It is important to us to be there with our own resources, to be there for our customers with all of COSMO's expertise."

But there's even more to it, says Uwe Bergmann: "Especially in times of great changes, such as the ongoing digital transformation, you need a strong IT partner who not only knows what to do, but is also going to be there for the long haul. By bringing together two market leaders under a common roof at COSMO CONSULT, our customers can be sure to have the strongest Microsoft partner for digital transformation in Europe at their side."

# Tags

EXHIBIT C

EFiled: May 19 2021 02:33PM EDT
Transaction ID 66615238
Case No. 2020-0252-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| XAPT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0252-JRS |
| | ) | |
| DEERE & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED SECOND AMENDED AND
## SUPPLEMENTED COMPLAINT FOR INJUNCTIVE RELIEF

XAPT Corporation ("XAPT"), by and through its undersigned attorneys, brings its Verified Second Amended and Supplemented Complaint for Injunctive Relief[1] against Defendant Deere & Company[2] ("Deere"), and alleges as follows:

---

[1] A redline version showing the changes from the prior complaint is attached hereto as Exhibit "X". By Order dated November 19, 2020, this Court granted a motion for confidential treatment (Dkt. No. 34). Exhibits 1 to 5 to the First Amended Complaint were filed with confidential treatment the same day (Dkt. No. 36), and the public versions of those were filed at Dkt. No. 38 on November 30, 2020.

[2] XAPT's original Verified Complaint named "Deere & Company, Inc." as the defendant. Deere entered its appearance in this case as "Deere & Company, Inc." Furthermore, XAPT understands that the Delaware Division of Corporations would not allow two companies to co-exist under the names "Deere & Company" and "Deere & Company, Inc." However, for clarity, XAPT has amended the reference to Deere & Company.

## **PRELIMINARY STATEMENT**

1.     By 2013, Deere realized it had a critical operational problem: its dealers worldwide used a number of different and incompatible dealer management systems that did not allow for uniformity and easy integration with respect to core business functions. Deere was itself a provider of some of these systems, and Deere had reached the view that the systems it provided had reached the end of their commercial viability. Deere therefore commenced a several-year long pursuit of a solution to its problem.

2.     The team at Deere tasked with identifying a solution had extensive dealer experience and included experts in the selection, design, negotiation, delivery, and support of such systems. Deere evaluated and considered several standard "out-of-the-box" solutions including various Microsoft-based systems. Ultimately, Deere realized that its problem required a standard industry solution that could be specifically adapted to its needs. Fortuitously, Deere became aware that XAPT had developed such a system--NAXTCore--that was being successfully employed by Deere's competitors.

3.     Thus, Deere contacted XAPT in December 2015. In approaching XAPT, Deere represented that it was looking for a strategic partner who could provide Deere with a solution adapted to Deere's specific business and operational requirements. To provide Deere with the required solution, XAPT would need to

first install its NAXT Core product and then adapt the software by the use of configuration and, where necessary, by customization by developing new software code specifically developed for Deere. The adaptation of the NAXT Core software to Deere's requirements therefore necessitated a collaborative process.

4.      Over a period of 18 months, Deere and XAPT engaged in numerous meetings, demonstrations, proofs of concept, functional reviews, and contract negotiations. For its part, Deere engaged in extensive due diligence of XAPT's methodology, development approach, business practices, and the functional capability of the NAXT Core software. Deere was afforded every opportunity to evaluate XAPT's proposal and to fully understand how the solution would be delivered by XAPT, as well as to convey the scope of the customizations and adaptations that XAPT would need to make to its NAXT Core solution.

5.      With the benefit of this exhaustive background investigation and due diligence, Deere and XAPT undertook the negotiation of their contractual relationship. These negotiations were extensive and painstaking. Both parties included their legal, commercial, technical, and project staff throughout the process. Final contract documents were executed in June 2017.

6.      By committing its proven expertise, talents, and software solutions to Deere, XAPT made a critical investment in the success of this undertaking. XAPT

granted extraordinary pricing and commercial concessions to Deere, which it viewed as a partner.

7.      Deere was no partner. Not long into the project and ignoring the warnings of XAPT and unambiguous contractual terms, Deere sought to significantly change the scope of the project by adding a multitude of customization items, which would broaden the scope of the software development project, while expecting no delay or increase in price.

8.      In February 2019, the parties executed an amendment of their contract relationship to establish, clearly and definitively, the scope of work and pricing. Deere breached the amended contract almost immediately by failing to provide required input to the customization process and, again, demanding many additional modifications to the NAXT Core product while refusing to pay for them. Deere has now repudiated and repeatedly and materially breached the contracts that govern its relationship with XAPT.

9.      Deere obstinately refused to engage in constructive discussions with XAPT that were needed to get the project back on track. Beginning in August of 2019, Deere's communications and conduct expressed and demonstrated its clear and unequivocal repudiation of its agreements with XAPT. Eventually, Deere fabricated a story and fashioned a strategy of anticipatory breach and repudiation and termination of its contracts with XAPT, the center piece of which is a groundless

lawsuit filed in the United States District Court for the Central District of Illinois. Not only is Deere's lawsuit groundless on the merits, but also constitutes a breach of a mandatory, well-defined and bargained-for dispute resolution process. Additionally, the Master Agreement (as defined below) provides that it is governed by Delaware law and designates the courts of Delaware as a proper venue, which leads to the obvious conclusion that this Court is the most appropriate forum for the adjudication of disputes arising under the Master Agreement.

10.     Deere's apparent aim is to leverage the expense, cost, and distraction of groundless litigation in order to extract concessions from XAPT just months before XAPT could complete its work on Deere's dealer management system.

11.     XAPT brings this action to hold Deere accountable for its multiple breaches of contract and repudiation of the parties' agreements and seeks injunctive relief to prevent irreparable harm from Deere's illegal possession and misuse of XAPT's unique software.

## **THE PARTIES**

12.     XAPT is a Florida corporation with a principal place of business in Budapest, Hungary.

13.     Deere is a Delaware corporation with a principal place of business in Moline, Illinois.

## JURISDICTION AND VENUE

14.     Jurisdiction and venue are proper in this Court because Deere is a Delaware corporation. The parties agreed and consented to the jurisdiction of the courts of the State of Delaware over the disputes and claims alleged in this Verified Complaint.

15.     At Deere's insistence, the laws of the State of Delaware were selected as governing the agreements at issue. Accordingly, this Court has subject matter jurisdiction under 6 *Del. C.* § 2708(b), which grants Delaware courts jurisdiction over actions arising out of or relating to a contract governed by Delaware law. Furthermore, XAPT seeks injunctive relief providing this Court with subject matter jurisdiction under 10 *Del. C.* § 341, which provides this Court with jurisdiction "to hear and determine all matters and causes in equity."

## FACTS

I.     INITIAL NEGOTIATIONS.

16.     XAPT's business is focused exclusively on providing its proprietary software program--NAXT Core--to heavy equipment dealers throughout the world.[3]

---

[3] XAPT Kft is a Hungarian company which owns XAPT. XAPT Kft also owns NAXT Core. XAPT Kft licenses NAXT Core to XAPT; XAPT in turn sublicenses NAXT Core to its clients.

17.    NAXT Core provides a solution to heavy equipment dealers by delivering a streamlined set of functionalities that manage all aspects of their business from sales and rentals to human resources.

18.    NAXT Core is an example of a software "add-on" to Microsoft's Dynamics 365 software. Microsoft Dynamics 365 is a self-contained Microsoft software program that includes basic business functions such as accounts, inventory, and procurement. Microsoft allows selected vendors, such as XAPT, to add industry-specific functions to Microsoft Dynamics 365 by extending the Microsoft code, a process designed by Microsoft where XAPT programmers and others are able to add computer code to the existing Microsoft code to change or add functionality to the Microsoft Dynamics 365 software program. XAPT has a long-running partnership with Microsoft and stands as one of the few Microsoft partners that are focused on heavy equipment dealers. Through NAXT Core, XAPT offers solutions for hundreds of standard business processes, and is able to provide customized functions for its customers where requested. Due to this relationship with Microsoft and its familiarity with Microsoft's technology, XAPT's position in the industry is unmatched. XAPT has an arrangement with Microsoft under which XAPT, through XAPT Kft, is licensed to "bundle" Microsoft Dynamics 365 with NAXT Core (the bundled Microsoft Dynamics 365/NAXT Core software is referred to herein as the "Product") and sell the Product to heavy equipment dealers worldwide, including in

the United States, South America, Australia, and Europe. The Product has been implemented in 29 countries and has been licensed for nearly 32,000 individual users.

19.     Given XAPT and NAXT Core's provenance, it comes as no surprise that Deere would look to XAPT to provide a solution to their dealership management system problem. Deere knew that the Product was already being used by some of its competitors and approached XAPT about becoming a strategic partner in December 2015. The relationship would be predicated upon XAPT configuring, and in certain. cases modifying, its NAXT Core software to accommodate the existing needs of Deere's dealers.[4] The resulting customized solution (the "Deere Customized Solution")[5] thus comprises three separate, clearly identifiable sets of software codes: (i) Microsoft Dynamics 365, owned by Microsoft, (ii) NAXT Core, owned by XAPT Kft and licensed to XAPT; and (iii) Supplier Modifications, which would be owned by XAPT Kft and licensed to XAPT, and then sublicensed to Deere (and Deere dealers). Each individual Deere dealer would enter into licensing agreements directly with XAPT in order to use the Deere Customized Solution. XAPT, through

---

[4] The new modifications to the NAXT Core software  form  a  separate, identifiable set of software, referred to herein as "Supplier Modifications," as they are referred to in most of the governing agreements.

[5] The Deere Customized Solution is also referred to  as  the  "Combined Solution" in the Master Agreement and as the "Global Template" in the SDA (defined below).

XAPT Kft, owns licensing rights to the intellectual property in the NAXT Core and Supplier Modifications software.

20.     XAPT and Deere engaged in numerous meetings over an 18-month period to attempt to identify any required Supplier Modifications. Each Supplier Modification was labeled a "Gap" that would need to be closed (or deemed unnecessary by Deere) in order to modify NAXT Core to Deere's specifications. The terms "Gap" and "Supplier Modification" have the same meaning.

21.     After 18 months of due diligence, XAPT and Deere agreed to include in the Global Template Statement of Work (SOW) a list of 50 Supplier Modifications and 137 "interfaces" (connections to another Deere software program) that would require software development and the cost for the development separately identified. XAPT's personnel warned Deere that each additional Supplier Modification and interface beyond those already agreed upon and identified would increase the costs associated with coding and testing the additional modification. Thus, the pricing for the software development process required to deliver the agreed-upon Supplier Modifications under the governing contracts executed in June 2017 was not fixed. Rather, the pricing was based primarily on time spent by XAPT personnel on developing each Supplier Modification and reimbursement of out of pocket costs. Ex. 1 § 6.1 (Global Template).

II.   GOVERNING CONTRACTS.

22.   The parties executed four interconnected contracts to govern their relationship on June 26, 2017 (the "Agreements").[6] Those contracts included:

a.   Master Services Agreement ("Master Agreement");

b.   Work Order Template -  Global Template ("Global Template SOW");

c.   Work Order - Governance ("Governance SOW"); and

d.   XAPT Subscription Delivery Agreement ("SDA").

III.   THE MASTER AGREEMENT.

23.   The Master Agreement expressly provides that it "shall apply to all SOWs entered into between the Parties." Section 1.16 defines "'SOW' or 'Work Order'" to mean a "statement of work that complies with section 4 of this Master Agreement." Ex. 2 § 1.16 (Master Agreement).

24.   The Master Agreement further provides in Section 1.1 that it "applies to all Deliverables, Products and Services provided by [XAPT] to Deere as described in each SOW or other document executed by the parties during the term of this Agreement." Ex. 2 § 1.1 (Master Agreement).

---

[6] The Agreements include the Global Template Amendment executed later and defined below.

25.     Per Section 1.33, the term of the Master Agreement is from June 26, 2017 and continuing until it is terminated under Section 12. Ex. 2 § 1.33 (Master Agreement).

26.     Deere has repudiated the Master Agreement and, therefore, cannot claim any benefits under it.

27.     Under Section 12.2, the Master Agreement may be terminated by Deere "without cause and for convenience" upon 30 days' prior written notice and payment to XAPT of any applicable "termination for convenience fees." Ex. 2 § 12.2 (Master Agreement).

28.     Under Section 12.3, the Master Agreement may be terminated by any party upon notice if the other party is in "Material Default." Material Default is defined as a breach either of the Master Agreement, a Schedule, or an SOW which is not cured within 30 days after notice specifying the breach. Ex. 2 § 12.3 (Master Agreement).

29.     Section 12.4 establishes the parties' obligations upon termination, including the return of confidential information and property. Ex. 2 § 12.4 (Master Agreement).

30.     Per Section 12.6, termination of the Master Agreement also terminates all current SOWs, unless the parties otherwise agree to continue specified SOWs. Ex. 2 § 12.6 (Master Agreement).

4814-4970-0840.1

31.     Section 15.6.1 establishes the following dispute resolution process:

The Parties agree to work together in good faith to resolve controversies, claims or disputes relating to this Master Agreement ("Dispute"). The respective Project Managers will first attempt to resolve the Dispute; however, if there is no resolution within ten (10) business days, either party may then require that their next level management meet within the next ten (10) business days to resolve the Dispute. If these managers are unable to resolve the Dispute, then there may be one final escalation to designated leaders, who will meet within ten (10) business days to make one last attempt to resolve the Dispute. Except for injunctive relief described below, the Parties agree to use this mutual dispute resolution process before pursuing any legal action against the other. Each party will provide the other with information and documentation to substantiate its position with respect to the Dispute.

Ex. 2 § 15.6.1 (Master Agreement).

32.     Section 15.7 of the Master Agreement authorizes a party to bring legal action for injunctive relief to prevent or limit "irreparable harm or damage." Ex. 2 § 15.7 (Master Agreement).

IV.    THE GLOBAL TEMPLATE SOW.

33.     The Global Template is an SOW executed simultaneously with the Master Agreement. The Global Template expressly provides that "upon execution, [it] will be incorporated within and governed by the [Master Agreement]." Ex. 1 Preamble (Global Template). The Global Template SOW includes project specifications (including a list of identified Supplier Modifications, known as "Enhancements" in the Global Template SOW), system requirements, and estimated costs and timelines. *See generally* Ex. 1 (Global Template SOW). No specific Deliverables are identified in the Global Template SOW.

V.    THE GOVERNANCE SOW.

34.    The Governance SOW, executed simultaneously with the Master Agreement, expressly provides that "upon execution, [it] will be incorporated within and governed by the [Master Agreement]." Ex. 3 at 1 (Governance SOW).

35.    The Governance SOW defines the roles and responsibilities of XAPT and Deere with respect to the development of the Deere Customized Solution and establishes reporting mechanisms "that are required to maintain an effective working relationship and implement the agreement." Ex. 3 § 2 (Governance SOW).

36.    The Governance SOW requires XAPT and Deere to regularly meet to review and assess the status of the project and any issues with the development of the Deere Customized Solution. Ex. 3 § 2.1.1 (Governance SOW).

VI.    THE SDA AND XAPT'S SOFTWARE.

37.    The SDA governs the use and licensing of the various software components in connection with the development of the Deere Customized Solution. The SDA itself specifies the terms of licensing and payments. In addition, the XAPT Subscription License Agreement (the "XSLA"), which is attached as Exhibit L to the SDA, governs Deere's access to and use of XAPT's software.

38.    As long as the Agreements were in place, XAPT would license NAXT Core and Supplier Modifications to Deere under the SDA and the XSLA, for which Deere would pay subscription fees. Deere required access to NAXT Core and the

Supplier Modifications software in order to support implementations of the developed system with its dealers. Each individual Deere dealer would also need to enter into a separate Dealer User Subscription License Agreement ("DUSL") to obtain a license to use NAXT Core and Supplier Modifications. Ex. 4 § 1.11 (SDA).

39.     Additionally, XAPT's other material provided to Deere includes design documents, workflow documents, proposals, marketing plans, specifications, training manuals, business processes, and future development plans. XAPT owns or licenses intellectual property rights in each of these items.

40.     Section 2.3 of the SDA grants to Deere a non-exclusive license to use the Deere Customized Solution (referred to in the SDA as the "Global Template"). Ex. 4 § 2.3 (SDA). The SDA further provides that XAPT would license the Deere Customized Solution to Deere dealers through separately executed DUSLs. Ex. 4 § 4 (SDA).

41.     Under the parties' agreed-upon arrangement, the system would first be deployed to select "pilot" Deere dealers by Deere with XAPT's assistance where required. Following the pilot phase, Deere would deploy the system to the rest of the Deere dealers.

VII.   <u>XAPT DEVELOPS THE DEERE CUSTOMIZED SOLUTION.</u>

42.     Creating and implementing the Supplier Modifications implicated three interconnected phases. First, during the alignment phase, XAPT would work with

Deere to identify Supplier Modifications to the NAXT Core software required to conform to Deere's requirements. Second, during the execution phase, XAPT would work to develop software code to create those Supplier Modifications--i.e., close the Gaps. Lastly, during the deployment phase, XAPT would work with Deere to deploy the Deere Customized Solution to Deere's network of dealers.

43.     During the alignment phase, the number of Supplier Modifications that Deere "identified" grew at an alarming rate. XAPT reminded Deere of its previous warnings that the more Supplier Modifications Deere requested, the higher the ultimate costs would be for the execution phase. This consequence is inherent in any software modification project. Deviations require multiple steps to implement; it is just not as simple as pressing a button to produce a change. The software developers must code in the new feature. The new feature must then be tested to ensure that the modification has not broken anything else in the software. Because the features within the software are interconnected, the process requires many different testing variants. For example, Deere could request additional fields for an invoice search function. Software developers code that feature into the software. The testers would then need to stress test the newly implemented fields to determine if they functioned as designed and, importantly, to ensure that the modification had not created any new problems in the software.

44.     In fact, this concept was expressly contemplated by the Global Template SOW. Section 2.4.2 of the Global Template SOW provides:

> The implementation plan, timeframes and costs are dependent on Deere maintaining its focus on implementing a standard solution using the methodology. In creating the Global Template, it is critical that Deere, where possible, adopt the approach of adopting the standard processes and minimizing changing the system to meet Deere's current business processes.

> Deere should strive to focus on aligning existing processes to the capabilities and leading practices that exist within the Supplier's solution.

> . . .

> Deviating from the standard business processes and functionality through development of Enhancements may impact the future costs of maintenance and upgrades, negatively impact ongoing application support, and reduce the ability to take advantage of future enhancements offered by Supplier.

Ex. 1 § 2.4.2 (Global Template SOW). 45. Thus, the parties clearly memorialized their mutual understanding that Deere would need to align its existing business processes as closely as possible with the capabilities of the NAXT Core software in order to minimize the number of Supplier Modifications, and thus, costs. Deere failed to comply with that agreement.

46.     As time went on, Deere deviated further and further from the NAXT Core functions. Deere was again advised that additional Supplier Modifications would result in significant cost increases. Rather than heed these warnings, the scope of Deere's requested Supplier Modifications spiraled out of control. Rather than

4814-4970-0840.1

control and narrow the scope, Deere began to change the scope daily, sometimes within hours of purportedly finalizing it.

47.     Further contributing to the problem, Deere failed to provide XAPT with the Functional Requirement Documents ("FRDs") that would specify the software development work to be performed by XAPT. The FRDs were to be authored by the parties' business analysts and would describe the functional requirements Deere needed for each Supplier Modification. XAPT needed the FRDs so that it would know exactly what modifications to make to customize NAXT Core to meet Deere's specifications. Delays in Deere providing the FRDs only further contributed to the rising costs.

VIII.  THE AMENDMENT TO THE GLOBAL TEMPLATE SOW.

48.     As the number of Supplier Modifications that Deere "identified" grew exponentially (along with their corresponding costs), Deere requested an amendment to the Global Template SOW. Deere wanted to fix the costs associated with XAPT modifying NAXT Core to achieve the expanded Supplier Modifications. XAPT explained to Deere that if Deere wanted to fix the costs associated with the coding and testing of Supplier Modifications, Deere would need to firmly fix the scope of work and provide a final number of Supplier Modifications to be delivered. XAPT could not, of course, give a fixed price if it remained unclear how much time and other resources would be required to implement Deere's ever-changing number of

Supplier Modifications. Following negotiations, Deere's lawyers drafted Amendment No. 1 to Work Order - Global Template (the "Global Template Amendment"), to fix the scope and cost of developing the Deere Customized Solution. This Deere amendment was executed on February 11, 2019.

49.     The Global Template Amendment fixed the price of the agreed number of Supplier Modifications. The Global Template Amendment provided that: "Section 6.1 of the [Global Template SOW] is hereby amended by deleting it in its entirety and by inserting ... Deere shall pay to supplier the fixed fee of $5,746,476." Ex. 5 § 2.1 (Global Template Amendment) (emphasis added). Section 2.2 of the Global Template Amendment similarly fixed the scope of work. The original scope of work was addressed in Appendices A, B, and C of the Global Template. Section 2.2 of the Global Template Amendment provided that Appendices A, B, and C of the Global Template would be "deleted in [their] entirety and shall be replaced with the new [Appendices A, B, and C], attached as Exhibit[s] [A, B, and C] to this Amendment." Ex. 5 § 2.2 (Global Template Amendment). Deere was now getting a fixed price for a fixed amount of work.

50.     The Global Template Amendment was drafted and proposed by Deere's attorneys, including the language that deleted Appendices A, B and C and replaced them with Exhibits A, B and C to the Global Template Amendment.

IX.   DEERE PROMPTLY BREACHES THE GLOBAL TEMPLATE
      AMENDMENT.

51.    Almost immediately after the parties entered into the Global Template
Amendment, Deere began requesting that XAPT provide further Supplier
Modifications not contained in the Global Template Amendment's Appendices
("Amended Appendices"). XAPT tried to discuss the situation with Deere, but it
quickly became apparent that Deere was attempting to completely rewrite the scope
of work under the Global Template Amendment. Although its own attorneys had
prepared and drafted the Global Template Amendment, Deere indicated in its later
complaint that it never intended for the work identified in the Amended Appendices
to constitute all of the Supplier Modifications. Deere incredibly asserted that it
wanted XAPT to deliver the Supplier Modifications that were listed in the original
Global Template Appendices, but were omitted from the Global Template
Amendment Appendices. The Global Template Amendment, however, clearly
provides that the Global Template's original appendices are "deleted" and replaced
with those attached to the Amendment. XAPT could not, of course, offer to complete
the different work Deere was now requesting for the fixed price in the Global
Template Amendment, which was based on the scope of work established in the
Amended Appendices. As XAPT explained in great detail to Deere, it was already
providing this work to Deere at a substantial discount--which when calculated results
in a pricing concession of almost $5,750,000--in the spirt of compromise and in an

4814-4970-0840.1

effort to see this project through to completion so the true value could be realized for both parties.

52.    Deere then breached the Global Template Amendment within a week of its signing by failing to deliver the FRDs in the timeframe required by the Amendment. Section 2.1 provided that going forward, "FRDs will be completed prior to the start of each delivery quarter based on the following schedule; 2019-Ql by February 15, 2019, 2019-Q2 by March 15, 2019, 2019-Q3 by May 15, 2019, and 2019-Q4 by August 15, 2019." Ex. 5 § 2.1 (Global Template Amendment). February 15, 2019 passed without XAPT receiving any FRDs. XAPT informed Deere of its breach, but in an effort to keep the project moving forward, continued to work with Deere on a revised FRD schedule. Deere continued to change the revised FRD schedule on a weekly basis and it was ultimately never finalized.

53.    Deere then began to spuriously contest invoices submitted by XAPT and fail to make payments. Once XAPT would submit an invoice, rather than pay, Deere would concoct an issue with XAPT's work and refuse payment on that basis. XAPT, in an effort to work with Deere, would then resolve Deere's purported issue, only to find in the meantime that Deere had "found" another problem with XAPT's work. Deere would continuously refuse to make payments based on these moving goalposts. All of this resulted in Deere failing to make $317,122.50 in development payments due to XAPT. XAPT was also due risk premium payments based on

4814-4970-0840.1

meeting certain milestones associated with the development of the entire Deere project. Work already completed would satisfy the first of these milestones, entitling XAPT to an additional $323,662 in payments from Deere. By improperly terminating the Master Agreement, Deere has prevented XAPT from receiving these payments.

X.    DEERE'S LAWSUIT.

54.    On August 26, 2019, XAPT received a letter from April A. Price, Senior Attorney, Global Law Services Group for Deere, stating that "i[t] has become apparent that XAPT cannot fulfill its obligations under the Agreement." The letter threatened litigation against XAPT and falsely claimed that XAPT and Deere had satisfied the dispute resolution requirements of Section 15.6.1 of the Master Agreement with respect to the claims stated in the letter, which were generic, non-specific, and unsubstantiated.

55.    XAPT responded by letter on September 2, 2019, stating that it was "fulfilling its obligations under the Agreement as amended" and noted that it was Deere, not XAPT, who had failed to meet its obligations under the Master Agreement by failing to provide XAPT with timely FRDs, which negatively affected XAPT's ability to complete its work on the project. XAPT's letter also pointed out that, because the claims in Deere's letter were neither detailed nor substantiated, the parties should engage in the dispute resolution process required by Section 15.6.1 of

the Master Agreement so that XAPT could better understand the precise nature of Deere's issues.

56.    XAPT expected Deere to respond to its invitation to engage in the dispute resolution process mandated by the Master Agreement, including mediation. Instead, it received a two-paragraph letter dated October 3, 2019 from Deere's outside counsel enclosing a 28-page, 129-paragraph Complaint captioned in the U.S. District Court, Central District of Illinois, Rock Island Division, which counsel indicated was to be filed shortly.

57.    XAPT responded by letter on October 15, 2019 rejecting the allegations of the Complaint and renewing its request that Deere engage in the dispute resolution process required by the Master Agreement.

58.    Deere responded through its outside counsel on October 16, 2019. Deere frivolously claimed that Section 15.6.1 of the Master Agreement had been satisfied because "Deere has continuously relayed the issues described in its complaint to [XAPT]" and inexplicably cited Deere's August 26, 2019 letter, which provided virtually no specific information regarding the apparent dispute and indisputably did not satisfy the requirements of Section 15.6.1 of the Master Agreement, in support of that claim. Deere ended its letter by improperly, and in violation of the Master Agreement, demanding a settlement offer within two days in order to avoid a lawsuit.

59.     Consistent with the requirements of the Master Agreement, XAPT responded on October 17, 2019 that it was not able to make any settlement proposal because the parties had not engaged in the meaningful negotiations required by Section 15.6.1 of the Master Agreement.

60.     On the very next day, instead of complying with its contractual obligation to engage in the dispute resolution process, Deere filed a civil action against XAPT (the "Illinois Action") in the United States District Court for the Central District of Illinois (the "Illinois Court"). Deere wrongly alleges that XAPT has breached its contractual obligations to Deere and that XAPT fraudulently induced Deere to hire XAPT, and seeks reformation of the Agreements.

61.     Deere repudiated the Agreements. Deere's communications and conduct constituted an outright refusal to continue the Agreements or to perform any of its obligations under the Agreements. Deere's letter of October 16, 2019 stated: "At this point, Deere does not believe XAPT is a suitable partner to bring to its dealers. The type of resolution Deere seeks is laid out in the complaint. Please provide a settlement offer that compensates Deere for its losses and amicably resolves Deere and XAPT's relationship." Deere filed the Illinois Action and terminated its performance under the Agreements without even purporting to terminate the Agreements under their terms and without providing at least 30 days advance notice to XAPT as required for a valid termination under Sections 1.2.2 and

1.2.3 of the Agreements. Deere did not purport or attempt to terminate the Agreements until three months later, on January 24, 2020, and did so without providing the required 30 days advance notice to XAPT. Deere never even attempted to comply with the mandatory dispute resolution process in the Master Agreement and rejected XAPT's request to engage in the dispute resolution process. Additionally, Deere's demand in the Illinois Action for reformation of the Global Template Amendment also makes clear that Deere was unwilling to perform without a material change in the terms of the Agreements. Deere did not terminate the Agreements under their terms or use the mandatory dispute resolution process. It simply refused to continue working under the Agreements and filed suit -- so it could illegitimately grab its favored forum and attempt to drag XAPT before a jury in Deere's backyard.

62.    Inexplicably, in the Illinois Action, Deere seeks to modify the Global Template Amendment that its own attorneys prepared and drafted. Deere frivolously alleges that the Global Template Amendment was not intended by the parties to accomplish what it expressly and unambiguously accomplishes: a modification of the parties' arrangement to a fixed price for a fixed amount of work. XAPT agreed to a fixed price, which was requested by Deere, only because Deere committed to limiting the scope of work. XAPT did not and would never agree to an open-ended scope of work, constantly evolving at Deere's discretion, for a fixed price.

4814-4970-0840.1

24

63.     XAPT subsequently filed a motion to dismiss Deere's lawsuit for failure to satisfy the mandatory dispute resolution process and other grounds. XAPT otherwise denies the allegations of Deere's lawsuit as factually groundless.

64.     On March 27, 2020, Deere filed a motion for leave to file an amended complaint seeking to join three additional entities affiliated with XAPT as defendants. The proposed amendment reasserted Deere's same baseless theories. Contending that the amended complaint mooted XAPT's motion to dismiss, Deere asked the Illinois Court to rule on its motion for leave prior to ruling on XAPT's motion to dismiss.

65.     On May 6, 2020, Magistrate Judge Hawley of the Illinois Court granted Deere's motion for leave to file its amended complaint (the "May 6 Order"). XAPT promptly filed an objection to the May 6 Order under Federal Rule of Civil Procedure 72, on the grounds that the May 6 Order erroneously determined that XAPT could not prevail on a motion to dismiss for Deere's failure to comply with the Master Agreement's mandatory dispute resolution process-a dispositive issue in the Illinois Action. In connection with the pending objection, the Illinois Court extended the deadline for XAPT to respond to Deere's amended complaint until 14 days after the Illinois Court rules on XAPT's objection. In late July, Deere attempted to force XAPT to respond to its amended complaint (and thus prejudice itself) even

though XAPT's Rule 72 objection was still pending. The Illinois Court promptly denied Deere's request.

66.     On September 24, 2020, the Illinois Court affirmed the May 6 Order, but explicitly held that XAPT was not foreclosed from pursuing an argument, including in a dispositive motion, that Deere failed to comply with the mandatory dispute resolution process.

## XI.   DEERE "TERMINATES" THE AGREEMENTS AND REFUSES TO COMPLY WITH ITS CONTRACTUAL OBLIGATIONS.

67.     On January 24, 2020, over three months *after* filing the Illinois Action, Deere emailed a letter to XAPT by which it purported to terminate the Master Agreement and the SDA on the grounds that XAPT was in "Material Default."

68.     XAPT is not in material default of its obligations under the Master Agreement or the SDA. Nor has XAPT received any notice specifying its purported breach as required by Section 12.3 of the Master Agreement as a predicate to any termination for "Material Default." By terminating the Master Agreement and the SDA on improper grounds--including by failing to provide XAPT notice specifying XAPT's purported breach and by failing to comply with the Master Service Agreement's mandatory dispute resolution protocol--Deere confirmed its repudiation of the Agreements.

69.     XAPT seeks relief from this Court only as last resort to prevent the illegal commercialization and use of its assets, NAXT Core and Supplier

4814-4970-0840.1

Modifications, which will undoubtedly cause XAPT irreparable harm, and only after making multiple attempts to resolve its dispute with Deere and shut down the Illinois Action that Deere filed in clear violation of the Master Agreement without complying with the required dispute resolution process.

70.     Section 12.4 of the Master Agreement requires each party to return (or certify destruction of) the other party's property and confidential information upon termination of the Master Agreement.

71.     Under Section 2.3 of the SDA, Deere was licensed to use NAXT Core and Supplier Modifications, but only during the term of the SDA. When Deere repudiated the Agreements, it forfeited any rights it had under those contracts, including those associated with the NAXT Core and Supplier Modifications licenses.

72.     Deere currently possesses a partially completed Deere Customized Solution for its own use and for use by its dealer network. Deere is apparently using or planning to use the Deere Customized Solution to complete, distribute and implement a software solution built upon, and incorporating, NAXT Core and Supplier Modifications, as well as other XAPT materials and confidential information. In the months prior to XAPT's filing of its original Complaint, XAPT repeatedly demanded in writing that Deere return, or certify destruction of, its NAXT Core and Supplier Modifications software (termed "intellectual property and

confidential information" in the relevant communications) on February 26, 2020, March 9, 2020, March 25, 2020, March 26, 2020, and again on April 1, 2020. (February 26, March 9, 25, and 26, and April 1, 2020 Emails from R. Cummins to M. Seale). Deere refused. In the months since, XAPT has continued to request that Deere cease use of and return, or certify destruction of, its NAXT Core and Supplier Modifications and confidential information. Deere's only response has been to demand that XAPT identify, file by file, which materials XAPT wants returned. But Deere refuses to accept XAPT's answer: Deere has repudiated the Agreements, cannot claim any benefits under the Agreements and, therefore, is required to return to XAPT (or certify destruction of) all NAXT Core and Supplier Modifications software and other materials that XAPT provided to Deere.

73.     For months, XAPT attempted to resolve the dispute by offering in writing, multiple times, to license to Deere to use the NAXT Core and Supplier Modifications that Deere is currently misappropriating. As early as September 3, 2019, Dejan Popovic, then-President of XAPT, wrote to Mark Theuerkauf, then-Finance Vice President of Deere, reminding him that the parties needed to negotiate a mutually agreeable licensing agreement for Deere's use of the Deere Customized Solution. (September 3, 2019 Email from D. Popovic to M. Theuerkauf). The parties discussed the price and terms of such a licensing agreement until September 26, 2019, when Deere abruptly cut off discussions. On October 24, 2019, Hamza Kamal,

XAPT Project Manager, followed up with Deere representatives to further address the necessity of Deere obtaining a license from XAPT and to initiate the Master Agreement's dispute resolution process so that the licensing issue could be resolved. (October 24, 2019 Email from H. Kamal to R. Wittich). On November 7, 2019, Chris Wittusen, XAPT Program Director, again followed up with Deere's representatives, imploring Deere to engage in the dispute resolution process and moving the dispute to the second step of the dispute resolution process. (November 7, 2019 Email from C. Wittusen to N. Mathis and D. McHugh). Rather than engage in the contractually mandated dispute resolution process or discuss a license, Deere ignored XAPT's repeated requests.

## XII.    DEERE CONJURES A NONSENSICAL INTERPRETATION OF THE AGREEMENTS.

74.    Deere has refused to return or certify destruction of the NAXT Core or Supplier Modifications software or other materials or confidential information to XAPT. In support of its conduct, Deere has provided only a contorted, illogical and unworkable interpretation of the relevant agreements.

75.    Deere contends, remarkably, that XAPT granted a license to Deere to possess, use and exploit "any IP that may exist," forever and for free, on the date that the parties signed the agreements. *See* March 27, 2020 Letter from M. Seale to R. Cummins. Deere's interpretation involves a  labyrinth of  cherry-picked  and

partially quoted provisions, but its lynchpin is Section 18 of the SDA, which

provides:

> As contemplated by Section 6.6.4 of the MOSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent that XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-Existing Work is dependent upon any Supplier Modifications, Competitive Advantage Modifications and/or Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modifications and/or Supplier Pre-Existing Work into any Deliverable, Deere Modifications, and/or Deere Pre-Existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully-paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce and distribute (within Customer, its Affiliates and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications and Supplier Pre- Existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-Existing Work. XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications and/or Supplier Pre-Existing Works to its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications and/or Supplier's Pre-Existing Work. In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

76.    Deere asserts that because Section 18 includes language referring to a

license of Supplier's Pre-Existing Work, Deere holds a license to use NAXT Core

4814-4970-0840.1

and the Supplier Modifications. This cannot work. Supplier's Pre-Existing Work is not defined under the SDA, but is defined in Section 1.32 of the Master Agreement as software used by XAPT to provide "Services." Ex. 2 § 1.32 (Master Agreement). "Services" means services provided by XAPT to Deere under a Statement of Work or "SOW." Ex. 2 § 1.25 (Master Agreement). All services under the Global Template SOW are to implement the Deere Customized Solution, including, among other things, the provision of Supplier Modifications and therefore, by definition, cannot include NAXT Core or Supplier Modification software. For instance, Section 4.1 of the Master Agreement requires that all Statements of Work contain the items listed in Exhibit A. Ex. 2 § 4.1 (Master Agreement). Exhibit A, in turn, requires the Statement of Work to contain a "[d]etailed description of the Deliverables, Products, Services…." Ex. 2 at Exhibit A (Master Agreement). None of these items encompasses NAXT Core or Supplier Modifications. The definition of "Deliverable" specifically excludes NAXT Core and Supplier Modifications. Ex. 2 § 1.12 (Master Agreement).

77.    Similarly, Section 6.6.2 of the Master Agreement provides that XAPT would not:

> (i) embed, install or incorporate any Supplier Pre-Existing Works into any Deliverable or Deere Pre-Existing Works; or (ii) develop or configure any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, unless such Supplier Pre-Existing Works are (A) identified, in the

applicable SOW as being so used, embedded, installed or incorporated, or (B) Supplier has provided to Deere with detailed advance written notice thereof and obtained Deere's prior written consent for such use.

Nothing in the Global Template SOW, Governance SOW, or Global Template Amendment indicates that the NAXT Core code is embedded into any Deliverable or Deere Pre-Existing Works, nor is there any indication that a Deliverable or Deere Pre-Existing Work has been developed or configured such that the use or exploitation of the Deliverable or Deere Pre-Existing Work depends on the Supplier Pre-Existing Work.

78.     Deere's reading of Section 18 also renders meaningless the significant time and resources the parties expended negotiating the terms of the DUSLs. If Deere actually held a royalty-free license, it could simply sub-license the software to its dealers.

79.     Deere's own actions belie its newfound interpretation of the SDA. Deere has previously paid the minimum fees to license Microsoft Dynamics 365, NAXT Core, and the Supplier Modifications. *See* Ex. 4 § 8 (SDA) (requiring upfront payment of the Minimum Commitment Amount, "compris[ing] Subscription Fees for use of the Subscription Licenses by Deere Users"); § 1.24 (defining Subscription Licenses as "the subscription licenses for providing access and use of the Global Template and Subscription Service to Customer Users and Dealer Users and functionality for the Subscription Service"); § 1.28 (defining Global Template as the

4814-4970-0840.1

"configurations, integrations and all Modifications of the Product developed for Customer under the [Master Agreement]"); § 1.31 (defining Product as a fully integrated and compatible XAPT 365 equipment service, dealer and device management solution based on Microsoft Dynamics 365 for Operations). Deere would not have paid the licensing fees for Microsoft Dynamics 365, NAXT Core, and the Supplier Modifications if in fact it believed that it actually had a perpetual, royalty-free license.

80.     More fundamentally, the conclusion that Deere owns or is licensed to use NAXT Core and the Supplier Modifications forever, without any obligation to pay royalties, contradicts and renders superfluous vast parts of the agreements and would defeat the economic foundation and purpose of the entire project. For example, Section 12.4.3 of the Master Agreement provides that, after termination of the agreements, the parties "must license to Deere and designated third parties" any Supplier Pre-existing Works or other IP needed to allow Deere to perform the Services. Ex. 2 § 12.4.3 (Master Agreement). Section 12.4.3 would not require the granting of a license to Supplier Pre-Existing Work to Deere upon termination, if Deere already owns a perpetual, royalty free license for Pre-Existing Work under Section 18 of the SDA. Another example is Section 13.15 of the SDA, which addresses Deere's use of intellectual property and confidential information after termination:

> During the Deere Termination Notice Period or XAPT Termination
> Notice Period and after the expiration of the Deere Termination Notice
> Period or XAPT Termination Notice Period, Customer shall have the
> right to (i) develop internally or through use of any contractor a new
> dealer management system or modify an existing dealer management
> system, (ii) actively work with and endorse a dealer management
> system that is either developed by Customer or provided by any third
> party and (iii) to directly market and promote any dealer management
> system that is either developed by Customer or provided by a third
> party; provided that Deere shall not (a) use or disclose any Confidential
> Information of XAPT to any third party, (b) use for any purpose any
> material, including design documents, software, business processes,
> files, data, concepts, ideas, logos, trade marks, graphics, video, audio,
> configuration, functionality or any other artefact in which XAPT or its
> licensors own intellectual property rights, except as where authorized
> in writing by XAPT, or (c) induce, solicit or persuade any current
> XAPT employee or contractor to disclose to Deere any XAPT
> Confidential Information or any material in which XAPT or its
> licensors own intellectual property rights.

Ex. 4 § 13.15 (SDA). The terms of the SDA thus allow Deere, post-termination, to

develop a software system for its dealers, but may not "use for any purpose any

material, including design documents, software, business processes, files, data,

concepts, ideas, logos, trademarks, graphics, video, audio, configuration,

functionality or any other artefact in which XAPT or its licensors own intellectual

property rights" without the written consent of XAPT. Ex. 4 § 13.15 (SDA). But by

its repudiation of the Agreements, Deere has forfeited any post-termination contract

rights.

81.    And Section 28.12 of the SDA states that the provisions that survive

termination of the Agreement are "all provisions that by their nature should survive

termination." Ex. 4 § 28.12 (SDA). Deere conveniently ignores the plain language of the SDA, which only provides that certain rights and obligations remain in effect where their continued efficacy makes sense. Deere cannot point to any provision in the SDA (or any other agreement) granting it unfettered access to and use of NAXT software, let alone show that such a provision would by its nature survive termination -- and certainly would not survive repudiation of the Agreements by Deere. And regardless, Deere has forfeited any post-termination rights by repudiating the Agreements.

82.    Deere's litigation-driven reading of the SDA also defies reality and the purpose of the project. The software development fees for XAPT are not the reason that XAPT would undertake and complete a project such as the Deere Customized Solution. In fact, XAPT has given Deere large discounts on those fees to try to finish the project.

83.    The economic reward for XAPT comes from the licensing of the Deere Customized Solution to Deere's dealers. XAPT was incurring very large losses, in the millions of dollars, to complete the development project. However, after the initial three-year rollout to the dealers, XAPT would expect to earn tens of millions in license fees annually.

84.    The SDA includes a comprehensive structure for the granting and pricing of the DUSLs. Ex. 4 §§ 1.11, 4, 5, 6, 7, 8, 9, 10, 11, 12 (SDA). Under Deere's

4814-4970-0840.1

interpretation, the entire licensing scheme in the SDA would be meaningless because, based on a single section of the SDA (Section 18), Deere was purportedly granted a perpetual, royalty-free license to "any IP that may exist," on the day the SDA was signed. Deere's interpretation would allow Deere to use, and provide to its dealers, the Deere Customized Solution without needing a single license from XAPT. XAPT would not have even started such a project, where Deere was given a free, forever license to NAXT Core and Supplier Modifications on the date the agreements were signed.

85.     Deere, of course, must know that its interpretation of the Agreements, as well as its Illinois Action, are fatally flawed. Deere is seeking to extract concessions from XAPT to finish the project, after XAPT has already made a substantial investment in Deere's solution. Deere's repudiation of the Agreements has resulted in the forfeiture of any post-termination benefits.

XIII.   XAPT FILES SUIT IN THE APPROPRIATE FORUM.

86.     On April 3, 2020, following Deere's purported termination of the Agreements and the parties' failed mediation, XAPT filed its original Verified Complaint in this Court, seeking injunctive relief against Deere based on Deere's breaches of the Agreements and refusal to cease use of and return (or certify destruction of) its NAXT Core and Supplier Modifications software. XAPT also sought expedited proceedings leading to a preliminary injunction hearing.

87.     Deere then derailed this action by removing the case to the United States District Court for the District of Delaware (the "District Court of Delaware"). Deere subsequently moved to dismiss XAPT's complaint and moved to transfer the entire case to the Illinois Court--its real purpose for removing the case to the District Court of Delaware.

88.     Four months later, on August 17, 2020, the District Court of Delaware rejected Deere's argument and remanded the case back to this Court.

XIV.  THE NEED FOR PROMPT ACTION BY THIS COURT.

89.     For months, XAPT made extraordinary attempts to resolve its dispute with Deere without seeking judicial assistance. Deere refused to cooperate and remains intent on using XAPT's intellectual property, including NAXT Core and Supplier Modifications, to complete development of, and distribute, Deere's own software system to its dealers, and perhaps to other unauthorized third parties. Deere could also employ a software development firm that competes with XAPT to finish the project, which would involve providing a competitor with XAPT's most valuable asset. The distribution and dilution of unique, confidential and highly valuable software would irreparably injure XAPT. Deere has refused to execute and file a simple stipulated order, in Illinois or Delaware, agreeing not to use any of XAPT's software. Because of Deere's continued obfuscation, XAPT has no visibility into

Deere's uses and plans for XAPT's intellectual property. If Deere were not using XAPT's intellectual property, Deere would simply return or destroy it.

90.     XAPT is also fully aware of this Court's doctrine under *McWane Cast Iron Pipe Corporation v. McDowell-Wellman Engineering Company*, but action from this Court is needed and is the only practical option available to XAPT. XAPT anticipates that the Illinois Action will be dismissed, or terminated by summary judgment, based on Deere's fundamental failure to follow the required dispute resolution process (and other grounds). XAPT believes that its dispute with Deere belongs in this Court. The Master Agreement includes a non-exclusive forum selection provision specifying the courts of Delaware and the agreements are governed by Delaware law. Ex. 2 § 15.4 (Master Agreement). At the same time, an attempt by XAPT to seek preliminary injunctive relief in the Illinois Action would be impracticable. The only way XAPT could seek preliminary relief in the Illinois court would be through counterclaims against Deere.

91.     But XAPT is seeking dismissal, through a pleading motion or summary judgment, on the grounds that Deere did not follow the Master Agreement's dispute resolution process. Thus, XAPT would be stuck in an untenable position of seeking preliminary relief prior to trial in an action that it contends should be dismissed. In the event the Illinois Court grants XAPT's motion to dismiss or motion for summary judgment, XAPT would be prejudiced and judicial resources would be wasted.

XAPT would need to dismiss its counterclaims and request for preliminary injunctive relief if it wanted to seek relief in the correct forum (this Court) and start all over, after a significant delay. This problem would be exacerbated if the Illinois Court granted XAPT a preliminary injunction and then dismissed Deere's claims.

92.    XAPT would actually end up worse off in trying to protect itself from irreparable harm and fully pursue its contractual rights. Accordingly, XAPT must ask this Court to issue preliminary injunctive relief before dismissal of the Illinois Action.

## COUNT I
## (BREACH AND REPUDIATION OF CONTRACT FOR MISAPPROPRIATION OF INTELLECTUAL PROPERTY AND CONFIDENTIAL INFORMATION)

93.    XAPT restates and incorporates the preceding paragraphs of its Complaint.

94.    The Master Agreement and the SDA are valid and binding contracts.

95.    XAPT has substantially performed under the Master Agreement and the SDA.

96.    Through its performance under the Agreements, XAPT has provided Deere use of its confidential information and NAXT Core and Supplier modifications software (and the intellectual property rights subsisting in such software), but Deere is no longer entitled to possess or use such software because Deere has repudiated the Agreements. Alternatively, even assuming Deere

4814-4970-0840.1

terminated the Agreements under their terms, Deere must still return or certify destruction of NAXT Core and Supplier Modifications, and XAPT's confidential information (except for specified, software components licensed to Deere) and all other unlicensed materials to XAPT. Deere has refused to return anything.

97.    On information and belief, Deere continues to use or intends to use XAPT's confidential information and software.

98.    XAPT will be irreparably harmed by Deere's continued use and misappropriation of XAPT's software.

99.    XAPT has no adequate remedy at law.

## <u>COUNT II</u>
## (BREACH OF CONTRACT UNDER THE GLOBAL TEMPLATE)

100.  XAPT restates and incorporates the preceding paragraphs of its Complaint.

101, The Global Template SOW is a valid and binding contract between the parties.

102.  XAPT has substantially performed under the Global Template SOW and Global Template Amendment.

103.  Deere has breached the Global Template by failing to comply, among other requirements, with Sections 2.1 and 2.2 of the Global Template Amendment, Section 6.1.8 of the Global Template as amended, and by failing to make payments required under the Global Template Amendment.

4814-4970-0840.1

104.   As a direct and proximate result of Deere's breaches, XAPT has suffered-and continues to suffer-damages.

## COUNT III
## (BREACH AND REPUDIATION OF THE AGREEMENTS)

105.   XAPT restates and incorporates the preceding paragraphs of its Complaint.

106.   The Agreements are valid and binding contracts between the parties.

107.   XAPT has substantially performed under the Master Agreement and has fulfilled all conditions precedent to requiring Deere's performance.

108.   Deere has breached and repudiated the Agreements, among other ways, by communicating its refusal to continue under the Agreements, by failing to comply with Section 15.6 of the Master Agreement, by failing to validly terminate the Agreements under their terms, and by filing the Illinois Action prior to engaging in the contractually required mutual dispute resolution process or validly terminating the Agreements.

109.   Because of Deere's breach and repudiation of the Agreements and refusal to participate in the Master Agreement's mandatory dispute resolute process, XAPT could not, and was no longer obligated to, comply with the mandatory dispute resolute process.

110.   As a direct and proximate result of Deere's breach, XAPT has suffered, and continues to suffer, damages, including lost royalties and profits.

4814-4970-0840.1

## **PRAYER FOR RELIEF**

WHEREFORE, XAPT respectfully requests that the Court provide the following relief:

A.    Declare that Deere has forfeited all rights and benefits under the Agreements;

B.    Enter a permanent injunction prohibiting Deere from using, accessing, transmitting, or disclosing XAPT's intellectual property;

C.    Order Deere to return to XAPT all confidential information and all software and other material that XAPT provided to Deere: or alternatively, if Deere validly terminated the Agreements, order Deere to return to XAPT (or certify destruction of) its software and confidential information as required by the Agreements;

D.    Declare that Deere has breached and repudiated the Agreements;

E.    Award damages for Deere's breaches and repudiation of the Agreements in an amount to be proven at trial, including but not limited to, lost royalties and profits, with pre-and post-judgment interest;

F.    Award XAPT its reasonable attorneys' fees, costs, and expenses incurred in bringing this action; and

4814-4970-0840.1

G.     Grant any further and additional relief to which XAPT is entitled under

the circumstances.

LEWIS  BRISBOIS
BISGAARD & SMITH LLP

By: */s/ Francis G. X. Pileggi*
Francis G.X. Pileggi (#2624)
Ciro C. Poppiti, III (#4905)
500 Delaware Avenue, 7th Floor
Wilmington, DE 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Ciro.Poppiti@LewisBrisbois.com

OF COUNSEL:

Josh M. Kantrow, Esquire
Margaret Fitzsimmons, Esquire
LEWIS BRISBOIS BISGAARD
     & SMITH LLP
550 West Adams Street, Suite 300
Chicago, IL  60661

Daniel C. DeCarlo, Esquire
LEWIS BRISBOIS BISGAARD
     & SMITH LLP
633 West 5th Street, Suite 4000
Los Angeles, CA  90071

William S. Helfand, Esquire
Felix Digilov, Esquire
LEWIS BRISBOIS BISGAARD
     & SMITH LLP
24 Greenway Plaza, Suite 1400
Houston, TX  77046

*Attorneys for Plaintiff*
*XAPT Corporation*

Dated:  May 19, 2021

4814-4970-0840.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 19th day of May, 2021, that a copy of the foregoing was served on the following counsel via File & ServeXpress.

Melanie K. Sharp, Esquire
James L. Higgins, Esquire
Young Conaway Stargatt
    & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, DE  19801

<u>   */s/ Francis G.X. Pileggi*   </u>
Francis G.X.Pileggi
Del. Bar No. 2624

EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:19-cv-04210-SLD-JEH |
| | ) | |
| v. | ) | |
| | ) | |
| XAPT CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEERE & COMPANY'S RESPONSES AND OBJECTIONS TO XAPT
CORPORATION'S SECOND SET OF REQUESTS FOR PRODUCTION**

Plaintiff Deere & Company ("Deere"), by and through its undersigned counsel, pursuant to Federal Rules of Civil Procedure 26 and 34, hereby submits its Objections & Responses to Plaintiff XAPT Corporation's Second Set of Requests for Production to Deere & Company.

**GENERAL OBJECTIONS AND STATEMENTS**

Deere makes the following general objections and statements with respect to each of the specific Requests below:

1.      Deere objects to XAPT's definitions and instructions to the extent they purport to impose discovery obligations broader than those imposed by the Federal Rules of Civil Procedure and the Court's Orders, to the extent they call for the disclosure of information or production of documents not within the custody or control of Deere, and/or to the extent they call upon Deere to violate federal law or the laws of any state or local jurisdiction.

2.      These responses are made solely for the purpose of this litigation. Each response is subject to any and all objections as to competency, relevancy, materiality, propriety and admissibility and to any and all other objections and grounds that would require the exclusion of any information contained herein or document identified herein if any information contained

herein or in any of said documents was asked of a witness present and testifying in this matter, and all such objections are hereby expressly reserved by Deere and may be interposed at or before the time of trial.

3.  The following responses are based upon information and documents presently available to and located by Deere and its attorneys and, except for explicit facts expressly admitted herein, no incidental or implied admissions are intended hereby. The fact that Deere has responded to any request or part thereof, or identified or produced any document or part thereof, should not be taken as an admission that Deere accepts or admits the existence of any "fact" set forth or assumed by the request for which said response was made or for which said document was identified or produced, or contained in any said document, or that any such document or response or objection to the request constitutes admissible evidence. The fact that Deere has responded to all or part of any request, or has identified or produced all or part of any document, is not intended to be and shall not be construed to be a waiver by Deere of all or any part of any objection to any request made herein.

4.  To the extent that any or all of the requests herein call for information, materials or documents prepared in anticipation or defense of litigation, or for information, materials or documents covered by the work product doctrine, or privileged from discovery by the attorney-client privilege or any other privilege, Deere objects to each and every such request and thus will not supply or render any information, materials or documents protected from discovery by the Federal Rules of Civil Procedure, the Court's Local Rules, the work product doctrine, the attorney-client privilege, and/or any other pertinent privilege. This objection extends to and includes requests seeking the identities of individuals with knowledge of matters, where such persons are counsel for Deere or obtained such knowledge solely through communications with

2

counsel for Deere.  Any inadvertent disclosure of such information, or documents underlying such information, shall not be deemed a waiver of any privilege or immunity.

5.     To the extent that any or all of the requests herein call for expert-related information, materials or documents, including draft reports of and communications by Deere's counsel with Deere's expert witnesses, Deere objects on the grounds that it contravenes the Joint Discovery Plan (Dkt. No. 32), under which the parties are not required to provide expert reports until February 5, 2021.  Deere will provide, with respect to each expert witness who has been retained or specially employed to provide expert testimony in this case, the written report required by Rule 26(a)(2)(B) in accordance with the Joint Discovery Plan or any subsequent court order addressing expert disclosures.

6.     Deere objects to the extent that any or all of the requests herein purport to limit, characterize, or otherwise interpret the allegations in Deere's Second Amended and First Supplemental Complaint ("SAC") or the parties' contracts.  The allegations in Deere's SAC, and the terms of the parties' contracts, speak for themselves.

7.     Deere's responses are limited to the project at issue in its SAC.

8.     Deere has made reasonable efforts to locate and produce information responsive to the interrogatories as it understands and reasonably interprets them.  If Deere subsequently asserts an interpretation that differs from that which Deere made in responding herein, Deere reserves its right to supplement or amend the responses and objections accordingly, in the event it is required to do so under Rule 26(e).

These general objections are hereby incorporated into each specific response below and the objections are not waived with respect to any such response.

## DEERE'S SPECIFIC OBJECTIONS AND RESPONSES

1.     Please produce all Project-related Electronically Stored Information, including all associated metadata, contained in Azure Subscription Resources environments and encompassing all submissions from June 26, 2017 to January 24, 2020.  All Project Documents and all Project-related electronically stored information may include, but is not limited to, Deere Modifications, Supplier Modifications, Deliverables, Competitive Advantage Modifications, and Supplier Pre-Existing Intellectual Property, as defined by the MSA.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere objects to this request to the extent it purports to characterize the allegations of Deere's SAC or the terms of the parties' contracts, which speak for themselves.  Deere is not withholding responsive documents on the grounds of this characterization objection.  Subject to and without waiving the foregoing General Objections and Statements, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce and/or make available for inspection, in the approved Court format, nonprivileged information responsive to this request.

2.     Please produce all Project-related Electronically Stored Information, including all associated metadata, contained in OneBox VM environments and encompassing all submissions from June 26, 2017 to January 24, 2020. All Project Documents and all Project-related electronically stored information may include, but is not limited to, Deere Modifications, Supplier Modifications, Deliverables, Competitive Advantage Modifications, and Supplier Pre-Existing Intellectual Property, as defined by the MSA.

4

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere objects to this request to the extent it purports to characterize the allegations of Deere's SAC or the terms of the parties' contracts, which speak for themselves.  Deere is not withholding responsive documents on the grounds of this characterization objection.  Subject to and without waiving the foregoing General Objections and Statements, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce and/or make available for inspection, in the approved Court format, nonprivileged information responsive to this request.

3.      Please produce all Project-related Electronically Stored Information, including all associated metadata, contained in Azure DevOps environments and encompassing all submissions from June 26, 2017 to January 24, 2020. All Project Documents and all Project-related electronically stored information may include, but is not limited to, Deere Modifications, Supplier Modifications, Deliverables, Competitive Advantage Modifications, and Supplier Pre-Existing Intellectual Property, as defined by the MSA.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere objects to this request to the extent it purports to characterize the allegations of Deere's SAC or the terms of the parties' contracts, which speak for themselves.  Deere is not withholding responsive documents on the grounds of this characterization objection.  Subject to and without waiving the foregoing General Objections and Statements, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce and/or make available for inspection, in the approved Court format, nonprivileged information responsive to this request.

4.      Please produce all Project-related Electronically Stored Information, including all associated metadata, contained in Microsoft Sandbox environments and encompassing all submissions from June 26, 2017 to January 24, 2020. All Project Documents and all Project-related electronically stored information may include, but is not limited to, Deere Modifications, Supplier Modifications, Deliverables, Competitive Advantage Modifications, and Supplier Pre-Existing Intellectual Property, as defined by the MSA.

**RESPONSE:**   In addition to the foregoing General Objections and Statements, Deere objects to this request to the extent it purports to characterize the allegations of Deere's SAC or the terms of the parties' contracts, which speak for themselves.   Deere is not withholding responsive documents on the grounds of this characterization objection.   Subject to and without waiving the foregoing General Objections and Statements, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce and/or make available for inspection, in the approved Court format, nonprivileged information responsive to this request.

5.      Please produce all Project-related Electronically Stored Information, including all associated metadata, contained in Microsoft Lifecycle Services environments and encompassing all submissions from June 26, 2017 to January 24, 2020. All Project Documents and all Project-related electronically stored information may include, but is not limited to, Deere Modifications, Supplier Modifications, Deliverables, Competitive Advantage Modifications, and Supplier Pre-Existing Intellectual Property, as defined by the MSA.

**RESPONSE:**   In addition to the foregoing General Objections and Statements, Deere objects to this request to the extent it purports to characterize the allegations of Deere's SAC or

the terms of the parties' contracts, which speak for themselves.  Deere is not withholding responsive documents on the grounds of this characterization objection.  Subject to and without waiving the foregoing General Objections and Statements, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce and/or make available for inspection, in the approved Court format, nonprivileged information responsive to this request.

6.     Please produce all Documents and Communications related to Deere's evaluation of any third-party developer's or vendor's responses to Deere's request for proposal for the Project.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.  Deere will not produce documents responsive to this request.Please produce all Documents and Communications related to any third-party developer's or vendor's responses to Deere's request for proposal for the Project.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.  Deere will not produce documents responsive to this request.

7.      Please produce all Documents and Communications related to Deere's evaluation of XAPT's response to Deere's request for proposal for the Project.

**RESPONSE:**   In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.   Deere will not produce documents related to other vendors.   Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce responsive, nonprivileged documents and communications that relate to Deere's selection of XAPT.

8.      Please produce all Documents, Communications, and presentation materials related to Deere's presentations in 2017 and 2018 regarding Deere's Project vendor selection process, including, but not limited to, which competing vendor proposals Deere reviewed and why Deere chose XAPT to develop the Project.

**RESPONSE:**   In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.   Deere will not produce documents related to other vendors.   Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce responsive, nonprivileged documents and communications that relate to Deere's selection of XAPT.

9.      Please produce all Documents, Communications, and presentation materials related to Deere's internal presentations regarding the Project, from January 1, 2015 to January 24, 2020.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.  Deere will not produce documents related to other vendors.  Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce nonprivileged documents and communications responsive to this request.

10.     Please produce all Documents, Communications, and presentation materials related to Deere's meetings with Deere's dealers regarding the Project, from June 26, 2017 to January 24, 2020.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents, Communications, and presentation materials relating to other vendors as overbroad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.  Deere will not produce documents related to other vendors.  Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce nonprivileged documents and communications responsive to this request.

11.     Please produce all Documents and Communications related to the Project, directed to or written by Deere's Chief Information Officer, from January 1, 2015 to January 24, 2020.

**RESPONSE:**  Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce nonprivileged documents and communications that are responsive to this request.

12.     Please produce all Documents and Communications related to the Project, which Deere directed to Microsoft or Microsoft directed to Deere, from June 26, 2017 to January 24, 2020.

**RESPONSE:**  Subject to and without waiving these objections, and after entry of, and subject to the terms of, an appropriate confidentiality protective order and ESI Protocol, Deere will produce nonprivileged documents and communications that are responsive to this request.

13.     Please produce all Documents and Communications related to the Project and Hitachi, including but not limited to service module integration, from January 1, 2015 to January 24, 2020.

**RESPONSE:**  In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents and Communications related to the Project and Hitachi as overbroad, vague, unduly burdensome, and seeking information that is not relevant to any party's claim or defense.  Deere will not produce documents related to other vendors.

14. Please produce all Documents and Communications relating to or reflecting all written contracts or agreements between You and to any third-party developer or vendor you may have hired to modify, improve, or further develop the global DBS system from June 26, 2017 to January 24, 2020.

**RESPONSE:** In addition to the foregoing General Objections and Statements, Deere also objects to the portion of the request seeking all Documents and Communications related to other vendors as overbroad, vague, unduly burdensome, and seeking information that is not relevant to any party's claim or defense. Deere will not produce documents responsive to this request.

Respectfully submitted,

Dated: October 16, 2020
By: /s/ Kara E.F. Cenar
Kara E. F. Cenar, IL Bar #6198864
S. Patrick McKey, IL Bar #6201588
kcenar@greensfelder.com
pmckey@greensfelder.com
GREENSFELDER, HEMKER & GALE, P.C.
200 West Madison Street, Suite 3300
Chicago, Illinois 60606
Telephone: (312) 419-9090
Facsimile: (312) 419-1930

Mary Ann L. Wymore, MO Bar #44061
Ronnie L. White II, MO Bar #67165
Kirsten M Ahmad, MO Bar # 52886
mlw@greensfelder.com
rwhite@greensfelder.com
km@greensfelder.com
GREENSFELDER, HEMKER & GALE, P.C.
10 South Broadway, Suite 2000
St. Louis, Missouri 63102
Telephone: (314) 241-9090
Facsimile: (314) 241-8624

11

Mariangela Seale
Lauren Jaffe
mseale@rshc-law.com
ljaffe@rshc-law.com
RILEY SAFER HOLMES & CANCILA LLP
70 West Madison Street, Suite 2900
Chicago, Illinois 60602
Telephone:  (312) 471-8700
Facsimile:  (312) 471-8701

*Attorneys for Plaintiff Deere & Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of October, 2020, a copy of the foregoing was electronically served on the following counsel of record via electronic mail:

Josh Kantrow
Lewis Brisbois
550 West Adams Street, Suite 300
Chicago, IL  60601
Josh.Kantrow@lewisbrisbois.com

Robert P. Cummins
The Cummins Law Firm, P.C.
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112-4600
rcummins@nhdlaw.com

**_Attorneys for Defendant XAPT Corporation_**.

_/s/ Lauren Jaffe_

13

EXHIBIT E

**Kirsten M. Ahmad**

| | |
|---|---|
| **From:** | ECF_Returns@ilcd.uscourts.gov |
| **Sent:** | Monday, December 13, 2021 9:51 AM |
| **To:** | ECF_Notices@ilcd.uscourts.gov |
| **Subject:** | [EXTERNAL] Activity in Case 4:19-cv-04210-SLD-JEH Deere & Company v. XAPT Corporation Order Setting Hearing on Motion |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### CENTRAL DISTRICT OF ILLINOIS

### Notice of Electronic Filing

The following transaction was entered on 12/13/2021 at 9:51 AM CST and filed on 12/13/2021

| | |
|---|---|
| **Case Name:** | Deere & Company v. XAPT Corporation |
| **Case Number:** | 4:19-cv-04210-SLD-JEH |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**TEXT ONLY ORDER Setting Motion Hearing in re ALL PENDING MOTIONS including: [168] MOTION for Leave to File Document Under Seal, [98] MOTION for Protective Order, [153] MOTION for Extension of Time to Complete Discovery, [166] MOTION Entry of Proposed Order Governing ESI Protocols, [160] MOTION to Stay, [124] MOTION to Compel *Production of Deliverables* and [147] MOTION for Protective Order *Barring Plaintiff From Seeking Documents From "New Frontier Group," Which Is Not A Legal Entity*. Motion Hearing set for 1/4/2022 at 1:30 PM IN PERSON in Courtroom C in Peoria before Magistrate Judge Jonathan E. Hawley. Entered by Magistrate Judge Jonathan E. Hawley on 12/13/21. (WG)**

**4:19-cv-04210-SLD-JEH Notice has been electronically mailed to:**

Felix M Digilov     felix.digilov@lewisbrisbois.com

Joseph R Marconi     marconij@jbltd.com, kotsiovost@jbltd.com

Josh M Kantrow     josh.kantrow@lewisbrisbois.com, megan.duffy@lewisbrisbois.com

Kara Eve Foster Cenar     kcenar@greensfelder.com, cpaillou@greensfelder.com,
krodriguez@greensfelder.com, meg@greensfelder.com

Kirsten M Ahmad     km@greensfelder.com, jlz@greensfelder.com

Lauren Elizabeth Jaffe     ljaffe@rshc-law.com

Margaret M Fitzsimmons     margaret.fitzsimmons@lewisbrisbois.com

Mary Ann L Wymore     mlw@greensfelder.com, mlauber@greensfelder.com

Matthew J Morris     matthew.morris@lewisbrisbois.com

Samuel D Branum     branums@jbltd.com

Steven Patrick McKey     pmckey@greensfelder.com

Thomas M Wolf     thomas.wolf@lewisbrisbois.com, megan.duffy@lewisbrisbois.com

Victor J Pioli     pioliv@jbltd.com, KOTSIOVOST@JBLTD.COM

William S Helfand     bill.helfand@lewisbrisbois.com

**4:19-cv-04210-SLD-JEH Notice has been delivered by other means to:**

EXHIBIT F

E-FILED
Friday, 10 December 2021 11:57:12 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-04210-SLD-JEH |
| | ) | |
| XAPT CORPORATION, XAPT | ) | |
| SOLUTIONS PTY LTD, XAPT KFT, and | ) | |
| COSMO CONSULT BUSINESS | ) | |
| SOLUTIONS S.R.L., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Before the Court are Defendant Cosmo Consult Business Solutions S.R.L.'s ("Cosmo")

Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 96; Plaintiff Deere & Company's

("Deere") Motion to Conduct Jurisdictional Discovery Re: Cosmo Consult, ECF No. 99;

Defendant XAPT KFT's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 108[1];

Defendant XAPT Corporation's ("XAPT Corp.") Motion to File Exhibits Under Seal, ECF No.

116; XAPT Corp.'s Motion to Dismiss or Stay the Second Amended and First Supplemental

Complaint, ECF No. 118; Cosmo and XAPT KFT's Motion to Dismiss or Stay Under Fed. R.

Civ. P. 12(b)(1), (6), ECF No. 119; Defendant XAPT Solutions Pty Ltd's ("XAPT Solutions")

Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 129; Deere's Motion to File Certain

Omnibus Response Exhibits Under Seal, ECF No. 132; XAPT Corp., XAPT KFT, XAPT

Solutions, and Cosmo's (collectively, "Defendants") Motion to Set Status Conference, ECF No.

145; and Defendants' Motion for Leave to File Replies to Deere's Filing Set Forth in ECF # 131,

---

[1] In the Second Amended and First Supplemental Complaint, ("SAC"), Deere refers to this entity as XAPT Kft, *see* SAC 1, ECF No. 60, but the entity refers to itself as XAPT KFT in its motion to dismiss, *see* XAPT KFT 12(b)(2) Mot. Dismiss 1. The Court will follow the entity's lead and refer to it as XAPT KFT.

ECF No. 155.  For the following reasons, Cosmo's Motion to Dismiss Under Fed. R. Civ. P.

12(b)(2) is DENIED; Deere's Motion to Conduct Jurisdictional Discovery Re: Cosmo Consult is

MOOT; XAPT KFT's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2) is DENIED; XAPT

Corp.'s Motion to File Exhibits Under Seal is DENIED; XAPT Corp.'s Motion to Dismiss or

Stay the Second Amended and First Supplemental Complaint is DENIED; Cosmo and XAPT

KFT's Motion to Dismiss or Stay Under Fed. R. Civ. P. 12(b)(1), (6) is DENIED; XAPT

Solutions' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2) is DENIED; Deere's Motion to File

Certain Omnibus Response Exhibits Under Seal is DENIED; Defendants' Motion to Set Status

Conference is DENIED; and Defendants' Motion for Leave to File Replies to Deere's Filing Set

Forth in ECF # 131 is DENIED.

## BACKGROUND[2]

### I.     Factual Background

Deere offers services related to heavy machinery through dealers situated around the

world.  In 2013, to facilitate the dealers' work, Deere decided to develop a fully integrated

computer software system that would bring together the many facets of its dealers' business in

one "Dealer Business System" ("DBS").  This required a developer to create the system.  Deere

solicited demonstrations from potential system developers, including XAPT Corp.  Throughout

the vetting process, XAPT Corp. consistently represented to Deere that it was capable of

undertaking a project of this size.  After extensive discussions, demonstrations, and meetings,

Deere selected XAPT Corp. to develop the DBS.

---

[2] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the plaintiff's] favor."  *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).  Thus, the factual background is drawn from the SAC.

Deere and XAPT Corp. signed four principal contracts pertaining to the development of the DBS (the "DBS Project"): the Master Services Agreement ("MSA"); the Work Order Template–Global Template ("Global Template SOW"), which was amended on February 11, 2019 ("Amendment 1"); the Work Order–Governance ("Governance SOW"); and the XAPT Subscription Delivery Agreement ("SDA") (collectively, the "Contracts").

It soon became clear to Deere that XAPT Corp. had misrepresented its abilities to handle the challenge. XAPT Corp. not only failed to meet deadlines for delivering installments of the product but produced code that was full of errors. Because XAPT Corp. had miscalculated the effort it would take to bring its own system in line with Deere's requirements, in June of 2018, XAPT Corp. sought a $10 million increase in the project price. The parties entered negotiations, which resulted in the aforementioned Amendment 1 six months later. Deere and XAPT Corp., however, had differing opinions about what Amendment 1 meant for the project: Deere believed that XAPT Corp. was still obligated to perform all of the tasks as initially agreed, while XAPT Corp. insisted that Amendment 1 had removed one of XAPT Corp.'s original duties from the scope of the project—service module integration—while still requiring Deere to pay for it. Deere learned of XAPT Corp.'s alternative interpretation and brought it to the attention of XAPT Corp.'s president, Dejan Popovic, on April 23, 2019. In response, Popovic stated that he "of course" knew that Amendment 1 would have this effect and that he was aware that Deere had a different expectation. Second Am. & First Suppl. Compl. ("SAC") 23, ECF No. 60. XAPT Corp. continued to refuse to provide service module integration work.

Section 3.6 of the MSA provides that XAPT Corp. may subcontract services to subcontractors approved by Deere and that before disclosing any of Deere's confidential information to an approved subcontractor, XAPT Corp. was to require the subcontractor "to

execute a non-disclosure agreement in the form provided by Deere." *Id*. at 11 (quoting MSA § 3.6). XAPT Solutions and XAPT KFT were subcontractors approved by Deere to work on the DBS Project. In October or November of 2019, Deere learned that XAPT Corp. was using an additional subcontractor on the project. This subcontractor, which had not been approved by Deere, operated under the email domain @cosmoconsult.com. Deere notified XAPT Corp. that it considered this a breach of Section 3.6 of the MSA and asked XAPT Corp. to explain its relationship with Cosmo. XAPT Corp. responded that Cosmo was the same as approved subcontractor XAPT KFT, although the entity's ownership had changed. In response to a renewed request for an explanation from Deere, XAPT Corp. then stated that S.C. XAPT Solutions SRL, an approved subcontractor, had changed its name to Cosmo. Because XAPT Corp. continued to use Cosmo as a subcontractor without authorization, Deere removed access to all @cosmoconsult.com email addresses. However, XAPT Corp. continued to share Deere's confidential information with Cosmo employees.

As of January 2020, the DBS was not available in a single country. Deere terminated the Contracts on January 24, 2020. It then asked XAPT Corp. to comply with all of its post termination obligations, which includes the return of Deere's confidential information. As of the date this case was filed, XAPT Corp. had not returned any materials or documents to Deere.

In a March 9, 2020 email, XAPT Corp. demanded that Deere "either return or destroy all . . . XAPT [i]ntellectual [p]roperty in its possession" and "cease using or accessing" such property. *Id*. at 29 (quotation marks omitted). Deere believes that it already owns or has a fully pre-paid perpetual and irrevocable license in and to the intellectual property.

## II.     Procedural History

Deere brought this lawsuit on October 18, 2019, ECF No. 1, then filed an amended

complaint on October 23, 2019, ECF No. 5, to address deficiencies in its original jurisdictional

statement.  On December 12, 2019, the parties jointly asked to stay the case to allow them to

pursue mediation.  Joint Mot. Mediation 1–2, ECF No. 17.  After mediation failed, XAPT Corp.

filed a motion to dismiss the amended complaint, arguing that Deere had not complied with the

mandatory pre-suit dispute resolution procedure contained in Section 15.6.1 of the Master

Services Agreement ("Section 15.6.1") and therefore could not bring this lawsuit.  XAPT Corp.

First Mot. Dismiss 1–2, ECF No. 24.  Deere filed a response to the motion to dismiss, ECF No.

41, and, on the same day, a motion for leave to file the SAC, ECF No. 43, which added XAPT

KFT, XAPT Solutions, and Cosmo as Defendants.  XAPT Corp. filed a response opposing

Deere's motion for leave, arguing that the proposed SAC would be futile because Deere failed to

comply with the mutual dispute resolution procedures in Section 15.6.1, this Court lacked

personal jurisdiction over XAPT Solutions, and Deere had no viable theory of liability against

XAPT KFT, XAPT Solutions, and Cosmo.  XAPT Corp. Opp'n Pl.'s Mot. Leave File Second

Am. & First Suppl. Compl. 2–3, ECF No. 53.

On May 6, 2020, Magistrate Judge Jonathan E. Hawley granted Deere's motion.  May 6,

2020 Order, ECF No. 59.  XAPT filed an objection to Judge Hawley's order, making the same

argument with respect to the dispute resolution procedure.  Obj. 4–6, ECF No. 63.  Reviewing

for clear error, the Court affirmed Judge Hawley's ruling.  Sept. 24, 2020 Order 11, ECF No.

101.

In the SAC, the operative complaint, Deere brings one claim for breach of contract

against XAPT Corp. (Count I), two claims for breach of contract against all four Defendants

(Count II, Count III), one claim for fraudulent inducement against XAPT Corp. (Count IV), and one claim for conversion against all four Defendants (Count VIII). SAC 33–40, 46. Deere seeks the reformation of Amendment 1, declaratory relief, injunctive relief, specific performance from all four Defendants, an order of replevin, a finding that the four Defendants are alter ego organizations, and damages. *Id.* at 40–46, 47–59.

On September 9, 2020, Cosmo filed a motion to dismiss the SAC against it for lack of personal jurisdiction. Cosmo 12(b)(2) Mot. Dismiss 1. In response, Deere asks the Court to stay briefing on Cosmo's motion to allow it to conduct jurisdictional discovery. Deere Mot. Conduct Jurisdictional Disc. 1. On October 8, 2020, XAPT KFT filed a motion to dismiss for lack of personal jurisdiction. XAPT KFT 12(b)(2) Mot. Dismiss 1. XAPT Corp. filed a motion to dismiss the SAC or stay the case on October 15, 2020, XAPT Corp. Mot. Dismiss or Stay 1, simultaneously filing a motion for leave to file exhibits under seal, XAPT Corp. Mot. Seal Exs. 1. Cosmo and XAPT KFT filed a similar motion to dismiss or stay the next day. Cosmo & XAPT KFT Mot. Dismiss or Stay 1. On November 5, 2020, XAPT Solutions filed a motion to dismiss for lack of personal jurisdiction. XAPT Solutions 12(b)(2) Mot. Dismiss 1. After receiving permission from the Court, *see* Oct. 26, 2020 Text Order, Deere filed an omnibus response opposing these motions. Deere Omnibus Resp. 1, ECF No. 131. It also filed an accompanying motion to seal the exhibits. Deere Mot. Seal Exs. 1. On December 10, 2020, all four Defendants filed a motion for a status conference. Defs. Mot. Status Conference 1. They jointly filed a motion for leave to file replies to Deere's omnibus response brief on January 8, 2021. Defs. Mot. Leave File Replies 1.

## DISCUSSION

### I.     Motion for Leave to File Replies

In their motion for leave to file replies, Defendants argue that replies are necessary because Deere's omnibus response "include[s] new and unexpected issues that [D]efendants should address in the interest of completeness and for this Court to have all of the relevant information in order to address the pending motions" and "raises new factual issues to dispute the testimony offered to show lack of personal jurisdiction."  Defs. Mot. Leave File Replies 4–5. Deere responds that "[e]ach proposed 'reply' contains new arguments, new case law, spurious unfounded attacks on Deere declarants, a new request to convert the XAPT Defendants' Motion to Dismiss to that of Summary Judgment, and a rehash of their prior arguments" and that "[a]llowing such positions to be advanced now for the first time is unhelpful to the Court and prejudicial to Deere."  Deere Resp. Defs. Mot. Leave File Replies 1–2, ECF No. 161 (footnote omitted).

For all motions not for summary judgment, "[n]o reply to the response is permitted without leave of Court."  Civil LR 7.1(B)(3).  "Typically, reply briefs are permitted if the party opposing a motion has introduced new and unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion."  *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011). However, "the Court does not typically permit the moving party to file a reply in order to introduce new arguments or evidence that could have been included in the motion itself, or to rehash the arguments made in the motion."  *Id.*  A court may also permit a reply "in the interest of completeness."  *Zhan v. Hogan*, Case No. 4:18-cv-04126, 2018 WL 9877970, at *2 (C.D. Ill. Dec. 18, 2018).

7

The proposed reply briefs in large part merely rehash arguments already addressed in the parties' initial briefs or which could have been addressed, and where they raise new points or provide new evidence, it is in response to arguments by Deere upon which the Court does not rely to reach its conclusions. For example, Defendants argue they should be permitted to reply to Deere's argument that Deere complied with the mutual dispute resolution procedure contained in the MSA, which Deere supports with the McHugh Declaration. Defs. Mot. Leave File Replies 4–5. However, as discussed below, the Court does not reach the question of whether Deere actually complied with the dispute resolution process and therefore does not rely on those portions of the McHugh Declaration. *See infra* Section III(b). As for the motions to dismiss for lack of personal jurisdiction, Defendants argue that "Deere . . . raises new factual issues to dispute the testimony offered to show lack of personal jurisdiction" and that a reply is warranted so that the Court "ha[s] all facts before it to ensure that it can properly exercise its jurisdiction" over XAPT KFT, XAPT Solutions, and Cosmo. Defs. Mot. Leave File Replies 5. But in addressing personal jurisdiction at this stage, the Court must "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Thus, any response by Defendants to the facts provided by Deere would have no impact. For these reasons, the Court does not find it necessary to allow Defendants an opportunity to reply to these issues and does not find the proposed reply briefs helpful to its disposition of the pending motions. Defendants' motion for leave to file replies is denied.

## II.    Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

### a.  Legal Standard

A defendant may move to dismiss an action pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  While "[a] complaint need not include facts alleging personal jurisdiction," once a motion to dismiss has been made, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quotation marks omitted).  When the district court rules on such a motion "based on the submission of written materials, without the benefit of an evidentiary hearing . . . , the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Id.* (quotation marks omitted).  "[T]he party asserting jurisdiction is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983).  The Court must "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Tamburo*, 601 F.3d at 700.

"A federal district court sitting in diversity must apply the personal jurisdiction rules of the state in which it sits." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015). Illinois law provides that courts may exercise personal jurisdiction up to the limits of the federal Constitution.  *See* 735 ILCS 5/2-209(c) ("A court may . . . exercise jurisdiction on any . . . basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."); *see Kipp*, 783 F.3d at 697 (citing to this provision to support that "[t]he governing statute in Illinois permits its courts to exercise personal jurisdiction up to the limits of the Due Process Clause of the Fourteenth Amendment"); *Hyatt Int'l Co. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) (indicating that, "while . . . these two standards hypothetically might diverge in some

9

cases," in practice, "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction"). The Due Process Clause of the federal Constitution "authorizes personal jurisdiction over out-of-state defendants when the defendant has 'certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Kipp*, 783 F.3d at 697 (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

There are two types of personal jurisdiction—general and specific. *Id.* "General jurisdiction is all-purpose; it exists only when the [party's] affiliations with the State in which suit is brought are so constant and pervasive as to render it essentially at home in the forum State." *Id.* at 697–98 (alteration in original) (quotation marks omitted). Specific jurisdiction, meanwhile, is "case-specific; the claim must be linked to the activities or contacts with the forum." *Id.* at 698; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("Specific jurisdiction . . . depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." (second alteration in original) (quotation marks omitted)). "[T]he relationship must arise out of contacts that the defendant himself creates with the forum State," and the "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) (emphasis omitted) (quotation marks omitted). Courts find that the Due Process Clause's "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotation marks omitted). "In analyzing whether the defendant's contacts are sufficient

10

to establish specific jurisdiction, [courts] do not employ a mechanical or quantitative test." *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quotation marks omitted).

### b. Analysis

XAPT KFT, XAPT Solutions, and Cosmo have each filed a motion to dismiss for lack of personal jurisdiction. The Court will first address whether it has personal jurisdiction over XAPT KFT. Deere does not argue that general personal jurisdiction exists over any of these three Defendants, so the Court's analysis will focus exclusively on specific personal jurisdiction.

### i. XAPT KFT's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

Deere brings claims against XAPT KFT for breach of contract resulting from the failure to return confidential information and deliverables and for the tort of conversion and seeks injunctive relief, specific performance, and an order of replevin related to those claims.[3] SAC 36–38, 44–47. XAPT KFT moves to dismiss these claims against it, arguing that it lacks the minimum contacts necessary for this Court to exercise personal jurisdiction over it. XAPT KFT 12(b)(2) Mot. Dismiss 1. It asserts that it is a Hungarian business organization with its principal place of business in Budapest. Br. Supp. XAPT KFT 12(b)(2) Mot. Dismiss 2, ECF No. 109. While it does own the other XAPT entities, it states that it "observes all formalities to maintain its existence as a distinct corporate entity." *Id.* It affirms that it has never maintained a physical presence or owned or rented property in the United States; advertised or provided its products or services there; employed anyone residing there; or entered into any direct business dealings with customers from there, with the exception of Uptake, an Illinois entity to which XAPT KFT licenses its software in exchange for a licensing fee. *Id.* at 3. XAPT KFT admits it was an

---

[3] Deere also seeks a determination that the four Defendants are alter egos. SAC 47–48.

approved subcontractor on the DBS Project but states that it primarily communicated through XAPT Corp. *Id.*

Deere contends that specific personal jurisdiction exists in this case. *See* Deere Omnibus Resp. 39–40. In support, it asserts that XAPT KFT is an alter ego of the other XAPT entities and that XAPT Corp. has conceded that personal jurisdiction exists over it. *Id*. at 13–18. It also argues that "XAPT [KFT] itself had significant, regular direct contacts with Deere in Illinois throughout the course of this project." *Id*. at 18.

Regardless of XAPT KFT's alter ego status, the Court finds that XAPT KFT had sufficient minimum contacts with the state of Illinois for specific personal jurisdiction to exist here. By XAPT KFT's own admission, it was an approved subcontractor on the DBS Project, providing consulting, software development, and other services, and it developed the software according to Deere's specifications, which were conveyed to it by XAPT Corp. Br. Supp. XAPT KFT 12(b)(2) Mot. Dismiss 3. Its representatives participated in monthly and weekly video or audio meetings with representatives from Deere and other XAPT entities and, furthermore, would contact Deere representatives directly via email or telephone when they needed clarification or additional support with regard to system functionalities and capabilities. *Id*. at 4.

Deere provides additional evidence showing contacts between XAPT KFT and Illinois. Deere alleges in the SAC that after the DBS Project began and the gaps became apparent, it participated in "over 100 meetings" with XAPT representatives at Deere's office and that "[a]mong the XAPT representatives who traveled to Deere's office located in East Moline, Illinois were individuals who worked for XAPT [KFT]." SAC 18; *see Tamburo*, 601 F.3d at 700 (noting that in resolving a motion to dismiss for lack of personal jurisdiction, a court "take[s] as true all well-pleaded facts alleged in the complaint"). In an affidavit, Rodney Wayne Wittich,

12

Jr., Deere's Scrum Master, declares that Janos Szabo, one of XAPT KFT's project managers, traveled to Deere's office in East Moline, Illinois to participate in an introduction and planning meeting regarding the DBS Project in August 2019.  Wittich Decl. ¶¶ 1, 3, Deere Omnibus Resp. Ex. I, ECF No. 131-18; *see also* Jaffe Decl. ¶ 11, Deere Omnibus Resp. Ex. H, ECF No. 131–17; *see Tamburo*, 601 F.3d at 700 (stating that courts must "resolve any factual disputes in the affidavits in favor of the plaintiff").[4]  Deere further points to MSA § 3.6, which requires all approved subcontractors to sign Deere's Confidential Information Agreement, a document that acknowledges the approved subcontractor's relationship with and duties to Deere regarding confidential information and its obligation to deliver materials to Deere after termination, Deere Omnibus Resp. 19–20—and Deere alleges in the SAC that XAPT KFT agreed to the terms of the Confidential Information Agreement, SAC 37.[5]

In analyzing personal jurisdiction "[i]n contract suits, the focus is on whether the defendant purposeful[ly] availed itself of the privilege of conducting business in the forum; with tort actions, courts instead inquire whether the conduct giving rise to the claim was purposefully directed at the forum."  *United States v. Kellogg Brown & Root Servs., Inc.*, Case No. 4:12-cv-4110-SLD-JAG, 2014 WL 4948136, at *4 (C.D. Ill. Sept. 30, 2014).  "[A]n out-of-state party's contract with an in-state party is alone not enough to establish the requisite minimum contacts," but "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" can show "the purposeful availment that makes litigating in the forum state foreseeable to the defendant."  *RAR, Inc. v. Turner Diesel,*

---

[4] Wittich also declares that Csaba Palfalvi, another of XAPT KFT's project managers, flew to Chicago, Illinois to attend a product roadmap session regarding the DBS Project in October 2018; however, the session actually took place in Iowa.  Wittich Decl. ¶ 2.

[5] Deere also notes that in the suit XAPT KFT and XAPT Solutions filed against Deere in the Delaware Court of Chancery, XAPT KFT alleges that upon becoming an approved subcontractor, it signed the Confidential Information Agreement.  Deere Omnibus Resp. 19 (citing XAPT KFT & XAPT Solutions Del. Ch. Compl. 5–6, 11, Deere Omnibus Resp. Ex. J, ECF No. 131-19).

*Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (quotation marks omitted).  Here, the Court finds that XAPT KFT's contacts with Illinois were not "merely random, fortuitous, or attenuated," *see Citadel*, 536 F.3d at 761, but, rather, were sufficient to establish personal jurisdiction with respect to both the contract and tort claims.

XAPT KFT was aware that its work on the DBS Project was for Deere, which was headquartered in Illinois, and that the software it was developing would be used by Deere.  *See Tekway, Inc. v. Agarwal*, Case No. 19-cv-6867, 2020 WL 5946973, at *6, *9 (N.D. Ill. Oct. 7, 2020) (finding that personal jurisdiction existed over the defendant where she "knowingly and voluntarily entered into an employment relationship with an Illinois corporation headquartered in Illinois").  As a result of the project, XAPT KFT had an ongoing relationship with Deere, which involved frequent communication directly between representatives from XAPT KFT and Deere, in both individual and group meetings, to ensure XAPT KFT was fulfilling Deere's wishes.  *See Eisenmann Corp. v. Tek-More, Inc*., No. 03C4375, 2003 WL 22220125, at *3 (N.D. Ill. Sept. 25, 2003) ("Courts have often held that an ongoing relationship between the parties is especially significant in making a personal jurisdiction determination. . . .  Because of their on going [sic] relationship with Plaintiff, Defendant could reasonably anticipate suit in Illinois." (citations omitted)).  "Regular communication . . . may support a finding of personal jurisdiction over the defendant."  *Tekway*, 2020 WL 5946973, at *7 (noting that "[w]hile it's true that phone calls or emails between parties might not provide a basis for personal jurisdiction on their own, they do contribute to the larger mosaic of contacts with the forum state"); *cf. 1st Bank Card Servs. Inc. v. Patel*, Case No. 17-cv-8744, 2018 WL 3608545, at *4 (N.D. Ill. July 27, 2018) (finding no personal jurisdiction where "[t]here [wa]s no evidence of any payments, telephone calls, or communications being made to Illinois").

14

XAPT KFT argues because it was only a subcontractor and XAPT Corp. was the intermediary between it and Deere, it "never had any direct contractual relationship with Deere." Br. Supp. XAPT KFT 12(b)(2) Mot. Dismiss 9.  However, the specific personal jurisdiction analysis is not "mechanical or quantitative," *Citadel*, 536 F.3d at 761 (quotation marks omitted); the lack of a formal contract, where contacts are otherwise sufficient to establish jurisdiction, is not dispositive, *see id*. at 762, 764 (finding specific personal jurisdiction even though "the parties' transaction never closed"); *Dual-Temp of Ill. v. Hench Control Corp*., No. 09-cv-595, 2009 WL 4674105, at *8 (N.D. Ill. Dec. 4, 2009) ("[T]he existence of a contract is neither the *sine qua non* nor the silver bullet of the personal-jurisdiction analysis.").  Moreover, there *was* a direct contractual relationship between XAPT KFT and Deere: XAPT KFT signed the Confidential Information Agreement with Deere.  This contract created long-term, continuing obligations to Deere with regard to XAPT KFT's work on the DBS Project, and, critically, its obligations with regard to the return of confidential property after termination.  *See* SAC 36–38 (bringing claims for breach of contract against XAPT KFT for failure to return confidential information after termination); *id*. at 46 (bringing a conversion claim against XAPT KFT because it wrongfully assumed control, dominion, and/or ownership over confidential information).  Such ongoing obligations strongly support the existence of personal jurisdiction. *See Tekway*, 2020 WL 5946973, at *8 (finding that "[t]he non-competition clause [in a contract directly between the plaintiff and the defendant] . . . cemented long-term ties to a company based in Illinois" and noting that "[w]here the defendant 'has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there'" (quoting *Burger King*, 471 U.S. at 476)).

15

XAPT KFT asserts that "[n]o one from XAPT KFT was physically present in Illinois." Br. Supp. XAPT KFT 12(b)(2) Mot. Dismiss 10.  But Deere has declared that one or more XAPT KFT representatives traveled to East Moline, Illinois for discussions related to the DBS Project, *see* Wittich Decl. ¶ 3; *see also* SAC 18, statements the Court must accept as true at this juncture.  Regardless, "[s]o long as a commercial defendant's efforts are purposefully directed toward residents of the forum state, the fact that the defendant hasn't physically entered it does not defeat personal jurisdiction there."  *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 493 (7th Cir. 2014).

Finally, none of the cases cited by XAPT KFT convince the Court that XAPT KFT's contacts with Illinois were so minimal that personal jurisdiction does not exist.  XAPT KFT suggests that *Philos Technologies, Inc. v. Philos & D, Inc.*, 802 F.3d 905 (7th Cir. 2015), "involves an international relationship even more intimate than the one presented here" and that, because personal jurisdiction was found not to exist in that case, personal jurisdiction likewise does not exist here.  Br. Supp. XAPT 12(b)(2) Mot. Dismiss 8–10.  In that case, the agreement between the plaintiff and defendant "was in essence a contract for the provision of goods" produced in Illinois and shipped to Korea, and the only other contact between the defendant and Illinois was a couple of "mostly incidental" trips.  *Philos*, 802 F.3d at 914–15.  Likewise, in *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc*., 751 F.3d 796 (7th Cir. 2014), the court found that there was not personal jurisdiction merely because the defendant made a few sales in the forum state, which the plaintiff "provide[d] no evidence . . . had any connection with this litigation."  *Id*. at 801.  The discrete shipment of goods from one place to another is clearly distinguishable from an ongoing business relationship between two parties replete with frequent check-ins, meetings to exchange thoughts about the product being

developed, and continuing obligations with respect to the forum state party's confidential information. *See Citadel*, 536 F.3d at 763 (distinguishing cases in which a "contract was to complete a discrete task" and the purchaser "only needed to accept and pay for the" product from cases in which the relevant contract was "to provide a service," creating "continuing obligations").

The Court finds that this evidence cumulatively indicates that XAPT KFT purposefully availed itself of the privilege of conducting business in Illinois as to the breach of contract claims and purposefully directed its conduct at Illinois as to the tort claim. As such, XAPT KFT "should have reasonably anticipated being haled into court in Illinois" for a case based on the DBS Project. *See id.* at 764; *see Valley Air Serv., Inc. v. Southaire, Inc.*, No. 06 C 782, 2006 WL 3743130, at *3 (N.D. Ill. Dec. 15, 2006) ("The main factor in specific jurisdiction analysis is foreseeability—was it reasonably foreseeable to the defendant that its action could result in litigation in the state in question."). Accordingly, Deere has established a prima facie case of personal jurisdiction over XAPT KFT, and XAPT KFT's motion to dismiss pursuant to Rule 12(b)(2) is denied.

### ii. XAPT Solutions' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

Deere brings the same claims against XAPT Solutions as against XAPT KFT: breach of contract and conversion. SAC 36–38, 46. XAPT Solutions has filed a motion to dismiss for lack of personal jurisdiction, arguing that it lacks the minimum contacts necessary to permit this Court to exercise jurisdiction over it.[6] XAPT Solutions 12(b)(2) Mot. Dismiss 1. It asserts that it is an Australian business organization with its principal place of business in Brisbane, Australia

---

[6] XAPT Solutions' motion also states that "service has yet to be made on it through the Hague Convention." XAPT Solutions 12(b)(2) Mot. Dismiss 1. Because XAPT Solutions has not moved for dismissal for insufficient service of process pursuant to Rule 12(b)(5), the Court does not discuss any issues related to service.

and that it "observes all formalities required by Australian law to maintain its existence as a distinct corporate entity." Br. Supp. XAPT Solutions 12(b)(2) Mot. Dismiss 2, ECF No. 130. Furthermore, it notes, it has never maintained a physical presence in the United States nor owned or rented property there, advertised or sold its products in the United States, employed anyone located there, or entered into direct business dealings with any United States customers. *Id.* "Its only customers are its parent, XAPT KFT, and its sister, XAPT Corp." *Id.* With regard to the instant case, XAPT Solutions argues while "employees of [XAPT] Solutions were physically present in Illinois engaging in relations with Deere," they "did so while on leave from [XAPT] Solutions and under the employment of XAPT Corp." *Id.* at 6. It maintains that "[i]t was never party to any contract or even negotiations with Deere." *Id.* at 7.

Deere refutes the argument that XAPT Solutions had no relationship to Deere or the DBS Project with a citation to the MSA: Section 3.6 provides that "upon execution of [the MSA], XAPT [KFT] and XAPT Solutions . . . shall be deemed approved subcontractors, for providing Services pursuant to the terms of this Agreement." Deere Omnibus Resp. 18–19 (emphasis omitted) (quoting MSA § 3.6). In the SAC, Deere alleges that XAPT Solutions agreed to the terms of the Confidential Information Agreement, SAC 37.[7] Based on this evidence, the Court concludes that XAPT Solutions was an approved subcontractor for the DBS Project and that, through the confidentiality agreement, it had long-term, continuing obligations to Deere with regard to its confidential information of just the sort that other courts have found to support the exercise of personal jurisdiction. *See Burger King*, 471 U.S. at 476; *Tekway*, 2020 WL 5946973, at *8.

---

[7] Additionally, Deere points to the complaint filed by XAPT Solutions and XAPT KFT in the Delaware Court of Chancery, Deere Omnibus Resp. 19, in which they allege that "[p]ursuant to the mandates of Section 3.6 of the MSA, representatives of XAPT Solutions . . . executed the [Confidential Information Agreements]," XAPT KFT & XAPT Solutions Del. Ch. Compl. 5.

Moreover, Deere has provided evidence sufficient for the Court to find, at this stage, that the XAPT Solutions employees purported to be on leave of absence and working only for XAPT Corp. were simultaneously working for XAPT Solutions, which further supports that XAPT Solutions, through its employees, had numerous contacts with Deere in Illinois. XAPT Solutions asserts that Ralph Hunt, its Chief Executive Officer, "took a leave of absence" at the end of 2017 "to serve as Project Director for the [DBS] Project as an employee of XAPT Corp." and that "[d]uring that time, he resided in Moline, Illinois, and drew a salary from XAPT Corp. and not from [XAPT] Solutions." Br. Supp. XAPT Solutions 12(b)(2) Mot. Dismiss 3. He resigned from XAPT Corp. in December 2019 and "resumed employment with [XAPT] Solutions." *Id.* But Deere provides evidence that Hunt corresponded with Deere personnel via email throughout 2016 and 2017 while holding himself out to be acting on behalf of XAPT Solutions. *See* Jaffe Decl. ¶ 19 (declaring that Hunt's signature block in these emails listed his employer as XAPT Solutions). Deere also provides an affidavit establishing that Hunt "traveled to Deere's offices in East Moline, Illinois on at least eight occasions between February 10, 2016 and July 18, 2017" related to the DBS Project, Wittich Decl. ¶ 4—a time period during which XAPT Solutions admits he was working for them, Br. Supp. XAPT Solutions 12(b)(2) Mot. Dismiss 3.

XAPT Solutions points to another employee, Peter Yates, who it claims "took a leave of absence from [XAPT] Solutions to serve as XAPT Corp.'s Project Manager on the [DBS] Project, during which time he resided in Davenport, Iowa, across the river from Moline." *Id.* at 2–3. Deere provides evidence that Yates emailed Deere employees on several dates between October 14, 2017 and January 12, 2018, using a signature block that listed his employer as XAPT Solutions. Jaffe Decl. ¶¶ 20–21.

19

With regard to Gyozo Barci, another of its employees, XAPT Solutions admits that he "was present in Illinois once in late 2019" but states he was there "for an unknown reason." Br. Supp. XAPT Solutions 12(b)(2) Mot. Dismiss 2–3. Wittich declares that Barci "traveled to Deere's offices in East Moline, Illinois on June 16, 2019, for a 'skill assessment' related to the" DBS Project. Wittich Decl. ¶ 5. According to another declaration provided by Deere, XAPT Corp. had suggested Barci for the job of Solution Architect, and the assessment was to determine whether Barci had the necessary skills for the role. McHugh Decl. ¶ 21, Deere Omnibus Resp. Ex. A, ECF No. 131-1. Ultimately, Deere concluded that he did not, and Barci was not hired. *Id*.

Cumulatively, this evidence establishes that XAPT Solutions had repeated, purposeful contact with Illinois related to the DBS Project and continuing obligations with regard to the confidential information from which Deere's contract and tort claims against XAPT Solutions stem. *See Burger King*, 471 U.S. at 472. As such, the Court finds that Deere has made out a *prima facie* case of specific personal jurisdiction. *See Purdue*, 338 F.3d at 782. XAPT Solutions' motion to dismiss for lack of personal jurisdiction is therefore denied.

### iii. Cosmo's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

Deere also brings claims for breach of contract and conversion against Cosmo. SAC 36–38, 46. Cosmo requests that the Court dismiss it as a defendant, arguing that it is a Romanian business entity and lacks the minimum contacts necessary for the Court to exercise personal jurisdiction over it. Cosmo 12(b)(2) Mot. Dismiss 1–2. It asserts that it "never had any direct business relationship with Deere" and that "all of Cosmo's business dealings were with the co-defendant XAPT entities." Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 8–9, ECF No. 97. Deere counters that Cosmo's "contacts with Deere in Illinois and overall involvement on this project

20

were anything but trivial or attenuated" and requests an opportunity to conduct limited jurisdictional discovery to provide the Court with evidence regarding Cosmo's contacts with Illinois.  Mem. Supp. Deere Mot. Conduct Jurisdictional Disc. 12, ECF No. 100.

The contacts to which Cosmo itself admits in its briefing—and of which it provides evidence—establish the minimum contacts necessary for the Court to exercise personal jurisdiction over Cosmo, so the Court finds jurisdictional discovery unnecessary.[8]  Cosmo admits that it developed software for the DBS Project according to Deere's specifications between July 2018 and January 2020.  Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 3–5.  Eight Cosmo employees worked on the project.  *Id.* at 3.  Each "in their individual names more than once signed nondisclosure agreements originating from Deere."  *Id.* at 3–4.  "Aside from their individual work, the eight Cosmo employees participated in regular team meetings regarding the [DBS] Project" via online video conferencing with representatives from Deere, XAPT KFT, and XAPT Solutions.  *Id.* at 4.  At these meetings, the Cosmo team would demonstrate the programs it had developed, and the parties would discuss areas of improvement.  *Id.*  The Cosmo employees contacted Deere directly via email when they needed additional support or clarification regarding their assigned tasks.  *Id.*  Cosmo provides an affidavit from its General Manager and Administrator, Mihai Madussi, affirming these facts.  *See* Madussi Aff. ¶¶ 4, 18–20, 23–38, Br. Supp. Cosmo 12(b)(2) Mot. Dismiss Ex. A, ECF No. 97-1.

The Court concludes from this information that Cosmo has the minimum contacts necessary for this Court to exercise specific personal jurisdiction over it.  Although Deere considered Cosmo a non-approved subcontractor, *see* Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 4;

---

[8] "Where . . . the defendants submit evidence opposing the district court's exercise of personal jurisdiction, the plaintiffs must similarly submit affirmative evidence supporting the court's exercise of jurisdiction."  *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019).  Because Cosmo's evidence *supports* the Court's finding of personal jurisdiction, Deere need not submit such affirmative evidence.

SAC 26–27, Cosmo employees spent over a year developing software for the DBS Project, participating in meetings at which they would demonstrate the programs and receive feedback from Deere representatives and contacting Deere representatives directly to clarify that their actions were in line with Deere's expectations. This prolonged, involved relationship and frequent direct communication between the software developer—Cosmo—and the intended software recipient—Deere—support a finding of purposeful availment. *See Eisenmann*, 2003 WL 22220125, at *3; *Tekway*, 2020 WL 5946973, at *7. Cosmo emphasizes that XAPT KFT operated as an intermediary between Cosmo and Deere. *See* Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 3 ("Cosmo began providing consulting services to XAPT KFT related to the project that XAPT KFT was already undertaking for Deere . . . ."); *id*. ("Cosmo was to develop software features according to Deere's specifications as conveyed to it through XAPT KFT."); *id*. at 4 ("Cosmo invoiced all work on the [DBS] Project to XAPT KFT, and all payments towards the invoices sent by Cosmo for work on the [DBS] Project came from XAPT KFT."). But Cosmo clearly knew that the product it was developing was not for XAPT KFT but for Deere, headquartered in Illinois, and that it would be used there. It does not matter if, as Madussi asserts, "[n]one of the members of the Cosmo Team ever was physically present in Illinois at any time when Cosmo . . . performed work related to the [DBS] Project," Madussi Aff. ¶ 22; as long as Cosmo's efforts were "purposefully directed toward" Deere, the fact that its employees did not physically enter the state "does not defeat personal jurisdiction there." *See Greving*, 743 F.3d at 493.

Furthermore, the Cosmo employees working on the DBS Project signed nondisclosure agreements directly with Deere related to the DBS Project, creating continuing obligations to Deere related to the very claims Deere brings against Cosmo. *See* SAC 36–38, 46. Such

ongoing obligations further support a finding of personal jurisdiction.  *See Burger King*, 471 U.S. at 476; *Tekway*, 2020 WL 5946973, at *8.  Cosmo makes much of the fact that the employees signed "in their individual names," Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 3–4, but it is not clear whether Cosmo believes this negates the effect of these agreements on the personal jurisdiction analysis, and if so, why.  The individuals worked on the DBS Project in their roles as Cosmo employees, *see* Madussi Aff. ¶ 20, and the existence of the nondisclosure agreements strengthens the apparent ties between Cosmo, through its employees, and Deere.  (The Court also notes Cosmo as an entity was paid for the work its employees performed.  Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 4.).  As the personal jurisdiction analysis is not "mechanical or quantitative," *Citadel*, 536 F.3d at 761 (quotation marks omitted), personal jurisdiction may be found even absent a formal contract between Cosmo as an organization and Deere—especially where Cosmo's employees, acting in that capacity, agreed to carry out long-term obligations to Deere stemming from Cosmo's involvement in the DBS Project.  *See Dual-Temp*, 2009 WL 4674105, at *8.

This evidence, provided by Cosmo itself, shows sufficient contacts with Illinois for this Court to find that a *prima facie* case for specific personal jurisdiction exists.[9]  Cosmo's interactions with Illinois were more than "merely random, fortuitous, or attenuated," *Citadel*, 536 F.3d at 761—it chose to participate at length in the DBS Project, engaging directly with Deere in the process of creating, testing, and improving the software.  And Cosmo should have known that the consequences of any failure on its part to adequately develop the software or abide by the non-disclosure agreement would be felt in Illinois.  *See RAR*, 107 F.3d at 1277.  As the Court finds that Cosmo should have reasonably foreseen being haled into court in Illinois for disputes

---

[9] The Court rejects Cosmo's reliance on the cases also cited by XAPT KFT, Br. Supp. Cosmo 12(b)(2) Mot. Dismiss 7–10, for the same reasons.  *See supra* Section II(b)(i).

related to the DBS Project, *see id.*, Cosmo's motion to dismiss for lack of personal jurisdiction is denied.  Because the Court has found personal jurisdiction to exist over Cosmo, Deere's motion for jurisdictional discovery is moot.

### III.  Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1)[10]

XAPT Corp. asserts that Deere has failed to fulfill a condition precedent to suit: the mutual dispute resolution procedure set forth in Section 15.6.1 of the MSA.  XAPT Corp. Mot. Dismiss or Stay 7.  As a result, XAPT Corp. argues, this case must be dismissed under both Rule 12(b)(6) and Rule 12(b)(1).  *Id.* at 7–12.

#### a.  Legal Standards

"A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint."  *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017).  When resolving such a motion, the Court "accept[s] as true all well-pleaded factual allegations and draw[s] reasonable inferences in favor of the plaintiffs."  *Id.*  The court may look beyond the complaint's jurisdictional allegations and view other evidence submitted by the parties to determine whether subject matter jurisdiction exists.  *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008).  "[A] plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met."  *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014).

A defendant may also seek to dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim.  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  At the motion to dismiss stage, the key

---

[10] Because the arguments for dismissal under both Rule 12(b)(6) and Rule 12(b)(1) are related, the Court will address them at the same time.

inquiry is whether the complaint is "sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (noting that courts also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice"). While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc*., 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When resolving a Rule 12(b)(6) motion, "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013), and the court must also "draw all inferences in the light most favorable to the nonmoving party," *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

### b. Analysis

XAPT Corp. believes that the SAC should be dismissed under Rules 12(b)(1) and 12(b)(6) because of Deere's failure to comply with the mutual dispute resolution procedure appearing in Section 15.6.1 of the MSA. XAPT Corp. Mot. Dismiss or Stay 7–12. Looking first to Rule 12(b)(6), XAPT Corp. argues that "the failure to engage in a contractually-agreed dispute resolution process prior to litigation is grounds for dismissal of an action for failure to state a

claim" and points to various cases it asserts support its position. *Id*. at 7–11. XAPT Corp. additionally asserts that "[c]ourts have dismissed actions pursuant to Rule 12(b)(1) when a plaintiff fails to satisfy a condition precedent that was necessary to trigger the right to commence litigation," urging this Court to follow their example. *Id*. at 11–12. Deere counters that "district courts within the Seventh Circuit analyze the issue of whether failure to satisfy a condition precedent warrants dismissal under Rule 12(b)(6)—not 12(b)(1)" and that "[t]his Court already held that Deere has sufficiently pled compliance with pre-suit obligations in the SAC." Deere Omnibus Resp. 27, 28 (emphasis omitted).

There is no dispute that the MSA should be interpreted in accordance with Delaware law. *See id*. at 36 (acknowledging that "the agreements are interpreted under basic Delaware contract law"). But while the Court must look to state law to resolve substantive matters in this case, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), whether dismissal should be granted under the Federal Rules of Civil Procedure is a federal procedural matter, *see Sibbach v. Wilson & Co*., 312 U.S. 1, 9–10 (1941). Thus, while the Court will use Delaware law should it need to interpret any provision of the MSA, it will look to federal law in analyzing the procedural aspects of this dispute.

Courts in the Seventh Circuit evaluate motions to dismiss suits for breach of contract based on lack of compliance with pre-suit dispute resolution provisions under Rule 12(b)(6), looking to whether plaintiffs have adequately pleaded compliance. *See Redfield v. Cont'l Cas. Corp*., 818 F.2d 596, 610 (7th Cir. 1987) ("An essential allegation of a complaint based upon a breach of contract is that the plaintiff performed all contractual conditions required of him . . . . [P]leading the performance of conditions precedent is necessary to state a cause of action for breach of contract . . . ." (citations omitted)); *Retreat Props., LLC v. KA Designworks Inc*., No.

26

17 C 5608, 2018 WL 4339378, at *7 (N.D. Ill. Sept. 11, 2018) (reviewing the defendants'

argument that the plaintiff "failed to satisfy the provision in the parties' contract that require[d]

mediation as a condition precedent to filing suit . . . under the legal standard applicable to a

motion to dismiss pursuant to . . . [Rule] 12(b)(6)" and looking to the plaintiff's "allegations that

it ha[d] satisfied all conditions of the contract" to come to a conclusion (citations omitted));

*Kmart Corp. v. Footstar, Inc*., No. 09 C 3607, 2010 WL 1541296, at *4 (N.D. Ill. Apr. 14, 2010)

(evaluating, at the motion to dismiss stage, whether the plaintiff's "complaint [was] deficient

because it fail[ed] to plead facts that demonstrate[d the plaintiff] satisfied two notice conditions

precedent"). The question of whether the plaintiff "actually performed all possible conditions

precedent . . . [is a] factual issue[] not ripe for adjudication at the motion to dismiss stage." *My*

*Canary LLC v. Susieair, LLC*, No. 16 CV 4000, 2017 WL 622235, at *4, *5 (N.D. Ill. Feb. 15,

2017) (finding, in a breach of contract case, that the plaintiff's "allegations sufficiently allege

performance of conditions precedent"); *see Unilever U.S., Inc. v. Johnson Controls, Inc*., Case

No. 16-CV-01849, 2017 WL 622209, at *7 (N.D. Ill. Feb. 15, 2017) (noting that at the motion to

dismiss stage, courts look to pleading standards for conditions precedent and stating that with

regard to exhibits provided by the plaintiff "purportedly showing its efforts to negotiate

[pursuant to a possible condition precedent], . . . the court [could ]not consider them without

converting the . . . motion [before it] into one for summary judgment").

     Although XAPT Corp. argues that the Court must now determine whether Deere *actually*

complied with Section 15.6.1 of the MSA, none of the federal cases to which it cites[11] convince

---

[11] XAPT Corp. also cites to a Delaware Chancery Court opinion which it believes establishes that "[u]nder Delaware law . . . , the failure to engage in a contractually-agreed dispute resolution process prior to litigation is grounds for dismissal of an action for failure to state a claim." XAPT Corp. Mot. Dismiss or Stay 7 (citing *Fernstrom v. Trunzo*, C.A. No. 2017-0518-PWG, 2017 WL 6028871, at *2 (Del. Ch. Dec. 5, 2017)). As noted above, a state court's procedure for dismissal is not relevant to this federal action.

this Court that it should do so at this stage. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co*., 811 F.2d 326 (7th Cir. 1987), a Seventh Circuit case which XAPT Corp. argues supports the idea that "[i]f a legal action requires the occurrence of an event that has not yet occurred, the controversy is not ripe for adjudication," XAPT Corp. Mot. Dismiss or Stay 7–8, involves arguments at summary judgment, not at the motion to dismiss stage. *See DeValk*, 811 F.2d at 336–38. *Bailey v. Bicknell Mins., Inc*., 819 F.2d 690 (7th Cir. 1987), concerns the exhaustion of available contractual remedies as a precondition to suit under § 301 of the Labor Management Relations Act, 29 U.S.C. §§ 141–97, a federal statutory scheme which has no relevance to the instant diversity breach of contract suit. *See Bailey*, 819 F.2d at 691–92.

While XAPT Corp. cites to two non-Seventh Circuit district court cases in which the court dismissed the suit for failure to satisfy a condition precedent, XAPT Corp. Mot. Dismiss or Stay 10–11 (citing *Tattoo Art, Inc. v. Tat Int'l, LLC*, 711 F. Supp. 2d 645, 648, 652, 655 (E.D. Va. 2010) (dismissing the case without prejudice pursuant to Rule 12(b)(1) because the plaintiff "failed to satisfy the condition precedent necessary to trigger the right to initiate litigation"); *Trone Health Servs., Inc. v. Express Scripts Holding Co*., No. 4:16CV1250 RLW, 2017 WL 3412158, at *3 (E.D. Mo. Aug. 8, 2017) ("[T]he [c]ourt finds that dismissal without prejudice [pursuant to Rule 12(b)(6)] is warranted where the parties agreed to complete certain prerequisites prior to commencing litigation.")), in both of these cases, the plaintiffs admitted they did not comply with conditions precedent, *see Tattoo Art*, 711 F. Supp. 2d at 651 ("[The p]laintiff does not dispute that it failed to request mediation prior to commencing the instant lawsuit."); *Trone*, 2017 WL 3412158, at *2 ("[The d]efendants assert, and [the p]laintiffs do not dispute, that [the p]laintiffs did not comply with the provisions of [the dispute resolution section of the contract].").  Here, Deere asserts that it has fulfilled all conditions precedent.  Deere

Omnibus Resp. 31. Moreover, XAPT Corp. fails to explain why this Court should follow the example of the Eastern District of Virginia and the Eastern District of Missouri while ignoring the holdings of myriad cases from district courts within the Seventh Circuit.

Courts presented with evidence beyond the pleadings may, at their discretion, choose to convert a motion to dismiss to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); *Marques v. Fed. Rsrv. Bank of Chi*., 286 F.3d 1014, 1017 (7th Cir. 2002) ("A motion under Rule 12(b)(6) becomes a motion for summary judgment when the defendant attaches materials outside the complaint . . . and the court actually considers some or all of those materials." (quotation marks omitted)); *see also Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (noting that "[i]t was within [the] discretion" of the district court to choose "to handle the case as a straightforward motion to dismiss, rather than converting it to a motion under Rule 56"). The Court declines to do so here. Deere has stated that discovery is not complete, *see* Deere Omnibus Resp. 30, and the Court does not wish to resolve a motion for summary judgment when one party believes it has not yet obtained all of the information it needs. *See Juarez v. Sobie Builders, Inc*., No. 09 C 4671, 2012 WL 6051968, at *2 (N.D. Ill. Dec. 5, 2012) ("We decline to convert [the] defendants' motion into a summary judgment motion. [The p]laintiffs have not yet obtained all of the discovery that they need and had difficulty earlier in this proceeding obtaining discovery from the defendants. Moreover, discovery is not limited to the [issue at hand]. We will disregard the documents submitted by defendants and continue under Rule 12.").

For these reasons, the Court looks to the Rule 12(b)(6) standard and evaluates whether

Deere has adequately pleaded compliance with the mutual dispute resolution procedure in the

SAC, not whether the evidence presented shows actual compliance.  According to Deere, Section

15.6.1 of the MSA provides that

> The Parties agree to work together in good faith to resolve controversies, claims
> or disputes relating to this Master Agreement ("Dispute").  The respective Project
> Managers will first attempt to resolve the Dispute; however, if there is no
> resolution within ten (10) business days, either Party may then require that their
> next level of management meet within the next ten (10) business days to resolve
> the Dispute.  If these managers are unable to resolve the Dispute, then there may
> be one final escalation to designated leaders, who will meet within ten (10)
> business days to make one last attempt to resolve the Dispute.  Except for
> injunctive relief described below, the Parties agree to use this mutual dispute
> resolution process before pursuing any legal action against the other.  Each Party
> will provide the other with information and documentation to substantiate its
> position with respect to the Dispute.

Deere Omnibus Resp. 10 (emphases omitted).  And in the SAC, Deere alleges

> Despite Deere providing notice as required under the Contracts and following the
> parties' mutual dispute resolution process, including months of communications
> with the requisite Project Manager, "next level" management, and "designated
> leader" levels at XAPT, and a failed mediation "conducted by a mutually
> agreeable mediator in a mutually agreed location," XAPT has failed to cure the
> breaches as required pursuant to MSA §§ 10.12, 15.6.1, 15.6.2.

SAC 35.

Federal Rule of Civil Procedure 9(c) provides that "[i]n pleading conditions precedent, it

suffices to allege generally that all conditions precedent have occurred or been performed."  *Cf.*

*id*. ("But when denying that a condition precedent has occurred or been performed, a party must

do so with particularity.").  This Deere has clearly done.  *See* SAC 35 ("Despite Deere . . .

following the parties' mutual dispute resolution process . . . .").  Even if the more stringent

pleading standard set forth in *Twombly* and *Iqbal* were to apply, requiring facial plausibility, *see*

*Iqbal*, 556 U.S. at 678; *cf. Unilever*, 2017 WL 622209, at *7 (noting that "[b]ased on Rule 9(c),

courts in this district have held that the Rule 8 pleading standard enunciated in *Twombly* and *Iqbal* does not govern pleading compliance with conditions precedent" (citation omitted)), Deere's allegations suffice. *See* May 6, 2020 Order 5 ("[Deere's] allegation easily satisfies the motion to dismiss standard set forth in *Iqbal* and *Twombly*."); Sept. 24, 2020 Order 11 (holding that Magistrate Judge Hawley's finding was not clearly erroneous). Deere has adequately pleaded compliance with the mutual dispute resolution process, and the Court will accordingly not dismiss the SAC for failure to state a claim. XAPT Corp. spends much time in its brief presenting the facts it believes show Deere's failure to comply, but whether it actually has is not the question with which the Court is currently faced. The issue before the Court is whether Deere adequately alleges compliance with Section 15.6.1 of the MSA, and the Court finds that it does.

## IV. Motions to Stay or Dismiss Under the *Colorado River* Abstention Doctrine

In the alternative, joined by Cosmo and XAPT KFT, Br. Supp. Cosmo & XAPT KFT Mot. Dismiss or Stay 1, ECF No. 120, XAPT Corp. moves to stay the case pursuant to the *Colorado River* abstention doctrine, contending that a parallel proceeding is pending before the Delaware Court of Chancery and that this Court's abstention in favor of that proceeding is justified. XAPT Corp. Mot. Dismiss or Stay 12–22.[12] In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court established a very limited exception to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *id.* at 817–18, holding that "in exceptional cases, a federal court should stay a suit and await the outcome of parallel proceedings as a matter of 'wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation,'"

---

[12] Because XAPT KFT and Cosmo adopt XAPT Corp.'s *Colorado River* argument, Br. Supp. Cosmo & XAPT KFT Mot. Dismiss or Stay 1, the Court will cite to XAPT Corp.'s briefing for these three Defendants' arguments.

*Finova Cap. Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999) (quoting *Colorado River*, 424 U.S. at 817). The "task in [such] cases . . . is not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983) (emphases omitted) (quotation marks omitted).

To determine whether a stay or dismissal under *Colorado River* is appropriate, a district court must conduct a two-part analysis. *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014). "First, the court must determine whether the state and federal court actions are parallel." *Id.* If they are not parallel, then the *Colorado River* doctrine does not apply. *Id.* But if the court finds that they are parallel, it next "must decide whether abstention is proper by carefully weighing ten non-exclusive factors." *Id.* These factors are:

> (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal c[ase].

*Id.* "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16. "The district court is given the discretion to apply more significant weight and analysis to those factors that are most relevant to the case at hand." *Freed*, 756 F.3d at 1021.

32

Before proceeding to the *Colorado River* test, the Court notes one important circumstance that will bear greatly on its analysis: the relevant state court case,[13] currently proceeding before the Delaware Court of Chancery, has been stayed in favor of the federal suit. *See* Del. Ch. Oct. 11, 2021 Order 3, Joint Not. Ruling Ex. C, ECF No. 175-1. Should Defendants be granted their request—the stay or dismissal of this case—there would be no case actively proceeding before either court. Nevertheless, mindful that "to avoid reversal, a district court . . . must consider the factors listed in *Colorado River* and its progeny and determine whether in light of those factors exceptional circumstances exist warranting abstention," *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001), the Court will conduct a full *Colorado River* analysis. But that the Delaware state court case is now stayed will play a large role in this Court's evaluation. *See LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1556, 1559 (7th Cir. 1989) ("[T]he district court should consider any special factors counselling for or against the exercise of jurisdiction in the case before it." (quotation marks omitted)).

### a. Parallel Suits

"Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora." *Finova*, 180 F.3d at 898 (quotation marks omitted). While "[t]he cases need not be identical to fulfill the requirement of parallelism," there has to be "a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Freed*, 756 F.3d at 1018–19 (quotation marks omitted); *see DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020) ("Formal symmetry is unnecessary . . . ."). An

---

[13] Initially, two separate actions were proceeding before the Delaware Court of Chancery: *XAPT Corp. v. Deere & Co.*, C. A. No.: 2020-0252-JRS, and *XAPT Solutions & XAPT KFT v. Deere & Co*., C. A. No.: 2020-0787-JRS. *See* Del. Ch. Oct. 11, 2021 Order 1, Joint Not. Ruling Ex. C, ECF No. 175-1. The Delaware Court of Chancery consolidated these two cases on October 11, 2021, ordering that all future filings in the litigation be made in Case No. 2020-0252-JRS. *See id*. at 2.

important factor for a court to consider is "whether both cases would be resolved by examining largely the same evidence." *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 647 (7th Cir. 2011). "[T]he mere presence of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel," *AAR Int'l*, 250 F.3d at 518; "the parallel nature of the actions cannot be destroyed by simply tacking on a few more defendants," *Freed*, 756 F.3d at 1020 (alteration omitted) (quotation marks omitted). Nor "can it be dispelled by repackaging the same issue under different causes of action." *Id*. (quotation marks omitted). "[A]ny doubt regarding the parallel nature of the [state court] suit should be resolved in favor of exercising jurisdiction." *Id*. at 1019 (alterations in original) (quotation marks omitted).

XAPT Corp., XAPT KFT, and Cosmo assert that this suit and the Delaware suit are parallel because the Delaware suit involves substantially the same parties—Cosmo is not a party to the Delaware action[14]—and because both suits stem from "XAPT [Corp.'s] development of the DBS for Deere and the various contractual agreements between XAPT [Corp.] and Deere relating to that project," bring claims for breaches of those contracts, and seek to assert rights over the intellectual property resulting from the DBS Project. XAPT Corp. Mot. Dismiss or Stay 14–15; *see also id*. at 16 ("In sum, in both proceedings the parties are asking the court to construe the parties' contracts, determine who has breached, and declare and enjoin the parties' contractual obligations. Thus, complete relief regarding Deere and XAPT's competing claims can be afforded in either forum, rendering duplicative proceedings pointless and wasteful."). Deere argues that the suits are not parallel because although the claims raised in the Delaware case are essentially compulsory counterclaims in the instant case, case law does not show that

---

[14] Conversely, XAPT Solutions *is* a party to the Delaware action but does not join in its co-Defendants' motions here.

actions are parallel where claims raised in one case are compulsory counterclaims of claims raised in the other case.[15]  *See* Deere Omnibus Resp. 34.

Like the SAC filed in the instant case, XAPT Corp.'s complaint against Deere in the Delaware Court of Chancery seeks relief related to the DBS Project and the underlying Contracts.  The fact section of the complaint focuses on the negotiations between the parties, the Contracts that resulted, and the breakdown between the parties.  XAPT Corp. Del. Ch. Compl. 6–34, Shen Decl. Ex. 2, ECF No. 118-6 at 10–49.  XAPT Corp. brings various claims for breach of contract, including for the alleged misappropriation of intellectual property and confidential information, failure to make required payments, and failure to comply with the contractually required mutual dispute resolution process before filing this suit before the Court.  *Id.* at 35–37. It seeks preliminary and permanent injunctions "prohibiting Deere from using, accessing, transmitting, or disclosing XAPT[ Corp's] intellectual property," an order directing "Deere to return to XAPT [Corp.] all confidential information and property as required by the parties' contracts," an award of "damages for Deere's breaches of contract," and attorney's fees and costs.  *Id.* at 38.  In a complaint filed with the Delaware Court of Chancery on September 16, 2020, XAPT KFT and XAPT Solutions seek a declaratory judgment that liability in the action pending before this Court may not attach to them because they were not parties to the Contracts. *See* XAPT KFT & XAPT Solutions Del. Ch. Compl. 12, Deere Omnibus Resp. Ex. J, ECF No.

---

[15] Deere also argues that "by pleading the Delaware actions as they have—attaching the Illinois Complaint and alleging that the claims made in this case are 'baseless'—Defendants have actually conceded that the Illinois case must be decided before their dependent Delaware claims can proceed" and that "[o]therwise, if this Court were to dismiss under the abstention doctrine, Defendants' allegations incorporating the Illinois pleadings would indirectly be dismissed."  Deere Omnibus Resp. 34.  The Court does not see how this argument supports the conclusion that the cases are not parallel.

131-19.  The two Delaware cases were consolidated on October 11, 2021.  Del. Ch. Oct. 11, 2021 Order 2.[16]

The Court finds that the Illinois federal action and the consolidated Delaware state action are parallel for purposes of the *Colorado River* analysis.  The parties are identical, with the exception of the omission of Cosmo from the Delaware suit.  The evidence underlying both cases is the same: the Contracts, the negotiations between the parties, and the course of dealing related to the DBS system.  The cases would both resolve whether any party breached the Contracts and to whom the intellectual property belongs, as well as whether XAPT KFT and XAPT Solutions may be held liable for breaches of the Contracts despite not being parties to them.  Deere's compulsory counterclaim argument is unavailing—while the cases it cites find that a suit based on claims which would be compulsory counterclaims in another pending suit is not *necessarily* parallel to that other suit, they do not hold that such a suit *cannot* be considered parallel, provided that other criteria are met.  *See AAR Int'l*, 250 F.3d at 520–22 (noting that "the appellees point to no authority . . . suggesting that a federal action is parallel to a state or foreign action for *Colorado River* abstention purposes when the claim upon which the federal action is based is pleadable as a compulsory counterclaim in the other action" but distinguishing the case before it from cases with essentially the same parties and closely intertwined issues); *Scion Dwight Managing Member LLC v. Dwight Lofts Holdings, LLC*, No. 10 C 6118, 2011 WL 2020677, at *2–3 (N.D. Ill. May 24, 2011) (declining to find two suits parallel where an important issue in the federal suit was missing from the state suit and noting that even if that

---

[16] In granting the motion to consolidate, the court found that "the questions of fact are basically the same in both cases" and that "[i]t seems highly likely these two actions will involve the same witnesses, substantial overlaps in discovery, the same contracts, and substantially similar facts and questions of law."  Del. Ch. Telephonic Rulings Tr. 8:9–10, 15–18, Joint Not. Ruling Ex. A, ECF No. 174-1.

issue were a compulsory counterclaim in the state suit, this "would not make the two suits parallel").

As such, the Court finds that "substantially the same parties are litigating substantially the same issues" in the federal and state actions and that the suits are therefore parallel for purposes of the *Colorado River* test. *See Finova Cap.*, 180 F.3d at 898 (quotation marks omitted); *cf*. Del. Ch. Telephonic Rulings Tr. 14:22–15:5, Joint Not. Ruling Ex. A, ECF No. 174-1 (finding that "there [wa]s more than enough factual and legal overlap between the Delaware and Illinois actions" to justify a stay of the Delaware action pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970)).

### b. Exceptional Circumstances

Having found that the two suits are parallel, the Court next evaluates the ten non-exclusive factors to determine whether abstention would be appropriate. "[B]ecause of the presumption against abstention, absent or neutral factors weigh in favor of exercising jurisdiction." *Huon*, 657 F.3d at 648.

### 1. State Jurisdiction over Property

All parties agree that the state of Delaware has not assumed jurisdiction over any property relevant to this case. *See* XAPT Corp. Mot. Dismiss or Stay 17 (stating that "neither court has assumed in rem jurisdiction"); Deere Omnibus Resp. 34 (asserting that "Delaware has no contact or interest in the property that is at issue in the litigation"). This factor is thus neutral.

### 2. Inconvenience of the Federal Forum

The Court does not find that the federal forum is less convenient than the state forum for any party. Although XAPT Corp. argues that the Central District of Illinois "is a decidedly inconvenient forum for XAPT [Corp.], whose principal witnesses are located in Europe and

37

which has no physical presence in Illinois," it does not explain why Delaware—where it likewise has no physical presence—would be more convenient, apart from its own decision to file suit there. *See* XAPT Corp. Mot. Dismiss or Stay 17–18. Moreover, as Deere's offices are located in Illinois, "virtually all of Deere's employee and/or former employee witnesses are located in Illinois, and none are in Delaware," and "[n]one of the [D]efendants' documents or witnesses are located in Delaware, nor are they located within the subpoena power of the Delaware court." *See* Deere Omnibus Resp. 35. This factor therefore weighs against abstention.

### 3. Desirability of Avoiding Piecemeal Litigation

This factor "turn[s] on . . . concerns about the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority." *Freed*, 756 F.3d at 1022 (quotation marks omitted). Where two courts are overseeing substantially similar proceedings, the amount of judicial resources necessary to reach a resolution is "effectively duplicat[ed]," which "cause[s] wasteful litigation, hindering judicial economy." *Id*. (quotation marks omitted). Furthermore, this "risk[s] duplicative rulings." *Tyrer v. City of S. Beloit*, 456 F.3d 744, 756 (7th Cir. 2006).

As the two cases are substantially similar, *see supra* Section IV(a), this factor would ordinarily weigh in favor of abstention. But as the Delaware Court of Chancery has stayed the state case, awaiting this Court's resolution of the federal case, Del. Ch. Oct. 11, 2021 Order 3, only one case is actively proceeding. As such, piecemeal litigation is not a concern. This factor weighs against abstention.

### 4. Order in which Jurisdiction Was Obtained

Deere filed suit in this case on October 18, 2019, Compl., and XAPT Corp. was served on October 21, 2019, Executed Summons, ECF No. 8. XAPT Corp. filed its complaint in Delaware Court of Chancery on April 3, 2020. XAPT Corp. Del. Ch. Compl. 38. Thus, this

Court obtained jurisdiction over XAPT Corp. more than six months before the Delaware Court of Chancery did.

Deere initially sought leave to file an amended complaint adding XAPT KFT, XAPT Solutions, and Cosmo as Defendants on March 27, 2020, Mot. File SAC 1, and was granted such leave on May 6, 2020, May 6, 2020 Order 16. Cosmo asserts that it was not served until August 19, 2020, and XAPT KFT states it was not served until September 17, 2020. Br. Supp. Cosmo & XAPT KFT Mot. Dismiss or Stay 2. XAPT KFT and XAPT Solutions initiated their Delaware suit on September 16, 2020, XAPT KFT & XAPT Solutions Del. Ch. Compl. 14. Assuming Defendants' dates are correct, they were served in the federal action prior to or around the time of the filing of XAPT KFT and XAPT Solutions' state complaint. This does not indicate abstention is warranted—given the "presumption against abstention," *Huon*, 657 F.3d at 646— nor does it counteract that the SAC was filed months before XAPT KFT and XAPT Solutions' Delaware case was initiated.

This factor weighs strongly against abstention.

### 5. Source of Governing Law

This is a diversity suit alleging breach of contract, fraudulent inducement, and conversion. *See* SAC 3, 33–40, 46. As such, this Court will look to state law to resolve substantive legal issues. *Erie*, 304 U.S. at 78. Neither party disputes that the relevant contracts must be interpreted using Delaware law, *see* XAPT Corp. Mot. Dismiss or Stay 19–20; Deere Omnibus Resp. 36, and thus Delaware law governs for at least part of the suit. "[A] state court's expertise in applying its own law favors a *Colorado River* stay." *Freed*, 756 F.3d at 1022 (quotation marks omitted). This factor weighs in favor of abstention.

### 6. Adequacy of State-Court Action to Protect Deere's Rights

Absent a stay, the Court does not question that the Delaware state court action would have adequately protected Deere's rights. But given the stay put in place by the Delaware court, this factor weighs against abstention.

### 7. Relative Progress of State and Federal Proceedings

Both this suit and the suit before the Delaware court are at the motion to dismiss stage. *See* Del. Ch. Oct. 11, 2021 Order 3 (deferring ruling on arguments raised in Deere's motions to dismiss the Delaware complaints apart from the motion to stay in favor of the Illinois litigation). Thus, prior to the stay in the Delaware suit, both cases had progressed to roughly the same stage. *See Huon*, 657 F.3d at 648 ("The question whether the state litigation has reached an advanced stage turns not on the amount of discovery completed but on how far the state court has progressed toward a final resolution."). Now that the Delaware case is stayed until this Court reaches a resolution, it is evident that (absent a federal stay) the instant suit will continue to proceed while the Delaware suit will not. *See Moses H. Cone*, 460 U.S. at 21 (noting that "[t]his factor . . . is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand"). This factor thus weighs strongly against abstention.

### 8. Presence of Absence of Concurrent Jurisdiction

Concurrent jurisdiction exists here; thus, as both parties agree, this factor is neutral. *See* XAPT Corp. Mot. Dismiss or Stay 21 (stating that this factor would be neutral if the Court finds that personal jurisdiction exists over Cosmo); Deere Omnibus Resp. 38 (asserting that this factor is neutral but that Deere has filed a motion to dismiss the Delaware action for lack of subject matter jurisdiction); *see also* Del. Ch. Telephonic Rulings Tr. 10:6–9 (declining to rule on Deere's motion while the case is stayed).

### 9. Availability of Removal

This "factor intends to prevent a federal court from hearing claims that are closely related to state proceedings that cannot be removed." *Freed*, 756 F.3d at 1023. The Delaware case is not removable to Delaware federal court, which Deere appears to concede. *See* Deere Omnibus Resp. 38 (acknowledging that its "efforts to remove the Chancery Court case to Delaware federal court on the basis of a federal question were unsuccessful"). No federal question is apparent in the Delaware case, *see* XAPT Corp. Del. Ch. Compl. 35–37; XAPT KFT & XAPT Solutions Del. Ch. Compl. 12, and Deere is incorporated in Delaware, precluding diversity jurisdiction in that state, *see* SAC 3. Indeed, after Deere removed the case brought by XAPT Corp. on April 7, 2020, the United States Court for the District of Delaware granted XAPT Corp.'s motion to remand. Del. Aug. 17, 2020 Mem. Opinion 4, 8, Shen Decl. Ex. 6, ECF No. 118-6 at 145–155. This factor weighs in favor of abstention.

### 10. Vexatious or Contrived Nature of the Federal Claim

Finally, XAPT Corp., XAPT KFT, and Cosmo argue that Deere's suit in the Central District of Illinois is vexatious and contrived, suggesting that because Deere filed suit before fulfilling the mandatory dispute resolution requirements, the case is "premature" and "designed to impose an inconvenient forum on" Defendants. XAPT Corp. Mot. Dismiss or Stay 21–22. The Court disagrees. As discussed above, Deere has adequately alleged compliance with Section 15.6.1 of the MSA, *see supra* Section III(b), and there is no evidence before the Court that the federal suit is vexatious or contrived. This factor weighs against abstention.

### 11. Balancing of the Factors

Having weighed each of these factors, the Court finds that abstention would not be appropriate. Eight out of ten factors either weigh against abstention or are neutral (and thus also

weigh against abstention, *Huon*, 657 F.3d at 648), with the order of jurisdiction and the relative progress of the state and federal proceedings strongly weighing in favor of exercising jurisdiction. And while the source of the governing law and the unavailability of removal of the state action weigh in favor of abstention, these factors do not outweigh the factors weighing against abstention or overcome the strong presumption in favor of retaining jurisdiction— "federal courts determine difficult questions of state law every day," *Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1157 (7th Cir. 1990); *see AXA Corp. Sols. v. Underwriters Reinsurance Corp.*, 347 F.3d 272, 279 (7th Cir. 2003) ("The district court found that the fact that only state-law claims were at issue did not carry much weight, because it had jurisdiction in any event because of the diversity of the parties.").

The Court is not required to abstain from this breach of contract suit simply because a similar state court action is also pending; "[a]bstention requires more than the pendency of another lawsuit, because judicial economy will always be an issue when there is concurrent litigation." *Huon*, 657 F.3d at 649; *see also Carr*, 903 F.2d at 1157–58 (7th Cir. 1990) ("At bottom, Carr's argument for a *Colorado River* stay is founded on the proposition that this is a diversity suit in which at least two proceedings will be necessary to adjudicate all claims. That is not enough to tip a balance heavily weighted in favor of the exercise of federal jurisdiction."). Defendants might prefer to litigate in their chosen forum, but "[t]he *Colorado River* doctrine is not intended to give defendants the upper hand by stalling the federal case to wait for a favorable final judgment in the state proceeding that then can be used to bar the plaintiff's claims in federal court." *Huon*, 657 F.3d at 650. XAPT Corp., XAPT KFT, and Cosmo's motions to dismiss or stay this suit pursuant to the *Colorado River* doctrine are denied.

## V.      Motion to Set Status Conference

All four Defendants have filed a Motion to Set Status Conference, requesting that the Court hold a status conference with the parties to determine whether or not Deere complied with Section 15.6.1 of the MSA.  Defs. Mot. Status Conference 1–3.  They argue that this is "a central issue . . . that would effectively dispose of all of the claims against all of the Defendants."  *Id*. at 1.  At the status hearing, Defendants indicate they intend to "request a short evidentiary hearing" to address the "deceptions and untruths" of a declaration Deere has provided regarding its compliance with the mutual dispute resolution procedure.  *Id*. at 2–3.

As the Court made clear, *see supra* Section III(b), at this stage, Deere need only adequately plead compliance with Section 15.6.1, which, the Court found, it has.  The Court declined to convert XAPT Corp.'s motion to dismiss into a motion for summary judgment, *see id.*, and accordingly has not considered any of the evidence beyond the pleadings provided by either party with regard to this issue.  Defendants' requested status conference would not aid the Court in resolving any issue currently before it; rather, it would involve issues properly suited for the summary judgment stage.  The Motion to Set Status Conference is therefore denied.

## VI.      Motions to Seal

Both XAPT Corp. and Deere have filed motions to seal documents provided in support of their motion to dismiss or stay and omnibus response brief, respectively.  *See* XAPT Corp. Mot. Seal Exs. 1; Deere Mot. Seal Exs. 1.  The Court has not relied on any portion of the documents filed under seal in addressing the motions before it.  Accordingly, both motions for leave to file under seal are denied, and the sealed documents will remain sealed on the docket.  *See Bd. of Trs. of Univ. of Ill. v. Micron Tech., Inc*., 245 F. Supp. 3d 1036, 1043 (C.D. Ill. 2017) (denying a motion for leave to file under seal after noting the material portions of the relevant documents

43

were not relied upon). The Court will not consider them for any purpose. *See* Civil LR 5.10(A)(4).

## CONCLUSION

For the foregoing reasons, Defendant Cosmo Consult Business Solutions S.R.L.'s ("Cosmo") Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 96, is DENIED; Plaintiff Deere & Company's ("Deere") Motion to Conduct Jurisdictional Discovery Re: Cosmo Consult, ECF No. 99, is MOOT; Defendant XAPT KFT's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 108, is DENIED; Defendant XAPT Corporation's ("XAPT Corp.") Motion to Dismiss or Stay the Second Amended and First Supplemental Complaint, ECF No. 118, is DENIED; Cosmo and XAPT KFT's Motion to Dismiss or Stay Under Fed. R. Civ. P. 12(b)(1), (6), ECF No. 119, is DENIED; Defendant XAPT Solutions Pty Ltd's ("XAPT Solutions") Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2), ECF No. 129, is DENIED; XAPT Corp., XAPT KFT, XAPT Solutions, and Cosmo's Motion to Set Status Conference, ECF No. 145, is DENIED; and XAPT Corp., XAPT KFT, XAPT Solutions, and Cosmo's Motion for Leave to File Replies to Deere's Filing Set Forth in ECF # 131, ECF No. 155, is DENIED. XAPT Corp.'s Motion to File Exhibits Under Seal, ECF No. 116, and Deere's Motion to File Certain Omnibus Response Exhibits Under Seal, ECF No. 132, are DENIED, and the sealed documents will remain under seal on the docket.

Entered this 10th day of December, 2021.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE